UNITED STATES of America, Plaintiff,

v.

AMERICAN TELEPHONE AND TELE-
GRAPH COMPANY; Western Electric
Company, Inc.; and Bell Telephone Lab-
oratories, Inc., Defendants.

UNITED STATES of America, Plaintiff,

v.

WESTERN ELECTRIC COMPANY,
INC., and American Telephone and
Telegraph Company, Defendants.

UNITED STATES of America, Plaintiff,

v.

AMERICAN TELEPHONE AND
TELEGRAPH COMPANY, et
al., Defendants.

Civ. A. Nos. 74–1698, 82–0192.
Misc. No. 82–0025(PI).

United States District Court,
District of Columbia.

Aug. 11, 1982.

Modification of Final Judgment
Aug. 24, 1982.

Judgment Affirmed Feb. 28, 1983.
See 103 S.Ct. 1240.

Ronald G. Carr, James P. Denvir, U.S. Dept. of Justice, Antitrust Div., Washington, D.C., for plaintiff.

Howard J. Trienens, Sidley & Austin, Washington, D.C., for defendants.

The following were designated by Judge Greene to argue on behalf of interested persons at a non-evidentiary hearing regarding the proposed consent decree held on June 29–30, 1982:

Deborah A. Dupont, Nat. Ass'n of Regulatory Utility Com'rs, Washington, D.C., for Nat. Ass'n of Regulatory Utility Com'rs.

Carl D. Lawson, Albert Halprin, Federal Communications Com'n, Washington, D.C., for Federal Communications Com'n.

Jeffrey H. Olson, Citizens Communications Center, Georgetown University Law Center, Washington, D.C., for Black Citizens for a Fair Media, et al.

Philip J. Mause, Kadison, Pfaelzer, Woodard, Quinn & Rossi, Washington, D.C., for Public Service Com'n of Wis., et al.

Charles O. Monk, II, Baltimore, Md., for State of Maryland, et al.

J. Roger Wollenberg, Wilmer, Cutler & Pickering, Washington, D.C., for Southern Pacific Communications Corp.

Harry M. Shooshan, III, Shooshan & Jackson, Washington, D.C., for Geller, et al.

Malcolm R. Pfunder, Hamel, Park, McCabe & Saunders, Washington, D.C., for Tandy Corp.

John M. Dempsey, Lansing, Mich., for State of Michigan, et al.

Jack Shreve, Tallahassee, Fla., for Nat. Ass'n of State Utility Consumer Advocates.

William E. Willis, Sullivan & Cromwell, New York City, for Satellite Business Systems.

Stanley R. Jones, Jackson, Jones & Price, Tustin, Cal., for San/Bar, et al.

Herbert E. Marks, Wilkinson, Cragun & Barker, Washington, D.C., for Independent Data Communications Manufacturers.

Richard E. Wiley, Kirkland & Ellis, Washington, D.C., for American Newspaper Publishers Association, et al.

Jay E. Ricks, Hogan & Hartson, Washington, D.C., for Nat. Cable Television Ass'n, et al.

John E. Bryson, San Francisco, Cal., for California Public Utilities Commission, et al.

OPINION

HAROLD H. GREENE, District Judge.

These actions are before the Court[1] for a determination whether a consent decree proposed by the parties is in the "public interest"[2] and should therefore be entered as the Court's judgment. Over six hundred comments from interested persons, many of them objecting to various aspects of the proposal, have been received, and the Court has considered briefs submitted by the parties and others, and it has heard extensive oral argument. This opinion discusses the principal questions raised by these interested persons, and it embodies the Court's decision on the appropriateness of the proposed decree under the Tunney Act's public interest standard.

The opinion is divided into twelve parts. Part I relates the history of the litigation and the terms of the proposed decree. The next two sections contain analyses of two underlying legal issues—the standard of review to be applied by the Court under the Tunney Act (Part II) and the relationship between the decree and state regulation (Part III). The following section (Part IV) considers the question whether the divestiture of the local Operating Companies is in the public interest. Two sections discuss the removal of restrictions from AT & T— Section V as a general matter, and Section VI in the context of the provision of information and of electronic publishing services. The next two sections directly relate to the Operating Companies: Section VII considers whether the proposed limitations on Operating Company activities are in the public interest and Section VIII whether the decree makes adequate provision for access by intercity carriers to Operating Company networks. Part IX discusses the issues arising from the division of assets between AT & T and the Operating Companies; Part X considers special issues and provisions; and Part XI deals with problems of implementation and enforcement. Part XII contains the Court's summary and conclusion.

I

*Preliminary Considerations*

A. *History of the Litigation*

On January 14, 1949, the government filed an action in the District Court for the District of New Jersey against the Western Electric Company, Inc.[3] and the American Telephone and Telegraph Company, Inc. (Civil Action No. 17–49).[4] The complaint alleged that the defendants had monopolized and conspired to restrain trade in the manufacture, distribution, sale, and installation of telephones, telephone apparatus, equipment, materials, and supplies, in viola-

---

1. A number of prior opinions of this Court deal with earlier phases of these cases. The principal opinions in that category are reported at 461 F.Supp. 1314 (D.D.C.1978) and 524 F.Supp. 1336 (D.D.C.1981). Other opinions and memoranda may be found at 1982–1 Trade Cas. ¶ 64,623 (D.D.C.1982); 1982–1 Trade Cas. ¶ 64,-522 (D.D.C.1982); 1982–1 Trade Cas. ¶ 64,521 (D.D.C.1982); 1982–1 Trade Cas. ¶ 64,476 (D.D.C.1982); 1982–1 Trade Cas. ¶ 64,465 (D.D.C.1982); 524 F.Supp. 1381 (D.D.C.1981); 524 F.Supp. 1331 (D.D.C.1981); 1981–2 Trade Cas. ¶ 64,203 (D.D.C.1981); 516 F.Supp. 1237 (D.D.C.1981); 1981–1 Trade Cas. ¶ 63,987 (D.D.C.1981); 1981–1 Trade Cas. ¶ 63,938 (D.D.C.1981); 1980–81 Trade Cas. ¶ 63,711 (D.D.C.1981); 1980–81 Trade Cas. ¶ 63,705 (D.D.C.1981); 1980–81 Trade Cas. ¶ 63,696 (D.D.C.1980); 88 F.R.D. 47 (D.D.C.1980); 498 F.Supp. 353 (D.D.C.1980); 86 F.R.D. 603 (D.D.C.1980); 1980–1 Trade Cas. ¶ 63,244 (D.D.C.1980); 84 F.R.D. 350 (D.D.C.1979); 83 F.R.D. 323 (D.D.C.1979); and 86 F.R.D. 603 (D.D.C.1979).

2. Antitrust Procedures and Penalties Act, 15 U.S.C. §§ 16(b)–(h) (hereinafter referred to as the Tunney Act). See Part I(C) and II *infra*. The statute was sponsored by Senator Tunney of California.

3. Western Electric is the wholly owned subsidiary of AT & T that manufactures telecommunications equipment for AT & T's Long Lines Department and the Operating Companies. In addition, Western Electric provides telecommunications equipment and services to government agencies and, to a limited extent, the independent telephone companies.

4. After the transfer of the action to this Court (see pp. 141–143 *infra*) it was docketed here as Civil Action No. 82–0192. The 1949 lawsuit will generally be referred to herein as the "*Western Electric* action."

tion of sections 1, 2, and 3 of the Sherman Act, 15 U.S.C. §§ 1, 2, and 3.[5] The relief sought included the divestiture by AT & T of its stock ownership in Western Electric; termination of exclusive relationships between AT & T and Western Electric; divestiture by Western Electric of its fifty percent interest in Bell Telephone Laboratories;[6] separation of telephone manufacturing from the provision of telephone service; and the compulsory licensing of patents owned by AT & T on a non-discriminatory basis.

The court record reveals little activity in the case between the date of the filing of the complaint in 1949 and the entry of a consent decree in 1956. Except for the notation that an answer was filed in April, 1949, there are no record entries until the Fall of 1951 when the government filed and the court ordered compliance with several discovery requests. Following the discovery order, there is another two-year gap, and it is not until April 27, 1953, that another record entry is found. This entry indicates that defendants were given two additional months to complete their compliance with the government's 1951 discovery requests. The next reference is to the transcript of a hearing held on January 24, 1956, during which the consent decree was approved as being in the public interest. See pp. 137–138 *infra.*

The gaps in the court record are partly filled by a report of a committee of the United States House of Representatives[7] which conducted an intensive investigation of the circumstances surrounding the entry of the consent decree. Report of the Antitrust Subcommittee of the House Committee on the Judiciary on the Consent Decree Program of the Department of Justice, 86th Cong., 1st Sess., January 30, 1959 (Committee Print) [hereinafter Subcommittee Report]. That report reveals that the parties were quite active between the time of the filing of the government's discovery requests in 1951 and the signing of the consent decree in 1956.

As early as February 28, 1952, the president of Bell Laboratories, Dr. M.J. Kelly, met with Secretary of Defense Robert A. Lovett and other members of the Department of Defense to enlist their help in persuading the Justice Department to suspend prosecution of the action[8] until the end of the Korean War,[9] a suspension the Attorney General refused to grant.[10]

AT & T continued its attempts to end the litigation as soon as the Eisenhower Administration took office. Its executives and lawyers met with officials of the Departments of Defense and Justice throughout the first six months of 1953. Subcommittee Report at 51–52. These efforts culminated in a meeting on June 27, 1953, during a judicial conference held at White Sulphur

---

5. The action thus focused on the practices of defendants with respect to the telecommunications equipment industry.

6. Bell Telephone Laboratories, AT & T's telecommunications research and development facility, is a jointly owned subsidiary in which AT & T and Western Electric each owns 50 percent of the stock.

7. In a Tunney Act proceeding the Court is not limited by the rules of evidence but may take into account facts and other considerations from many different sources. See, *e.g.,* 15 U.S.C. § 16(f).

8. That same day, counsel for AT & T met with Attorney General J. Howard McGrath to make the same request, contending that the antitrust litigation was forcing key Bell Laboratories and Western Electric executives involved in important national defense projects to divert their attention from that work to preparations for trial. Subcommittee Report at 45–46.

9. Secretary of Defense Lovett requested the postponement in a letter to the Attorney General dated March 20, 1952. As stated by the Committee,

> [i]ndefinite postponement was requested by the Defense Department despite the fact that neither Mr. Lovett . . . nor anyone else in the Department had made an independent investigation to determine whether trial of the suit would actually impede the mobilization effort or whether Bell System personnel working on defense matters would actually be needed for preparation of trial of the case.

Subcommittee Report at 47.

10. The Defense Department continued to advocate this position for the remainder of 1952. Subcommittee Report at 51.

Springs, West Virginia, between T.B. Price, AT & T's general counsel, and Attorney General Herbert Brownell. According to a memorandum prepared by Price following this meeting, Attorney General Brownell said that he believed that "a way ought to be found to get rid of the case," and that AT & T "could readily find practices that [they] might agree to have enjoined with no real injury to [their] business." Memorandum of T.B. Price (March 3, 1954) *reprinted in* Subcommittee Report at 53–54.[11]

Shortly after this meeting, AT & T again urged the Defense Department "to intercede with the Justice Department to have the case settled on a basis that would not require divorcement of Western." Subcommittee Report at 55. To that end, Secretary of Defense Charles E. Wilson had a letter hand-carried to Attorney General

Brownell urging him to end the litigation without divesting Western Electric. The rationale stated for this position was that the severance of Western Electric would "effectively disintegrate the coordinated organization which is fundamental to the successful carrying forward of these critical defense projects," and would "be contrary to the vital interests of the Nation." Subcommittee Report at 56. The Wilson letter was actually prepared by AT & T.[12]

Periodic negotiations between AT & T and the government continued through 1954 and 1955, and by early December, 1955, the government and AT & T had reached an agreement.[13]

The consent decree which was the product of this process included neither the divestiture of Western Electric[14] nor any of

11. In reviewing Price's memorandum and other information concerning the meeting, the Antitrust Subcommittee characterized the government's position as follows:

> There can be little doubt that by his statements to Mr. Price at the White Sulphur Springs meeting, Attorney General Brownell manifested a willingness to have the Justice Department consider a token settlement and forego a decree consistent with the public interest—an attitude denoting partiality toward the defendants incompatible with the duties of his public office.

Subcommittee Report at 55.

12. During the summer of 1953, the Defense Department asked AT & T to prepare a memorandum explaining why that department should be interested in the termination of the antitrust litigation. AT & T obliged, and in early July, it provided the Defense Department with a memorandum which urged settlement of the suit without the divestiture of Western Electric. The memorandum was drafted in such a way as to make it appear that the Defense Department rather than AT & T had prepared it and, with two relatively minor exceptions, a letter identical to the memorandum was sent out the next week to the Attorney General over the signature of Secretary of Defense Wilson. Subcommittee Report at 55–56.

13. The Subcommittee described in some detail how it uncovered evidence of the negotiating process between AT & T, the Department of Defense, and the Department of Justice. It appears that, as part of an attempt to investigate the Justice Department's policies and practices regarding antitrust consent decrees, the Subcommittee requested the Attorney General make available the files relating to the

negotiation and signing of the Western Electric consent decree. Subcommittee Report at X–XI. The Department refused to produce the files, and it also declined to supply answers to specific questions. According to the Subcommittee (Report at XIII), "[t]he extent to which the Department of Justice went to withhold information from the committee in this investigation is unparalleled in the committee's experience." In its view, the Department's reluctance to provide information "resulted from a desire to cover up those facts which the Department considered to be embarrassing." Subcommittee Report at XIII, 42.

Because of the Department's failure to cooperate, the subcommittee acquired the necessary information from "correspondence, memorandums [sic], and other files from AT & T, Western Electric Co., the Department of Defense, and the Federal Communications Commission." Subcommittee Report at XIV. Moreover, with regard to the information provided by the Defense Department, the subcommittee criticized that agency for providing the very same material to AT & T, even though it contained internal memoranda and correspondence between the Secretary of Defense and the Attorney General. Indeed, it appears that the Defense Department gave AT & T all of this material the day after AT & T made an oral request for the documents. Subcommittee Report at 43.

14. The Justice Department contacted the Federal Communications Commission to determine the Commission's position on the issue of the divestiture of Western Electric, advising AT & T that it was doing so. AT & T immediately contacted each FCC Commissioner individually

the other structural relief originally requested by the government. Instead, an injunction was issued which precluded AT & T from engaging in any business other than the provision of common carrier communications services; precluded Western Electric from manufacturing equipment other than that used by the Bell System; and required the defendants to license their patents to all applicants upon the payment of appropriate royalties.

Despite the substantial differences between the structural relief requested in the government's 1949 complaint and the relief actually provided by the proposed decree, the District Court for the District of New

to convey the Bell System's position on the issue. Subcommittee Report at 71–73. Ultimately, the Commission informed the Justice Department that it did not regard the divestiture of Western Electric as essential.

15. *United States v. Western Electric Co.,* Civil Action No. 17–49, C.A. 82–0192, Transcript, January 24, 1956, at 5. The transcript of the hearing at which the decree was approved is six pages in length. The only substantive question the Court asked was whether the defendants would be required to provide patent licensees with "a general exposition of the know-how" in addition to providing them with manufacturing drawings, blueprints, and specifications. The government responded in the affirmative. This one assurance, however, appears to have been directly contrary to AT & T's interpretation of its obligation under the decree. During the House Subcommittee's hearings, Chairman Emanuel Celler criticized AT & T's counsel for failing to correct the court's misimpression, stating "[b]y your silence, it strikes me that there was something very much akin to deception on the court, because the court must have had an erroneous impression as to what the decree implied and he signed that decree." Hearings at 2258, *reprinted in* Subcommittee Report at 95–96.

16. The only exception prior to 1980 is a dispute that occurred in the late 1960s when a private communications system carrier sought leave to intervene as a party plaintiff to challenge New Jersey Bell's offering of what the proposed intervenor characterized as a private communication system to hospitals in violation of the decree. The District Court denied the motion to intervene (*United States v. Western Electric,* C.A. No. 17–49, C.A. No. 82–0192, Order, February 26, 1968) and the Supreme Court affirmed (*Clark Walter & Sons, Inc. v. United States,* 392 U.S. 659, 88 S.Ct. 2286, 20 L.Ed.2d 1348 (1968).

Jersey accepted the proposal on January 24, 1956, after a brief hearing, stating: [15]

I feel that I can unhesitatingly accept the recommendation of the Attorney General, that this judgment is in the public interest, and that it is a satisfactory adjustment of this very, very vexatious problem; and I am therefore happy to go along with the recommendation made by the Attorney General and shall forthwith sign this judgment.

After the decree was approved, no major developments occurred in the case for the next several years. Until 1981, the entries in the court record [16] concern primarily the patent licensing provisions.[17]

17. However, there was significant activity early in 1981. On May 2, 1980, the Federal Communications Commission had issued its so-called *Computer II* decision. *Second Computer Inquiry,* 77 F.C.C.2d 384 (1980), *on reconsideration,* 84 F.C.C.2d 50 (1980), *on further reconsideration,* 88 F.C.C.2d 512 (1981), *appeal pending sub nom. Computer & Communications Industry Ass'n. v. FCC, et al.,* D.C.Cir., 693 F.2d 198 (and Consolidated Cases). In that decision, the FCC in essence modified the interstate telecommunications regulatory structure in three ways: first, it distinguished between basic transmission services traditionally provided by common carriers and enhanced network services such as those used for computer data processing; second, it found that enhanced services and customer premises equipment should not be regulated as common carrier offerings; and third, it concluded that AT & T should be allowed under the Communications Act to offer such services and such equipment but only through a fully separate subsidiary. The Computer and Communications Industry Association and others have appealed the *Computer II* decision to the Court of Appeals for this Circuit, and that appeal is still pending.

In the wake of the FCC's decision, AT & T and Western Electric on March 4, 1981, filed a "Motion for Construction" of the consent decree in the *Western Electric* case with the District Court in New Jersey requesting a ruling that the decree would not bar AT & T from furnishing the services authorized by *Computer II.* The motion was opposed by the government, but on September 4, 1981, the Court granted AT & T's request. *United States v. Western Electric Co.,* 1981–2 Trade Cases ¶ 64,275 (D.N.J.1981). The government initially took an appeal to the Court of Appeals for the Third Circuit. On January 8, 1982, contemporaneously with the proposed settlement of these cases, the government and AT & T filed a

This was the status of the *Western Electric* suit when the government filed a separate antitrust action on November 20, 1974, in this Court against AT & T, Western Electric, and Bell Telephone Laboratories, Inc. (Civil Action No. 74–1698).[18] The complaint in the new action alleged monopolization by the defendants with respect to a broad variety of telecommunications services and equipment in violation of section 2 of the Sherman Act. In this lawsuit, the government initially sought the divestiture from AT & T of the Bell Operating Companies (hereinafter generally referred to as Operating Companies or BOCs)[19] as well as the divestiture and dissolution of Western Electric. While the action was pending, the government changed its relief requests several times asking, at various times or in various alternatives, for the divestiture from AT & T of Western Electric and portions of the Bell Laboratories.[20]

Pretrial discovery began shortly after the defendants filed their answer in February 1975, but during the next three-and-one-half years, that discovery was effectively halted for over thirty months.[21] On February 7, 1978, the Court referred the case to the United States Magistrate for preparation of a discovery schedule. Pursuant to that authority, the Magistrate issued two orders on April 27, 1978, but attempts at discovery led to various disagreements, and by the Summer of 1978, very little progress had been made.

On September 11, 1978, the Court issued an opinion which disposed of all then outstanding legal issues[22] and laid out the future course of the pretrial proceedings. See *United States v. AT & T, supra,* 461 F.Supp. 1314. In brief, the proceedings were designed to coordinate discovery and the definition of issues and move both forward simultaneously and with expedition. To these ends, the parties were directed to file over the following eighteen months four[23] successive Statements of Contentions and Proof which precisely and in detail defined their legal and factual conten-

joint motion to dismiss the appeal and to vacate as moot the District Court's order. The Third Circuit granted the motion on February 2, 1982, and on March 12, 1982, the District Court vacated its order. *United States v. Western Electric,* C.A. No. 17–49, C.A. No. 82–0192, Order, March 25, 1982.

**18.** The government has indicated that it brought the 1974 suit because in its judgment the 1956 consent decree was not adequate to prevent activities that unreasonably restrained competition in telecommunications equipment markets, and did not protect against antitrust violations in the intercity telecommunications field. Competitive Impact Statement at 5 filed by the Department of Justice February 10, 1982. This Court has held that the 1956 decree did not bar the filing of the 1974 action under the doctrine of *res judicata. United States v. AT & T, supra,* 524 F.Supp. at 1374. The 1974 lawsuit will generally be referred to herein as the "*AT & T* action."

**19.** The twenty-two Bell Operating Companies, most of which are wholly owned by AT & T, provide the means by which local telephone service is furnished. Bell customers presently also gain access to the network for both local and long distance telecommunications services through the Operating Companies. These Operating Companies are regulated by the various state public utility commissions. They may encompass several states, a single state, or only a single metropolitan area.

**20.** The divestiture of all or at least some of the Operating Companies remained one of the government's principal alternative relief requests. See Part IV *infra.*

**21.** Discovery was first stayed for almost twenty-two months while the Court resolved certain jurisdictional issues (Pretrial Order No. 1) and then again, this time by the Court of Appeals, while defendants appealed from an order this Court had issued on November 24, 1976, and then sought certiorari in the Supreme Court.

**22.** Three major legal issues were addressed, as follows: (1) whether the Court had jurisdiction over the action in light of the federal and state regulatory scheme; (2) whether all of the departments and agencies of the United States constituted the party plaintiff in this suit for purposes of discovery; and (3) whether the government could secure documents obtained in private antitrust suits against the defendants. Defendants unsuccessfully sought a writ of mandamus from the Court of Appeals and a writ of certiorari from the Supreme Court with respect to portions of the order.

**23.** Ultimately only three Statements of Contentions and Proof were filed because the fourth Statement became unnecessary.

tions.[24] Each Statement was to be more specific and more focused than the last, and discovery at each stage was to be limited to the issues raised in the most recent Statements.[25]

Upon the completion of this process, and pursuant to a further pretrial order, the parties began a structured stipulation process. This process was designed to produce, and it did produce, stipulations of all uncontested facts and contentions, a catalogue of all contentions that remained in dispute, and the proof (both testimonial and documentary) that would be used to support each contention. As a result of this process, the case was essentially divided into 82 segments or episodes,[26] many of which constituted major antitrust disputes in their own right. These episodes provided the structure for the presentation of evidence at trial.[27]

The trial itself began on January 15, 1981. At the request of the parties, the trial was recessed immediately after the opening statements[28] for a period of six weeks in order to afford an opportunity for a negotiated settlement.[29] When the settlement discussions proved fruitless, the trial resumed on March 4, 1981. The government presented close to one hundred witnesses, many thousands of documents, and additional thousands of stipulations. After the conclusion of the government's case, defendants moved to dismiss the action on a variety of grounds. That motion was denied on September 11, 1981. *United States v. AT & T, supra,* 524 F.Supp. 1336. Defendants commenced their case-in-chief on August 3, 1981, and during the next five months they presented approximately 250 witnesses[30] and tens of thousands of pages of documents.

Defendants were scheduled to complete the presentation of their evidence on about January 20, 1982, and it was expected that the government's rebuttal evidence would be presented between that date and February 10, 1982, when the trial would have ended. However, early in January, 1982, the Court was advised of the proposed decree described below.

### B. The Proposed Decree

On January 8, 1982, the parties to these two actions filed with the District Court for

---

**24.** Plaintiff's final Statement consisted of 1870 pages; defendants' third Statement of 2145 pages.

**25.** To oversee discovery disputes, the Court relied upon the Magistrate and upon two Special Masters appointed by the Court. In Pretrial Order No. 16, the Court also ordered the Special Masters to supervise the judicial notice procedure established by the Court. The purpose of this procedure was to determine what documents would be admitted into evidence, notwithstanding their appearance as hearsay documents, for the truth of the matters stated therein. See *United States v. AT & T, supra,* 498 F.Supp. 353. For both discovery and judicial notice disputes, the parties could appeal the rulings of the Magistrate and of the Special Masters to the Court.

**26.** The 82 episodes were recorded on over 4,200 computer printout pages. By the time of trial, some episodes and some contentions had been dismissed by the parties.

**27.** For a more detailed explanation of this process, see *United States v. AT & T, supra,* 88 F.R.D. 47.

**28.** Under 15 U.S.C. § 16(a), in any civil or criminal antitrust suit brought by the United States, a final judgment or decree to the effect that a defendant has violated the antitrust laws "shall be prima facie evidence against such defendant under said laws as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto: *Provided,* That this section shall not apply to consent judgments or decrees entered before any testimony has been taken."

**29.** Initially, only a two-week recess had been sought and granted, but this was subsequently extended to allow the incoming Reagan Administration and the new leadership of the Department of Justice to evaluate the pending settlement proposals. See this Court's Memorandum Orders of January 16 and January 30, 1981.

**30.** The trial record in this case contains over 24,000 transcript pages.

the District of New Jersey a stipulation consenting to the entry by the Court of the "Modification of Final Judgment" [31] filed therewith.[32] On the same day, they attempted to file in this Court a dismissal of the *AT & T* action pursuant to Rule 41(a)(1)(ii), Federal Rules of Civil Procedure. This Court ordered that the dismissal be lodged, not filed,[33] and, in accordance with that order and the provisions of the Tunney Act, the dismissal has not yet been effected. See note 52 *infra.*

In their settlement proposal, the parties proposed that the Court enter the following judgment with respect to both lawsuits.[34]

Section I of the proposed decree would provide for significant structural changes in AT & T. In essence, it would remove from the Bell System the function of supplying local telephone service by requiring AT & T to divest itself of the portions of its twenty-two Operating Companies which perform that function.

The geographic area for which these Operating Companies would provide local telephone service is defined in the proposed decree by a new unit, the "exchange area."

According to the Justice Department, an exchange area "will be large enough to comprehend contiguous areas having common social and economic characteristics but not so large as to defeat the intent of the decree to separate the provision of intercity services from the provision of local exchange service." [35] Court approval would be required for the inclusion in an exchange area of more than one standard metropolitan area or the territory of more than one State.[36]

The Operating Companies would provide telephone service from one point in an exchange area to other points in the same exchange area—"exchange telecommunications" [37]—and they would originate and terminate calls from one exchange area to another exchange area—"exchange access." [38] The interexchange portion of calls from one exchange area to another exchange area [39] would, however, be carried by AT & T and the other interexchange carriers, such as MCI and Southern Pacific Co.[40]

The proposed decree sets forth general principles governing the configuration of

31. The parties have designated their agreement as a "Modification of the Final Judgment." However, since the agreement encompasses far more than a modification of the 1956 judgment —and, indeed, as described at pp. 140–143 *infra,* deals primarily with the *AT & T* lawsuit—it would be misleading to refer to the agreement as a modification of the 1956 decree. The agreement will generally be referred to herein as the "proposed decree."

32. The parties also filed a Memorandum suggesting procedures for evaluating the settlement proposal and a motion to transfer the *Western Electric* action to this Court. In addition, they filed a joint motion to dismiss the appeals pending in the Court of Appeals for the Third Circuit from the District Court's decision concerning the 1956 consent decree. See note 15 *supra.*

33. Order filed January 8, 1982.

34. The description of the agreement in this part of the opinion is general in nature, and it takes account neither of various qualifications and exceptions in the agreement itself nor of the possible impact of a plan of reorganization which AT & T will be required to submit later.

These, more specific, issues are discussed in Parts IV through XI *infra.*

35. Competitive Impact Statement at 30. The exchange areas would generally not be smaller than the area served by a so-called Class Four Office. See pp. 199–200 *infra.*

36. AT & T would have the initial responsibility for drawing the boundaries of exchange areas, but its plan would have to be submitted to the Department of Justice for its approval.

37. Also referred to herein as intraexchange service. This may roughly be equated with local telephone service.

38. That is, they would provide local access to interexchange carriers.

39. In general, this is the service commonly known as long distance service.

40. The Operating Companies must also provide access services to link their subscribers with companies providing information services. This category of service, discussed in Part VI, *infra,* includes information retrieval, automatic telephone answering services, and electronic publishing.

the Operating Companies [41] which AT & T would be required to divest.[42] Under the proposal, AT & T would be required to endow the companies with sufficient personnel, facilities, systems, and rights to technical information to enable them to provide exchange telecommunications and exchange access services.[43] These personnel, systems, facilities, and rights would be drawn from the Operating Companies and from AT & T and its other affiliates. AT & T would be permitted to choose to transfer some of these elements directly to the new Operating Companies and to place others in a central entity jointly owned by them.

AT & T would be required by the proposed decree to formulate a plan of reorganization which complied with these principles, and to submit the plan to the Department of Justice within six months after the Court approved the decree. The plan would not be effective without the Department's approval.

After divestiture, the new Operating Companies would be required to provide, through a centralized body, a single point of contact for national security and emergency preparedness. They would be permitted to use this or a similar central body to provide those services, such as administration and engineering, which "can most efficiently be provided on a centralized basis." In addition, until September 1987, AT & T, West-

ern Electric, and Bell Laboratories would have to provide on a priority basis, all research, development, manufacturing, and other support services necessary to enable the Operating Companies to fulfill the requirements of the proposed decree.[44]

Section II of the proposed decree would complement these structural changes by various restrictions which are said to be designed (1) to prevent the divested Operating Companies from discriminating against AT & T's competitors, and (2) to avoid a recurrence of the type of discrimination and cross-subsidization that were the basis of the *AT & T* lawsuit.

The first group of these provisions would require the divested Operating Companies to provide services to interexchange carriers [45] equal in type, quality, and price to the services provided to AT & T and its affiliates.[46] In addition, they would be prohibited from discriminating between AT & T and other companies in their procurement activities, the establishment of technical standards, the dissemination of technical information, their use of Operating Company facilities and charges for such use, and their network planning. The Justice Department has indicated that it intends these provisions to be "construed broadly to encompass all potential areas of favoritism, subtle as well as overt, that may arise in relationship

---

**41.** The number of new Operating Companies is not specified in the settlement proposal. AT & T has indicated that its reorganization plan will provide for the amalgamation of the twenty-two Operating Companies into seven regional Operating Companies.

**42.** The proposal would permit AT & T to determine the method by which divestiture will take place.

**43.** If a facility had both intraexchange and interexchange functions, it could not be jointly owned by AT & T and the Operating Company, but it could be shared through a leasing or similar arrangement, provided the Operating Company retained control over the intraexchange portion of the facility.

**44.** The proposal would further bar AT & T from reacquiring the stock or assets of the divested Operating Companies, and it would require the cancellation of the License Contracts between AT & T and the Bell Operating Companies and

of the Standard Supply Contract between Western Electric and the Operating Companies.

**45.** The information access functions performed by the Operating Companies for providers of information services would also be subject to the equality requirement.

**46.** Appendix B of the proposed decree describes in greater detail the requirement imposed by Section II on the Operating Companies to provide equal access to all interexchange carriers. According to the Competitive Impact Statement, these provisions are based on the principles (1) that the Operating Companies should have latitude to provide access in the manner they deem most efficient, (2) that they must meet performance and pricing criteria to ensure equal access, and (3) that a transition period is necessary to phase in these equal access requirements. See Part VIII *infra*.

between the divested BOCs and AT & T and its competitors." Competitive Impact Statement at 26–27.

The second type of restriction imposed upon the Operating Companies is said to be intended to prevent them from engaging in any non-monopoly business so as to eliminate the possibility that they might use their control over exchange services to gain an improper advantage over competitors in such businesses. Thus, the Operating Companies would not be permitted (1) to manufacture or market telecommunications products and customer premises equipment; (2) to provide interexchange services, (3) to provide directory advertising such as the Yellow Pages; (4) to provide information services; and (5) to provide any other product or service is not a "natural monopoly service actually regulated by tariff." The Operating Companies would have the authority, however, to engage in what are called the "inherent" functions of procurement, engineering, marketing, and management.

Section III of the agreement provides that the decree would be binding on AT&T and the Operating Companies and their successors and that it would not constitute any evidence against, an admission by, or an estoppel against AT&T or the Operating Companies.[47]

The proposed decree contains a number of enforcement provisions. Section V would impose a requirement upon AT & T and the Operating Companies to inform their employees of their obligations under the decree. Section VI would grant to the Department of Justice the right of access to AT & T and the Operating Companies to inspect books, interview and depose employees, and demand reports.[48] Section VII provides that the Court would retain jurisdiction for the purpose of issuing orders to construe or carry out the decree, to modify it, to enforce compliance, and to punish violations, upon application of the parties and, after the reorganization, upon the application of an Operating Company.

Finally, the proposed decree would vacate the final judgment entered on January 24, 1956 in the *Western Electric* case, eliminating the restrictions imposed upon AT & T by that decree.

On January 11, 1982, Judge Vincent Biunno of the District Court for the District of New Jersey, following a brief hearing, approved the proposed decree, interpreting it solely as a modification of the 1956 consent judgment, but he did not, initially, agree to the parties' request for a transfer of the *Western Electric* action to this Court.

The following day, this Court held a hearing and continued in effect its order that the stipulation of dismissal which the parties had attempted to file in the *AT & T* action here be simply lodged pending completion of the appropriate public interest proceedings. Judge Biunno thereafter granted the parties' motion for a transfer of the *Western Electric* action, that action was docketed here under Civil Action No. 82–0192 and, by order of this Court, it was consolidated with the *AT & T* action. At the same time, this Court vacated the order of January 11, 1982, which had approved the proposed decree, and it ordered that procedures equivalent to those required by the Tunney Act be applied to the consolidated actions.[49]

### C. Procedures in Connection with the Settlement Proposal

The Tunney Act provides that a proposal for a consent judgment submitted by the United States in an action brought under the antitrust laws may not be entered by

---

47. The limitation of the proposed decree's *res judicata* effect is apparently designed to prevent its use in private antitrust litigation as *prima facie* evidence of AT & T's liability pursuant to section 5(a) of the Clayton Act, 15 U.S.C. § 16(a). See note 25 *supra* and Part X *infra*.

48. There are special exceptions for privileged materials, and information collected may not be disseminated except to the FCC and in connection with court proceedings to secure compliance.

49. Order filed January 21, 1982. See Part I(C) *infra*.

the Court without prior compliance with certain procedures. These procedures include a sixty-day comment period, publication of a competitive impact statement by the Department of Justice, a sixty-day period for the receipt of public comments, and a determination by the Court that "the entry of such judgment is in the public interest." [50] For the purpose of this public interest determination the Court may consider

(1) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or relief sought, anticipated effects of alternative remedies actually considered, and any other considerations bearing upon the adequacy of such judgment;

(2) the impact of entry of such judgment upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of public benefit, if any, to be derived from a determination of the issues at trial.

Procedurally the Court may

(1) take testimony of Government officials or experts or such other expert witnesses, upon motion of any party or participant or upon its own motion, as the court may deem appropriate;

(2) appoint a special master and such outside consultants or expert witnesses as the court may deem appropriate; and request and obtain the views, evaluations, or advice of any individual, group or agency of government with respect to any aspects of the proposed judgment or the effect of such judgment, in such manner as the court deems appropriate;

(3) authorize full or limited participation in proceedings before the court by interested persons or agencies, including appearance amicus curiae, intervention as a party pursuant to the Federal Rules of Civil Procedure, examination of witnesses or documentary materials, or participation in any other manner and extent which serves the public interest as the court may deem appropriate;

(4) review any comments including any objections filed with the United States under subsection (d) of this section concerning the proposed judgment and the responses of the United States to such comments and objections; and

(5) take such other action in the public interest as the court may deem appropriate.

15 U.S.C. § 16(e), (f).

When they filed the present proposed decree, the government and AT & T took the position that the Tunney Act did not apply because (1) their submission in the District Court for the District of New Jersey was merely a "modification" of an existing consent judgment, as distinguished from the entry of a judgment,[51] and (2) no consent judgment at all was filed in this Court, but only a dismissal of the pending action.[52]

---

**50.** 15 U.S.C. § 16(e).

**51.** The theory apparently was that the Tunney Act does not apply to such modifications of existing decrees because most modifications are relatively minor and of interest only to the parties involved. There appears to be conflicting law on this subject. Compare *United States v. Motor Vehicle Manufacturers Ass'n.,* 1981–2 Trade Cas. ¶ 64,370 (C.D.Cal.1981) with *United States v. Swift & Co.,* 1975–1 Trade Cas. ¶ 60,201 (N.D.Ill.1975). Nevertheless, the government recognizes that when a major modification of an existing decree is proposed, the Tunney Act procedures "help facilitate thorough exposition and review." See Letter of Assistant Attorney General William F. Baxter to the Court (January 18, 1982). To this end, Tunney Act or comparable procedures have been followed at least in cases where major modifications of decrees have been made. See note 67 *infra.*

**52.** As the Court has previously commented (see Tr. 25040–45), there appear to be at least two problems with the parties' "dismissal" theory. First, for all intents and purposes, the settlement would dispose primarily not of the 1949 action (which matured into a consent decree in 1956—26 years ago) but of the lawsuit that at the time of the settlement was actively in trial and had been in trial for ten months. Indeed, as the recitation in Part I(B) above demonstrates, the proposed decree deals almost exclusively with *AT & T*—rather than *Western Electric*—issues. These basic facts cannot be obscured by the facile expedient of filing the proposal in New Jersey and denominating it a modification of the New Jersey decree. Second, while Fed.R.Civ.P. 41(a)(1) provides

In the opinion of this Court, that reasoning may most charitably be described as disingenuous. If that reasoning were deemed acceptable, the parties here—and in similar antitrust actions—could subvert the clearly expressed will of Congress by a mere act of labelling. The Tunney Act was designed to expose to public scrutiny and to a judicial public interest determination the settlements negotiated between the Department of Justice and the various antitrust defendants. The instant agreement, whatever the label the parties chose to affix, settled two such lawsuits. That settlement, moreover, not only disposed of what is the largest and most complex antitrust action brought since the enactment of the Tunney Act but the settlement itself raises what may well be an unprecedented number of public interest questions of concern to a very large number of interested persons and organizations. See note 60 *infra.* As

the Court made clear from the very day the settlement was announced, it was not and is not prepared to allow this circumvention of the congressional purpose.[53]

In any event, the parties have now stated in various ways and before various forums (including before this Court) that, irrespective of their opinion of the technical applicability of the Tunney Act, they are willing[54] to have the Tunney Act procedures applied by this Court.[55] In view of those representations, it became unnecessary for the Court to pass specifically upon the technical applicability of the Act. Instead, the Court on January 21, 1982, entered an order which, pursuant to the parties' consent and the Court's general equitable powers,[56] applied the substantive Tunney Act procedures to the instant settlement.

Following the entry of that order, and in compliance therewith,[57] the parties filed the appropriate pleadings and reports.[58] After

that the parties may file a dismissal without leave of court under certain circumstances, this may not be done where a statute provides otherwise. In the view of the Court, the Tunney Act is just such a statute.

Contrary to the parties' continued protestations that, notwithstanding these considerations, the *AT & T* litigation has been dismissed because they allegedly filed a dismissal notice, the lawsuit is pending and very much alive. As noted, this Court issued an order on January 8, 1982, that the dismissal notice was only to be lodged, not filed. Whatever may be the proper rule in other circumstances—a matter on which the Court expresses no opinion—at least when the dismissal of a major antitrust action has substantive aspects or is so closely tied to a "modification" of another decree as is the case here, Tunney Act procedures apply. The parties have not appealed the Court's decisions which refused the filing of the dismissal notice and required application of Tunney Act procedures.

53. Tr. 25039–46. See also Part II(A) *infra.*

54. This willingness took especially concrete form after the Court expressed its views on the matter on January 12, 1982. See note 49 *supra;* letter from Assistant Attorney General Baxter to the Court (January 18, 1982); letter from Jim G. Kilpatrick, General Attorney for AT & T, to the Court (January 18, 1982).

55. The parties have also stated that in their view the early approval by the New Jersey District Court of the settlement proposal does

not preclude this Court from following the full Tunney Act procedures. See, *e.g.,* Response of the United States to Public Comments, May 20, 1982 [hereinafter Department of Justice Response to Comments]; Reply Comments of the American Telephone and Telegraph Co., May 21, 1982 [hereinafter AT & T Reply Comments]; letter of the parties to the Court dated January 18, 1982; statement of counsel for the parties, January 12, 1982 (Tr. 25,016–26).

56. See, *e.g., United States v. Swift & Co.,* 1975–1 Trade Cas. ¶ 60,201 (N.D.Ill.1975); *United States v. Ling-Temco-Vought, Inc.,* 315 F.Supp. 1301 (W.D.Pa.1970); *United States v. F. & M. Schaefer Brewing Co.,* 1968 Trade Cas. ¶ 72,345 (E.D.N.Y.1967); *United States v. Carter Products, Inc.,* 211 F.Supp. 144 (S.D.N.Y. 1962).

57. However, on February 5, 1982, in its filing disclosing its lobbying activities in conformity with section 11 of the Court's order of January 21, 1982, AT & T stated that it made that filing "[i]n conformance with § 2(g) of the Antitrust Procedures and Penalties Act ('APPA'), 15 U.S.C. § 16(g)" rather than under the Court's order. In its subsequent public advertisements, AT & T has likewise taken the position that the settlement proposal is being reviewed by this Court "as provided in the antitrust statutes." See, *e.g.,* AT & T Advertisement "A Plea for Orderly Policy-making," *Washington Post,* March 28, 1982, at A28.

58. On January 28, 1982, the government published the proposed decree in the Federal Regis-

the Court issued its January 21 order—and even prior to that time [59]—a considerable number of individuals and entities sought to intervene in these proceedings for various purposes.[60] On February 5, 1982, the Court issued an order denying all such requests.[61]

ter (47 Fed.Reg. 4166 (1982) ); on February 5, 1982, AT & T filed with the Court its description of the written and oral communications made on its behalf with any officers or employees of the United States regarding the proposed decree; on February 10, 1982, the government filed with the Court its Competitive Impact Statement, and on February 17, 1982 published it in the Federal Register (47 Fed.Reg. 7170 (1982) ); beginning on February 19, 1982, the government made copies of the proposed decree available at the twenty-six district courts specified in the Court's order of January 21, 1982; over a period of two weeks in February, 1982, the government published in newspapers of general circulation in these twenty-six districts, a summary of the proposed decree and the Competitive Impact Statement and directions for the submission of written public comments; from February 19 to April 20, 1982, there was a sixty-day public comment period; on April 21, April 23, April 27, and May 4, 1982, the government filed these written comments with the Court; as set forth in the Court's order of May 5, 1982 and in lieu of publishing all written comments, on May 10, 1982, the government issued a press release describing the procedures for obtaining copies of comments, and on May 17, 1982 published the press release in the Federal Register (47 Fed.Reg. 21214 (1982) ); on May 17, 1982, the government published in the Federal Register the name and address of everyone who filed a written comment and the number of pages in each comment (47 Fed.Reg. 21214 (1982) ); and on May 20, 1982, the government made available in each of the twenty-six districts referred to above a copy of every comment received.

**59.** Those motions to intervene filed prior to the Court's issuance of the January 21 order were denied in that order.

**60.** Among those who have sought to intervene, submitted procedural or substantive suggestions, or entered their appearances through counsel are the following: Alabama Public Service Commission; Alarm Industry Telecommunications Committee; State of California; Public Utilities Commission of California; Computers and Communications Industry Association; Continental Telephone Corporation; Independent Data Communications Manufacturers Association; Jack Faucett Associates, Inc.; the States of Maine, Alabama, Arizona, Colorado, Idaho, Illinois, Iowa, Louisiana, Maryland, Massachusetts, Minnesota, Montana, New Hampshire, New Mexico, North Dakota, Oregon, Rhode Island, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, and Wyo-

ming; MCI Communications Corp.; State of Michigan; Michigan Public Service Commission; State of Missouri; State of New York; New York State Consumer Protection Board; Public Service Commission of the State of New York; National Association of Regulatory Utility Commissioners; National Citizens Committee for Broadcasting; Public Citizen; Consumer Federation of America; Rep. Ron Mottl; Media Access Project; Consumer Utility Board of Wisconsin; State of New Mexico; North American Telephone Association; Southern Pacific Communications Corp.; Tandy Corp.; Tennessee Public Service Commission; U.S. Telephone Communications, Inc.; Public Service Commission of the District of Columbia; Public Advocate of New Jersey; Consumer Counsel of Ohio; National Association of State Consumer Advocates; General Communications, Inc.; Control Data Corp.; International Telephone and Telegraph Corp.; Federal Communications Commission; Illinois Commerce Commission; Citizens of the State of Florida; Office of Communications United Church of Christ; Public Service Commission of Wisconsin; General Telephone & Electronics Corp.

**61.** The order explained that under the Tunney Act, permission to intervene is strictly within the Court's discretion; that it was premature to allow anyone to intervene because the public comment procedures provided ample protection for all legitimate interests at that stage of the proceedings; that at the end of the public comment period, the Court would establish a framework to ensure effective participation in further proceedings and would again consider what status should be given to participants; and that the denials to intervene were without prejudice to appropriate applications to intervene made at some later date.

Subsequent requests for intervention were disposed of on a similar basis. On March 25, 1982, for example, the Court denied the petition to intervene of the Public Service Commission for the District of Columbia and it reiterated (1) that there is no absolute right to intervene in these proceedings, and (2) that for the reasons stated in the February 5, 1982 order, no useful purpose would be served by allowing permissive intervention at this stage. Following the entry of that order, the Commission petitioned the United States Court of Appeals for a writ of mandamus directing this Court to permit it to intervene. In an order issued April 8, 1982, this Court denied a motion for a stay of all proceedings pending the appellate review, finding that none of the elements required for the granting of such relief had been satisfied. On

The Court also received a considerable number of comments from individual citizens. All such comments were filed in the Public Interest Docket,[62] and duplicates were turned over to the Department of Justice for its response in accordance with paragraph 8 of the January 21, 1982 order.[63]

During the months of April and May, 1982, the Department of Justice filed with the Court the comments it had received during the preceding sixty days, and on May 20, 1982, it filed its response to those comments.[64]

On May 25, 1982, the Court issued a Memorandum governing further proceedings. The Memorandum identified a number of key issues that were raised by the comments and the responses, and it invited the parties and the various interested persons to brief these issues in a form more

June 1, 1982, the Court of Appeals denied the petition for a writ of mandamus, granted AT & T's motion to dismiss, and denied as moot the Commission's motion for a stay of proceedings, its motion for oral argument, and its motion to expedite appeal. In an accompanying Memorandum, the Court of Appeals stated "[w]e conclude that the District Court was correct in denying intervention of right at this stage of the proceedings." *United States v. AT & T,* C.A. No. 82–1321, Order and Memorandum (D.C.Cir. June 1, 1982).

Petitions to intervene filed by other participants were denied in orders issued April 14, May 5, and June 4, 1982. In addition, on August 2, 1982, the Court of Appeals granted the motion of the State of Michigan to dismiss voluntarily its appeal of this Court's denial of its motion to intervene. *United States v. AT & T,* No. 82–1389 (D.C.Cir. Aug. 2, 1982). However, in an order issued May 25, 1982, which established further procedures to focus and sharpen the various issues raised during the public comment period, the Court invited all interested persons to apply for intervenor or amicus curiae status to the extent that they believed and could demonstrate that such status was necessary and appropriate to protect their particular interests. For subsequent developments regarding intervention, see Part XI *infra.*

**62.** In its February 5, 1982 order, the Court established a separate docket, Misc. No. 82–0025 (PI), for the filing of all documents relating to the public interest proceedings. The documents in this file have been treated as part of the record and have been utilized by the Court in considering the various issues raised

suitable to judicial adjudication than the necessarily somewhat diffuse comments. A hearing was held on June 29 and 30, 1982, at which time the issues were further elucidated and refined.[65] The Court's substantive conclusions based upon the comments, responses, briefs, oral arguments, and the entire record herein, are discussed below.

## II

### *Power of the Court in this Public Interest Proceeding*

Under the Tunney Act, the Court may approve the decree proposed by the parties only if it first determines that such approval is "in the public interest." [66] Before discussing the substantive provisions of the proposed decree, it is appropriate to set out the standards which will guide the Court's public interest review.[67]

in the public interest proceedings. For this docket, normal filing rules were waived to permit maximum participation by individual citizens as well as by persons and organizations represented by counsel.

**63.** On July 27, 1982, the chairman of the Subcommittee on Telecommunications, Consumer Protection, and Finance of the House Committee on Energy and Commerce, and four of his colleagues, forwarded to the Court a letter with a number of recommendations and copies of the subcommittee's hearings on H.R. 5158, a bill to amend the Telecommunications Act of 1934. Copies of the letter were served on counsel for both parties; the Court ordered a copy placed in the court jacket; and it has considered these views pursuant to subsection (f)(2) of the Tunney Act.

**64.** The next day, pursuant to leave of Court, AT & T filed its own reply to the comments.

**65.** Twenty counsel from eighteen organizations presented oral argument during this two-day hearing.

**66.** 15 U.S.C. § 16(e). While the Court has not held that the Tunney Act applies of its own force in this case, it is following the requirements of the statute in these proceedings. See pp. 144–145 *supra.*

**67.** The standards are the same whether the judgment is regarded as "new" or as a modification of the 1956 decree in the *Western Electric* action. See *United States v. Motor Vehicle Manufacturers Ass'n,* 1981–2 Trade Cas. ¶ 64,-

## A. *Purpose of the Tunney Act*

In enacting the Tunney Act, Congress sought to ensure that the Justice Department's use of consent decrees in antitrust cases would fully promote the goals of the antitrust laws and foster public confidence in their fair enforcement.[68] The legislators found that prior practice, which gave the Department almost total control of the consent decree process, with only minimal judicial oversight, failed to accomplish these ends.

The legislative history shows that Congress was particularly concerned that the "excessive secrecy" of the consent decree process deprived the public of the opportunity to scrutinize and comment upon pro-posed decrees, thereby undermining confidence in the legal system.[69] In addition, the legislators found that consent decrees often failed to provide appropriate relief, either because of miscalculations by the Justice Department[70] or because of the "great influence and economic power" wielded by antitrust violators.[71] The history, indeed, contains references to a number of antitrust settlements deemed "blatantly inequitable and improper" on these bases.[72]

To remedy these problems, Congress imposed two major changes in the consent decree process. First, it reduced secrecy by ordering disclosure by the Justice Department of the rationale and the terms of proposed consent decrees and by mandating

370 (C.D.Cal.1981) (applying Tunney Act); *United States v. General Electric Co.,* 1977–2 Trade Cas. ¶ 61,659 (E.D.Pa.1977) (applying public interest test); *United States v. Swift & Co.,* 1975–1 Trade Cas. ¶ 60,201 (N.D.Ill.1975) (applying public interest test). Courts have applied a stricter standard of review only when modifications of existing decrees are contested by one of the parties. See *United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932); Note, *Construction and Modification of Antitrust Decrees,* 77 Colum.L.Rev. 296, 304 (1977).

**68.** The importance of consent decrees as an antitrust enforcement tool—as evidenced by the fact that they were entered in approximately 80 percent of the government's cases at the time the Tunney Act was passed—was the source of much of the legislators' concern. See H.R.Rep. No. 93–1463, 93d Cong., 2d Sess. 6 (1974), U.S.Code Cong. & Admin.News 1974, p. 6535; 119 Cong.Rec. 3455 (1973) (Remarks of Sen. Gurney).

**69.** 119 Cong.Rec. 24598 (1973) (Remarks of Sen. Tunney). See also 120 Cong.Rec. 36343 (1974) (Remarks of Rep. Mezvinsky); 120 Cong.Rec. 36343–44 (1974) (Remarks of Rep. Jordan).

**70.** Senator Tunney stated:
Regardless of the ability and negotiating skill of the Government's attorneys, they are neither omniscient nor infallible. The increasing expertise of so-called public interest advocates and for that matter the more immediate concern of a defendant's competitors, employees, or antitrust victims may well serve to provide additional data, analysis, or alternatives which would improve the outcome. 119 Cong.Rec. 3452 (1973). Senator Tunney further suggested that a lack of resources fur-ther hampered the Justice Department's enforcement efforts (119 Cong.Rec. 24600 (1973) ) and that the Department sometimes simply did not insist upon sufficient remedial action by the defendant. 119 Cong.Rec. 24598 (1973).

**71.** S.Rep. No. 93–298, 93d Cong., 1st Sess. 5 (1973); H.R.Rep. No. 93–1463, *supra* at 6, U.S. Code Cong. & Admin.News 1974, p. 6537. See also 120 Cong.Rec. 36341 (1974) (Remarks of Rep. McClory).

**72.** 119 Cong.Rec. 24598 (1973) (Remarks of Sen. Tunney). References were made, among others, to *Cascade Natural Gas Corp. v. El Paso Natural Gas Corp.,* 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967), where the Supreme Court found that the Department of Justice had consented to a decree which completely failed to alleviate the conditions found to violate the antitrust laws; to the 1956 decree in the *Western Electric* action (see Part I *supra* ); and to the questionable circumstances surrounding the consent decrees entered in 1971 in cases involving the International Telephone and Telegraph Corp. (see *The ITT Dividend: Reform of Department of Justice Consent Decree Procedures,* 73 Colum.L.Rev. 594, 603–06 (1973) ). 120 Cong.Rec. 36342–43 (1974) (Remarks of Rep. Holtzman); 120 Cong.Rec. 36345 (1974) (Remarks of Rep. Gunter); *Antitrust Procedures and Penalties Act: Hearings on S. 782 and S. 1088 Before the Subcomm. on Antitrust and Monopoly of the Senate Comm. on the Judiciary,* 93d Cong., 1st Sess. 76, 120, 135–36, 142–43, 147, 163–64, 181 (1973) [hereinafter cited as Senate Hearings]; *Consent Decree Bills: Hearings on H.R. 9203, H.R. 9947, and S. 782 Before the Subcomm. on Monopolies and Commercial Law of the House Comm. on the Judiciary,* 93d Cong., 1st Sess. 162–68 (1973).

an opportunity for public comment.[73] Second, it sought to eliminate " 'judicial rubber stamping' of proposals submitted to the courts by the Department," by requiring an explicit judicial determination in every case that the proposed decree was in the public interest.[74] It is clear that Congress wanted the courts to act as an independent check upon the terms of decrees negotiated by the Department of Justice,[75] and this Court will review the instant settlement in that spirit.[76]

### B. *Factors to be Considered*

■ Although the statute is explicit as to the Court's obligation to make a public interest determination, it provides relatively little guidance regarding the meaning of "public interest" in this context.[77] What is clear is that, whatever other factors a court may take into account, it must begin by defining the public interest in accordance with the antitrust laws. S.Rep. No. 93–298, *supra,* at 3; H.R.Rep. No. 93–1463, *supra,* at 11–12. It is therefore to the basic purposes of the antitrust laws that we must first turn.

The Supreme Court has repeatedly held that, in enacting the Sherman Act, Congress sought to "preserv[e] free and unfettered competition as the rule of trade." *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958). See also *National Society of Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978); *United States v. Crescent Amusement Co.,* 323 U.S. 173, 187, 65 S.Ct. 254, 261, 89 L.Ed. 160 (1944). Competition has not been endorsed by the Congress and the courts as a purely academic matter. The need to safeguard free competition is a direct result of the fundamental premise of our economic system that

> unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time provid-

**73.** 15 U.S.C. §§ 16(b)–(d), (g). These procedures have been fully applied in this case. See pp. 145–147, *supra.*

**74.** H.R.Rep. No. 93–1463, *supra* at 8, U.S.Code Cong. & Admin.News 1974, p. 6538. See also 120 Cong.Rec. 36344 (1974) (Remarks of Rep. Jordan); 119 Cong.Rec. 3452 (1973) (Remarks of Sen. Tunney). Thus, Congress rejected case law to the effect that courts should not "assess the wisdom of the Government's judgment in negotiating and accepting [a] consent decree." *Sam Fox Publishing Co. v. United States,* 366 U.S. 683, 689, 81 S.Ct. 1309, 1312, 6 L.Ed.2d 604 (1961). See also *Swift & Co. v. United States,* 276 U.S. 311, 331–32, 48 S.Ct. 311, 316–17, 72 L.Ed. 587 (1928). The statute represents an endorsement of the line of cases in which courts examined proposed consent decrees to determine whether they were in the public interest. *E.g., United States v. Ling-Temco-Vought, Inc.,* 315 F.Supp. 1301 (W.D.Pa.1970); *United States v. Carter Products, Inc.,* 211 F.Supp. 144 (S.D.N.Y.1962). See Senate Hearings, *supra* note 7, at 147–48 (Testimony of Hon. J. Skelly Wright).

**75.** Accord, *United States v. National Broadcasting Co.,* 449 F.Supp. 1127, 1142 (C.D.Cal. 1978); *United States v. Morgan Drive Away, Inc.,* 1976–1 Trade Cas. ¶ 60,949 at 69,191 (D.D. C.1976); *United States v. Gillette Co.,* 406 F.Supp. 713, 715 (D.Mass.1975).

**76.** The Court's powers are not restricted by the circumstance that bills are pending in Congress concerning several of the issues raised in this case. The Tunney Act requires the Court to evaluate the decree proffered to it by the parties, and it is clear that it may not avoid this mandate merely because Congress might at some future date enact legislation in the same field. Just as the Court refused to delay the trial of the *AT & T* action when it was apprised of the possibility of legislative action (see order filed July 29, 1981; Transcript of Proceedings, July 29, 1981, at 8–10, 13–14) so it could not now abdicate its responsibilities with respect to the proffered decree because of possible future legislative activity. Congress may, of course, enact legislation overturning a decree entered by this Court.

**77.** The statute specifies several criteria which a court "may" consider in making its public interest determination (see 15 U.S.C. § 16(e)(1), (2) ) but the legislative history indicates that the listing of these factors was not meant to limit the court's inquiry. S.Rep. No. 93–298, *supra,* at 6; 120 Cong.Rec. 36344 (1974) (Remarks of Rep. Jordan); 119 Cong.Rec. 24599 (1973) (Remarks of Sen. Tunney). These criteria therefore cannot be regarded as embodying *the* standard against which a proposed decree is to be measured. For further discussion of these factors, *see note 93 infra.*

ing an environment conducive to the preservation of our democratic political and social institutions. *Northern Pacific Railway Co. v. United States, supra,* 356 U.S. at 4, 78 S.Ct. at 517. See also *National Society of Professional Engineers v. United States, supra,* 435 U.S. at 695, 98 S.Ct. at 1367.[78]

This policy is embodied in two types of legal standards—those applied to the liability phase of antitrust cases and those which govern the relief phase. Since the Court's determination here is concerned solely with remedies, the decisions granting relief after a finding of liability form the most relevant yardstick for determining whether the proposed consent decree will further antitrust policies, and the Court will therefore use these decisions as its basic standard.

■ Antitrust remedies, it is usually said, must "effectively pry open to competition a market that has been closed by defendants' illegal restraints." *International Salt Co. v. United States,* 332 U.S. 392, 401, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947). See also 2 P. Areeda & D. Turner, *Antitrust Laws* § 327 (1978). A decree must "break up or render impotent the monopoly power found to be in violation of the Act,"[79] that is, it must leave the defendant without the ability to resume the actions which constituted the antitrust violation in the first place. For these reasons, the decree should not be limited to past violations; it must also effectively foreclose the possibility that antitrust violations will occur or recur. As the Court

noted in *International Salt Co. v. United States, supra,* 332 U.S. at 400, 68 S.Ct. at 17,

it is not necessary that all of the untraveled roads to [anticompetitive conduct] be left open and that only the worn one be closed. The usual ways to the prohibited goals may be blocked against the proven transgressor.

See also *National Society of Professional Engineers v. United States, supra,* 435 U.S. at 697–98, 98 S.Ct. at 1368; *United States v. United States Gypsum Co.,* 340 U.S. 76, 88, 71 S.Ct. 160, 169, 95 L.Ed. 89 (1950); *Associated Press v. United States,* 326 U.S. 1, 22, 65 S.Ct. 1416, 1425, 89 L.Ed. 2013 (1945); *United States v. Crescent Amusement Co., supra,* 323 U.S. at 188, 65 S.Ct. at 261; *United States v. United Shoe Machinery Corp.,* 110 F.Supp. 295, 346–47 (D.Mass. 1953), *aff'd,* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954).[80]

■ While the issue of competition and the effects on competition which are at the heart of the antitrust laws should thus be deemed matters of paramount concern, it is clear from the cases that other factors are not irrelevant.[81] As the Supreme Court has put it, antitrust violations should be remedied "with as little injury as possible to the interest of the general public" and to relevant private interests. *United States v. American Tobacco Co.,* 221 U.S. 106, 185, 31 S.Ct. 632, 650, 55 L.Ed. 663 (1911). See also, *United States v. E.I. duPont de Nemours,* 366 U.S. 316, 327–28, 81 S.Ct. 1243, 1250–51, 6 L.Ed.2d 318 (1961). When choosing between effective remedies, a court

**78.** There is an obvious conceptual similarity between competition in commerce as the foundation of our economic system and competition in ideas as the basis of our political system.

**79.** *United States v. Grinnell Corp.,* 384 U.S. 563, 577, 86 S.Ct. 1698, 1707, 16 L.Ed.2d 778 (1966). See also *United States v. United Shoe Machinery Corp.,* 391 U.S. 244, 251, 88 S.Ct. 1496, 1500, 20 L.Ed.2d 562 (1968); *Schine Chain Theatres, Inc. v. United States,* 334 U.S. 110, 128–29, 68 S.Ct. 947, 957, 92 L.Ed. 1245 (1948).

**80.** On this basis, the Court may at the relief stage prohibit practices which have not been found unlawful if such a prohibition is necessary to avoid the recurrence of monopolization. *United States v. United Shoe Machinery Corp.,*

*supra;* see also *Hartford-Empire Co. v. United States,* 323 U.S. 386, 409, 65 S.Ct. 373, 385, 89 L.Ed. 322 (1945). In addition, restraints may be imposed upon the defendant which are designed to allow the development of nascent competition within the relevant market. *Ford Motor Co. v. United States,* 405 U.S. 562, 575, 578, 92 S.Ct. 1142, 1150, 1152, 31 L.Ed.2d 492 (1972).

**81.** The parties to this litigation as well as most interested third persons have expressly recognized that, in assessing whether the proposed decree is in the public interest, the Court may consider factors other than its effect on competition.

should impose the relief which impinges least upon other public policies. *United States v. American Tobacco Co., supra; United States v. E.I. duPont de Nemours, supra; United States v. Terminal Railroad Ass'n,* 224 U.S. 383, 410, 32 S.Ct. 507, 515, 56 L.Ed. 810 (1912).[82] Thus, the Court would be justified in rejecting the proposed decree or requiring its modification[83] if it concluded that the decree unnecessarily conflicts with important public policies other than the policy embodied in the Sherman Act.

### C. *Degree of Deference to the Proposal Submitted by the Parties*

Where, as here, a court is evaluating a settlement, it is not as free to exercise its discretion in fashioning a remedy as it would be upon a finding of liability. For when parties enter into a consent decree, they

> waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and the elimination of risk, the parties each give up something they might have won had they proceeded with the litigation.

*United States v. Armour & Co.,* 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). If courts acting under the Tunney Act disapproved proposed consent decrees merely because they did not contain the exact relief which the court would have imposed after a finding of liability, defendants would have no incentive to consent to judgment and this element of compromise would be destroyed. The consent decree would thus as a practical matter be elimina-

ted as an antitrust enforcement tool, despite Congress' directive that it be preserved. See S.Rep. No. 93–298, *supra,* at 6; H.R.Rep. No. 93–1463, *supra,* at 6.

It follows that a lower standard of review must be applied in assessing proposed consent decrees than would be appropriate in other circumstances. H.R.Rep. No. 93–1463, *supra,* at 12. For these reasons, it has been said by some courts that a proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is "within the reaches of public interest." *United States v. Gillette Co.,* 406 F.Supp. 713, 716 (D.Mass.1975). See also *United States v. Bechtel Corp.,* 648 F.2d 660, 666 (9th Cir. 1981); *United States v. Carrols Development Corp.,* 454 F.Supp. 1215, 1222 (N.D.N.Y.1978); *United States v. National Broadcasting Co.,* 449 F.Supp. 1127, 1143 (C.D.Cal. 1978). Although these decisions are not necessarily binding,[84] this Court will follow a similar approach.

It does not follow from these principles, however, that courts must unquestioningly accept a proffered decree as long as it somehow, and however inadequately, deals with the antitrust and other public policy problems implicated in the lawsuit. To do so would be to revert to the "rubber stamp" role which was at the crux of the congressional concerns when the Tunney Act became law. This consideration is especially potent in these cases, for several reasons.

First. This is not an ordinary antitrust case. The American Telephone and Telegraph Company, with its various components and affiliates, is the largest corpora-

---

**82.** However, where only one form of relief will effectively remedy the antitrust violation, it is that relief which must be imposed, regardless of its impact on other interests. *National Society of Professional Engineers v. United States, supra,* 435 U.S. at 697–98, 98 S.Ct. at 1368; *United States v. E.I. duPont de Nemours, supra,* 366 U.S. at 327–28, 81 S.Ct. at 1250–51.

**83.** The Court has the power to insist that the proposed decree take account of these other

values. See *United States v. Ling-Temco-Vought, Inc.,* 315 F.Supp. 1301 (W.D.Pa.1970), where the court refused to enter a proposed consent decree until the parties acted to safeguard the pension rights of the employees of the defendant.

**84.** There is no authoritative precedent from the Supreme Court or the Court of Appeals for this Circuit on this issue.

tion in the world by any reckoning,[85] and the proposed decree, if approved, would have significant consequences for an unusually large number of ratepayers, shareholders, bondholders, creditors, employees, and competitors. Beyond that, it is clear that the divestiture of the Operating Companies, combined with the entry of AT & T into new competitive markets, will be an enormous undertaking, fraught not only with many problems and difficulties, but also with a potential for substantial private advantage at the expense of the public interest. In view of these considerations, and of the potential impact of the proposed decree on a vast and crucial sector of the economy and on such general public interests as the cost and availability of local telephone service, the technological development of a vital part of the national economy, national defense, and foreign trade, the Court would be derelict in its duty if it adopted a narrow approach to its public interest review responsibilities.[86]

Second. Some of those who during the legislative hearings took a narrow view of the judicial responsibilities under the Act suggested that the courts would generally not be able to render sound judgments on settlements because they would not be aware of all the relevant facts.[87] But that factor is of relatively little relevance here, for this Court has already heard what probably amounts to well over ninety percent of the parties' evidence both quantitatively and qualitatively, as well as all of their legal arguments.[88] It is thus in a far better position than are the courts in the usual consent decree cases [89] to evaluate the specific details of the settlement.[90]

Third. These actions, and this settlement, have an unfortunate history. The 1956 *Western Electric* consent decree was evidently the product of the very kind of influence and pressure that Congress subsequently sought to prevent through the Tunney Act procedures. See pp. 135–138 *supra*. That identical settlement, and the identical parties, are now before the Court. Nor can those events simply be dismissed as ancient history, irrelevant to the events of 1981–82. One needs only to recall the peculiar circumstances under which the instant settlement proposal was sought to be filed in the courts [91] and the recurrence of an

---

85. The Bell System's total operating revenues in 1979 were over $45 billion, and in 1980, they exceeded $50 billion. These sums represent almost two percent of the gross national product of the United States in each of these years. The Bell System's net income for 1979 and 1980 was %5.6 billion and $6 billion, respectively. During 1979, the Bell System's net assets devoted to telephone service were valued at approximately $99.3 billion. At the end of 1979, the Bell System employed over one million people, and it was thus the largest employer in the United States with the exception of the federal government. Episode 5/57A, stipulation pars. 6, 8–9, 20. For a more impressionistic account of AT & T's size, see S. Kleinfeld, *The Biggest Company on Earth* (1982).

86. There have been suggestions by some that the issues in these cases, involving as they do national telecommunications policy, should be left by the Court for Congress to decide. For the reasons stated in note 76 *supra* and otherwise, this is inappropriate. At the same time, a subject of this importance should not be decided solely by an agreement between the Department of Justice and a single company. The involvement of the Judiciary under the Tunney Act thus provides a useful safeguard.

87. See, *e.g.*, Senate Hearings, *supra* note 72, at 71.

88. In addition, the Court has received comments and briefs concerning the proposed decree from several hundred interested persons, as well as voluminous submissions from the parties.

89. In *United States v. Ling-Temco-Vought, Inc.*, *supra*, 315 F.Supp. at 1309, the absence of a record forced the court to rely upon the parties' assurances that the proposed decree was in the public interest.

90. In fact, the parties sought review of the proposed decree in this Court precisely because of its "substantial expertise on the competitive situation in the telecommunications industry." Letter from Assistant Attorney General William F. Baxter, dated January 18, 1982.

91. See pp. 144–145 *supra*. Because of the method the parties chose, that proposal might either have escaped Tunney Act review altogether or it might at best have been reviewed only to the extent agreeable to them. See, *e.g.*, the Memorandum in Connection with Stipulation and Modification of Final Judgment, filed

inappropriate collaboration in the course of the litigation between the Department of Defense and AT & T similar to that which occurred in 1952–54. See *United States v. AT & T*, 524 F.Supp. 1331 (D.D.C.1981).[92] These circumstances do not foster a sense of confidence that the assessment of the settlement and its implications may be left entirely to AT & T and the Department of Justice.

None of this means, of course, that the Court would be justified in simply substituting its views for those of the parties. But it does mean that the decree will receive closer scrutiny than that which might be appropriate to a decree proposed in a more routine antitrust case.

The Court concludes that, taking into account the various legislative and decisional mandates discussed above, it will apply the following standard to its evaluation of the proposed decree. After giving due weight to the decisions of the parties as expressed in the proposed decree, the Court will attempt to harmonize competitive values with other legitimate public interest factors. If the decree meets the requirements for an antitrust remedy—that is, if it

effectively opens the relevant markets to competition and prevents the recurrence of anticompetitive activity, all without imposing undue and unnecessary burdens upon other aspects of the public interest—it will be approved.[93] If the proposed decree does not meet this standard, the Court will follow the practice applied in other Tunney Act cases[94] and, as a prerequisite to its approval, it will require modifications which would bring the decree within the public interest standard as herein defined.[95]

## III

### Conflict Between the Proposed Decree and State Regulation

A number of interested persons, principally States and state regulatory commissions,[96] contend that this Court lacks the power to enter the decree proposed by the parties without the approval of the regulatory commissions acting under state law. The decree would require AT & T to take various actions for which regulatory approval is required under state law,[97] and it would restrict the Operating Companies

---

by the parties in the District Court in New Jersey which refers to the procedures in restrictive terms, mentioning specifically only the publication and Federal Register requirements of the Tunney Act.

**92.** See also note 145 *infra*.

**93.** This standard encompasses the criteria specified in the Tunney Act except for "consideration of the public benefit, if any, to be derived from a determination of the issues at trial." 15 U.S.C. § 16(e)(2). This factor directs the Court to consider the effect of the proposed decree upon the ability of private antitrust plaintiffs to recover against the defendant for injuries alleged to have resulted from the activity challenged in the government. See 119 Cong.Rec. 3452 (1973) (Remarks of Sen. Tunney). However, the legislative history indicates that this is a secondary factor in the assessment of the decree and that the government's agreement to make information and evidence available to private plaintiffs will ordinarily be sufficient. S.Rep. No. 93–298, *supra* at 6–7; H.R.Rep. No. 93–1463, *supra* at 8.

The vigor with which several private plaintiffs have pursued actions against AT & T indicates that further prosecution of the government's case is not warranted on this basis. In

addition, the Justice Department has indicated its willingness to provide trial record materials to private plaintiffs. Competitive Impact Statement at 49 n. 34.

**94.** See, *e.g.*, *United States v. Gillette Co., supra*, 406 F.Supp. at 714–15.

**95.** The Court finds no basis in law or policy for the suggestion made by the FCC and some others that it may have the power to modify the proposed decree over the objections of the parties and enter it on its own motion on that basis. If the parties decline to incorporate the Court's recommended modifications, the 1956 decree in the *Western Electric* action will remain in effect, the *AT & T* trial will resume, and the Court will then make its own decision as to liability and, if appropriate, as to remedy. In view of the substantial completeness of the record, the parties might elect not to adduce additional evidence, in which event the Court would make its decision based on the present record.

**96.** All of these persons will be referred to hereinafter as the States.

**97.** Such as the transfer of assets.

with respect to activities which they are authorized to engage in under state regulation.[98] Because of this conflict, say the States, the decree may not be entered until the requisite permission from the various state agencies has been secured. The Department of Justice and AT & T assert in response that state law [99] is preempted to the extent that it bars execution of the decree.[100]

### A. General

This is not the first case in which States have argued that a federal court decree based upon federal law may not validly require actions prohibited by state law. These claims are almost as old as the Republic. One needs to recall only the great school desegregation disputes of the last thirty years, in the course of which a number of States justified their failure to comply with federal court injunctions by asserting that compliance was impossible because of the conflicting requirements of state law. The Supreme Court repeatedly and consistently held that the Supremacy Clause of the Constitution [101] rendered invalid any state authority that conflicted with the federal court order. *North Carolina State Board of Education v. Swann,* 402 U.S. 43, 46, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971); *Griffin v. County School Board,* 377 U.S. 218, 231–34, 84 S.Ct. 1226, 1233–34, 12 L.Ed.2d 256 (1964); *Cooper v. Aaron,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); see also *Morgan v. McDonough,* 540 F.2d 527 (1st Cir.1976); *United States v. Indianola Municipal Separate School District,* 410 F.2d 626, 630–31 (5th Cir.1969). More recently, in *Washington v. Washington*

---

**98.** For example, long distance telecommunications and the provision of customer premises equipment.

**99.** The District of Columbia Public Service Commission contends that the effect of the antitrust laws upon the District regulatory statutes cannot be analyzed under the preemption doctrine because both are congressional enactments. However, courts have characterized such local statutes as state laws for the purpose of reconciling them with national policies. See *D.C. Federation of Civil Associations, Inc. v. Volpe,* 434 F.2d 436 (D.C.Cir.1970); *Columbia Plaza Limited Partnership v. Cowles,* 403 F.Supp. 1337, 1341 (D.D.C.1975); *District of Columbia v. Greater Washington Central Labor Council,* 442 A.2d 110 (D.C.1982). The preemption doctrine would thus be an appropriate gauge of Congress' intent concerning the relationship between the D.C. statutes and the antitrust laws.

The recent decision in *Feldman v. Gardner,* 661 F.2d 1295 (D.C.Cir.1981), *cert. granted on other grounds,* —— U.S. ——, 102 S.Ct. 3483, 73 L.Ed.2d 1366 (1982), in which the court held that the District of Columbia Court of Appeals is immune from antitrust liability, does not require a different result. That case concerned antitrust *liability,* not the respect to be accorded District of Columbia statutes in implementing an antitrust *remedy.* In light of the *Feldman* Court's conclusion that the District "remains a federal enclave lacking the sovereignty inherent in statehood," it would be anomalous if statutes concerning purely local affairs could thwart vindication of a national policy when the statutes of the sovereign States cannot have such an effect. 661 F.2d at 1307.

**100.** The Court must decide the preemption issue at this juncture even though no State has yet taken specific action which conflicts with the terms of the proposed decree. In the first place, many States have made it abundantly clear that, unless the Court acts, they will proceed in a manner inconsistent with the decree. Further, the Court must delineate its powers now with respect to the conflicting state claims so as to avoid issuing an overbroad decree. Finally, the possibility that provisions of the decree could be vetoed by regulators on a state-by-state basis, with the resulting "balkanized scheme of telecommunications service" (Joint Comments of Alabama, et al., at 12) would obviously have a bearing on the basic question whether the proposed decree would and could effectively open the telecommunications industry to competition. If the States' claims are valid, the Court and the parties might have to search for different means to implement the mandate of the Sherman Act herein. It follows that a resolution of this legal issue is necessary if the Court is to render a proper determination under the Tunney Act. It may be noted, too, that the parties to the settlement as well as those who object thereto are in agreement that a decision by this Court at this time is both appropriate and necessary.

**101.** Art. VI, cl. 2 states:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

*State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 695, 99 S.Ct. 3055, 3079, 61 L.Ed.2d 823 (1979), the Court once again rejected the argument that state law restrictions could prevent a state regulatory agency from complying with a federal court's decree, reiterating that "[s]tate-law prohibition against compliance with the District Court's decree cannot survive the command of the Supremacy Clause of the United States Constitution."

■ While the basis for preemption is the Constitution, a preemptive effect in an individual case may be based on that document, on treaties, or on federal statutes such as the Sherman Act, which constitute valid exercises of federal power. See *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). In other words, if this Court has the authority under the Sherman Act to issue the proposed decree, state regulatory statutes are unenforceable to the extent that they prevent compliance with its terms.[102]

The States cannot and most of them do not dispute that the conditions sought to be remedied by the decree fall within the broad sweep of the Sherman Act. Like the Commerce Clause of the Constitution,[103] the Sherman Act "extend[s] beyond activities actually *in* interstate commerce to reach other activities that, while wholly local in nature, nevertheless substantially *affect* interstate commerce." *McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 241, 100 S.Ct. 502, 508, 62 L.Ed.2d 441 (1980). See also *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 743, 96 S.Ct. 1848, 1851, 48 L.Ed.2d 338 (1976). Similarly, the States do not dispute that the power of the Court under Section 4 of the

Sherman Act, 15 U.S.C. § 4, to "prevent and restrain" violations of the statute is broad enough to encompass the decree proposed by the parties in this case. Their argument bypasses these general constitutional and antitrust principles to rely instead on certain specific aspects of the exercise of federal antitrust power, as follows.

### 1. *Tenth Amendment*

■ Several States assert—citing *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976)—that the proposed decree would unconstitutionally invade powers reserved to them under the Tenth Amendment. In that case, the Supreme Court held that Congress was foreclosed from extending minimum wage and maximum hour employment standards to persons employed by the States themselves, ruling (426 U.S. at 851–52, 96 S.Ct. at 2474) that activities in areas such as

> fire prevention, police protection, sanitation, public health, and parks and recreation .... are typical of those performed by state and local governments in discharging their dual functions of administering the public law and furnishing public services. Indeed, it is functions such as these which governments are created to provide, services such as these which the States have traditionally afforded their citizens. If Congress may withdraw from the States the authority to make those fundamental employment decisions upon which their systems for performance of these functions must rest, we think there would be little left of the States' 'separate and independent existence.' ... [T]he dispositive factor is that Congress has attempted to exercise its Commerce Clause authority to prescribe minimum wages and maximum hours to

---

**102.** The fact that the decree would be issued pursuant to the parties' consent is irrelevant to its status, for a consent decree has the same effect as a decree issued after a finding of liability on the merits. *United States v. Swift & Co.,* 286 U.S. 106, 115, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932). Accordingly, courts have found that consent decrees displace state law to the same extent as do judgments on the merits. *Brown v. Neeb,* 644 F.2d 551, 563 (6th

Cir.1981); *United States v. American Society of Composers, Authors, and Publishers,* 442 F.2d 601 (2d Cir.1971).

**103.** Art. I, § 8, cl. 3. See *Heart of Atlanta Motel, Inc. v. U.S.,* 379 U.S. 241, 258, 85 S.Ct. 348, 358, 13 L.Ed.2d 258 (1964); *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942).

be paid by the States in their capacities as sovereign governments. . . . We hold that insofar as the challenged amendments operate to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions, they are not within the authority granted Congress by Art. I, § 8, cl. 3. (footnotes omitted).

The Court made it abundantly clear that its decision was not to be regarded as a wholesale retreat from the principle of federal supremacy in the event of federal-state conflict; rather, the decision was strictly limited to the proposition that the Tenth Amendment imposes limitations on the "exercise of congressional authority directed . . . to the States as States." *Id.* 426 U.S. at 845, 96 S.Ct. at 2471.

The progeny of *National League of Cities* has continued to distinguish sharply between federal regulation of States and such regulation of "private persons and businesses 'necessarily subject to the dual sovereignty of the government of the Nation and of the State in which they reside.' " *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 286, 101 S.Ct. 2352, 2365, 69 L.Ed.2d 1 (1981), *quoting National League of Cities v. Usery, supra*, 426 U.S. at 845, 96 S.Ct. at 2471. See also, *Federal Energy Regulatory Commission v. Mississippi*, —— U.S. ——, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). As to the latter category of regulation, said the Court, there is "no Tenth Amendment impediment to congressional action." *Hodel v. Virginia Surface Mining & Reclamation Ass'n, supra*, 452 U.S. at 286, 101 S.Ct. at 2365.

The proposed decree imposes obligations only on private business. By its terms, it does not apply to the States at all; pursuant to the congressional power over interstate commerce it simply regulates private activities which are without any doubt subject to that power. To be sure, some of these activities may also be subject to state regulation; but such confluence is not, and has never been held to be, regulation of "States as States."

The Supreme Court recently considered an analogous problem in *Federal Energy Regulatory Comm'n v. Mississippi, supra*. One of the statutory provisions at issue in that case permitted the Federal Energy Regulatory Commission to exempt certain private facilities from state laws. While the Court divided as to the application of the Tenth Amendment to other sections of the statute, it was unanimous in upholding this particular provision because, as the majority noted, "the Federal Government may displace state regulation even though this serves to 'curtail or prohibit the States' prerogatives to make legislative choices respecting subjects the States may consider important.' " —— U.S. at ——, 102 S.Ct. at 2129, quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n, supra*, 452 U.S. at 290, 101 S.Ct. at 2367. See also, —— U.S. at —— n. 1, 102 S.Ct. at 2130 n. 1 (O'Connor, J., dissenting).

### 2. *Communications Act*

■ Some States argue next that in enacting the Communications Act, Congress intended to prevent federal preemption of the state regulation of telecommunications permitted by that statute. There is no evidence whatever to support this proposition. Absent specific indication of congressional intent, the Court declines to read the Communications Act so as to immunize these state laws from preemption by other federal statutes.

Furthermore, the States' authority under the Communications Act is limited to "local services . . . that in their nature and effect are separable from and do not substantially affect the conduct or development of interstate communications." *North Carolina Utility Commission v. FCC*, 537 F.2d 787, 793 (4th Cir.1976). The decree, of course, concerns matters which are beyond this limited grant of jurisdiction.

Finally, even if the Communications Act did support certain kinds of state regulation, it would not help the States here. This Court has heard a variation of the argument they make when it was raised, again and again, by AT & T and has reject-

ed it every time. *United States v. AT & T, supra,* 524 F.Supp. at 1345; *United States v. AT & T, supra,* 461 F.Supp. at 1320–30. As the Court previously stated, regulation under the Communications Act is neither sufficiently explicit nor sufficiently pervasive [104] to allow it to stand in the way of the enforcement of the antitrust laws.[105] All other courts which have had occasion in recent years to consider the subject of telecommunications antitrust immunity on account of regulation under the Communications Act have reached the same conclusion. *Phonetele, Inc. v. AT & T,* 664 F.2d 716 (9th Cir.1981); *Sound, Inc. v. AT & T,* 631 F.2d 1324, 1327–31 (8th Cir.1980); *Mid-Texas Communications Systems, Inc. v. AT & T,* 615 F.2d 1372, 1377–82 (5th Cir.1980); *Essential Communications Systems, Inc. v. AT & T,* 610 F.2d 1114 (3rd Cir.1979). See also, *National Gerimedical Hospital and Gerontology Center v. Blue Cross,* 452 U.S. 378, 101 S.Ct. 2415, 69 L.Ed.2d 89 (1981). If the Communications Act itself and direct regulation by the FCC pursuant to that Act do not impair antitrust liability, *a fortiori* mere implied recognition in the Act of state regulation—assuming that there is such recognition—cannot stand in the way either of a finding of such liability or of the taking of necessary remedial action in implementation of the mandate of the Sherman Act.

**B.** *Parker v. Brown*

■ The States' primary contention is that the decree is barred by the state action exemption from the antitrust laws first announced in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed.2d 315 (1943). In that case, the Supreme Court upheld a regulatory program which restricted competition among raisin growers by setting prices and limiting production. Finding no suggestion in the legislative history of the Sherman Act that such state action was to be restrained, the Court declined to find that the Sherman Act preempted the state law.

The *Parker* doctrine, which has been restated and applied a number of times since then,[106] "reflects Congress' intention to embody in the Sherman Act the federalism principle that the States possess a significant measure of sovereignty under our Constitution." *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 53, 102 S.Ct. 835, 842, 70 L.Ed.2d 810 (1982). See also Areeda, *"Antitrust Immunity for 'State Action' After Lafayette,"* 95 Harv.L. Rev. 435, 436 (1981). At the root of the rule is the principle that federalism permits the States to impose a regime of economic regulation which is different from and inconsistent with the free competition principle mandated by the antitrust laws.

There are several reasons why the States' reliance on the *Parker* doctrine is misplaced.

In the first place, since the doctrine is rooted in the desirability of state experimentation and regulation, it is not at all self-evident that it is applicable to the type of activity involved in these cases. The telecommunications network is, technologically and economically, a national network with interdependent components.[107] Con-

---

**104.** See generally, *Gordon v. New York Stock Exchange,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975); *Otter Tail Power Co. v. United States,* 410 U.S. 366, 373–78, 93 S.Ct. 1022, 1027–30, 33 L.Ed.2d 359 (1973).

**105.** The Federal Communications Commission has consistently taken the same position. *In the Matter of Amendment of Subpart F of Part 1 of the Commission's Rules,* 42 F.C.C. 905, 906, 910–12 (1959); *In the Matter of the Applications of the Connecticut Water Co. & Woolridge Bros., Inc.,* 25 F.C.C. 1367, 1378 (1958). See also, Memorandum filed with this Court by the FCC as *amicus curiae* on December 30, 1975.

**106.** *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980); *New Motor Vehicle Board v. Fox,* 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978); *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978); *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); see generally 1 P. Areeda & D. Turner, *Antitrust Law, supra* at §§ 212–220.

**107.** Even after the division of the network into various separate entities as a result of the divestiture, it will still be a national network in its operational sense. See Part X(A) *infra.*

gress has recognized this interstate characteristic, with its impacts on the national economy and national defense, by exercising its power under the Commerce Clause to reserve federal control over interstate communications. *North Carolina Utility Commission v. FCC, supra.* It may be doubted that the *Parker* doctrine may reasonably be extended to this kind of an activity which is national par excellence.

█ In any event, the *Parker v. Brown* line of cases does not establish that all state regulation *per se* serves to immunize activities from the federal antitrust laws. Such an immunity exists only if (1) the restraint is clearly articulated and affirmatively expressed as state policy, and (2) the policy is actively supervised by the State. *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., supra,* 445 U.S. at 105, 100 S.Ct. at 943. Moreover, preemption is precluded only under special circumstances and to achieve a specific goal: to allow the states to implement alternatives to the Sherman Act system of free competition. It is against these standards that the States' contention here must be tested.

The conduct that is the subject of these antitrust actions is clearly not beyond the reach of the federal antitrust laws [108]—a conclusion with which the States are in agreement.[109] That is so because some of that conduct (*i.e.*, the allegedly anticompeti-

tive activity of AT & T in the intercity services market) is not under state regulation at all; and because the remainder (*i.e.*, AT & T's activity in the local services and equipment markets) is regulated by the States only in the sense that the local Operating Companies are required to file tariffs with respect thereto—actions which the courts have consistently held to be insufficient to qualify under the *Parker-Midcal* "active supervision" standard.[110] To put it another way, it is clear that state regulation would not be a defense during the liability phase of this or any other antitrust action based on similar conduct.

Since the conduct which is the subject of these lawsuits is thus well within the jurisdiction of the federal antitrust laws—as distinguished from the regulatory jurisdiction of the States—it would make no sense to hold that, in providing a remedy for the anticompetitive conduct,[111] the Court must refrain from interfering with state regulation.[112] Such a holding would in effect place this conduct in a no-man's land—not regulated by the states sufficiently to meet the *Parker-Midcal* test, yet immunized from effective federal antitrust jurisdiction because the antitrust remedy is barred by state regulations unrelated to this conduct.[113]

The practical consequences of such a rule to antitrust enforcement could be devastating.

---

**108.** See *Phonetele, Inc. v. AT & T, supra; Sound, Inc. v. AT & T, supra,* 631 F.2d at 1327–31, 1334–35; *Essential Communications Systems, Inc. v. AT & T, supra,* 610 F.2d at 1125; *Northeastern Telephone Co. v. AT & T,* 477 F.Supp. 251 (D.Conn.1978), *rev'd on other grounds,* 651 F.2d 76 (2d Cir.1981); *United States v. AT & T, supra,* 461 F.Supp. at 1320–30.

**109.** Brief on Topic Five of the Public Service Commission of Wisconsin, et al. at 8; Brief on Topic Five of State of California, et al., at 3.

**110.** To be sure, the States are closely regulating such activities as the transfer of assets by entities within their jurisdictions and the types of business operations in which the Operating Companies may engage. But these subjects of state regulation are not the target of antitrust actions before the Court; the conduct that is being challenged is that of AT & T in the intercity services and equipment markets. and,

as indicated *supra,* that conduct is not being regulated by the States at all.

**111.** The same rationale applies to its equivalent, a consent decree. Although the States' argument is directly addressed to the decree proposed by the parties, it is clear that the principle they espouse, if correct, would apply to judgments on the merits as well.

**112.** It may be for this reason that no court has ever applied the *Parker* doctrine to thwart an antitrust remedy when the conduct in question was not shielded from liability.

**113.** For example, in these cases, anticompetitive activity in the intercity carrier market would be protected because the remedy—divestiture—could be precluded by state regulations concerning the transfer of assets.

No effective, unconditional antitrust judgment could be entered and enforced with respect to any subject matter area in which the states had established a system of regulation. The federal antitrust court would have to await the outcome, the benevolent agreement, of the local regulatory authorities before it could implement its decree. Should one or more States or their regulatory bodies object, the decree could not be enforced, irrespective of the necessity for such enforcement in the vindication of federal antitrust policy.[114] It is inconceivable that Congress could have intended to defer to state laws in such a way as to preclude a court from effectively remedying an antitrust violation. Without effective relief, "the Government has won a lawsuit and lost a cause." *International Salt Co. v. United States, supra,* 332 U.S. at 401, 68 S.Ct. at 17.[115]

Deference to state law in this type of situation would leave the Sherman Act powerless to eliminate anticompetitive activity,[116] even though the activity was not subject to state regulation sufficient to preclude application of the antitrust laws. This result is directly contrary to the thesis of the state action doctrine: that "[t]he national policy in favor of competition" is supplanted only when state regulation will take its place.[117] *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., supra,* 445 U.S. at 106, 100 S.Ct. at 943.

In these particular cases, the rule proposed by the States would reduce the Court's judgment to little more than an advisory opinion: AT & T would have to obtain the approval of the public utilities commission of every State before that judgment would actually be implemented. As the States themselves have said, if their claim were accepted, they would have the "unassailable authority to veto" the divestiture and to cause a "balkanized scheme of telecommunications service" should they so choose.[118]

■■■ The Court concludes that the state action doctrine does not restrict the judicial power to impose an appropriate remedy under the Sherman Act.

## C. *Avoidance of Unnecessary Conflict with State Law*

■■■ The absence of absolute limitations upon a court's remedial powers under the

---

**114.** An antitrust defendant would need to find just one sympathetic local regulatory body to achieve immunity from structural relief at the behest of a federal antitrust court.

**115.** There is an obvious difference between direct state regulation and inchoate, general federal antitrust policy, on the one hand, and a conflict between such regulation and an explicit, valid federal court order, on the other. *Parker* deals only with the substantive scope of the antitrust laws, that is, with the situation which arises when a State has determined that, with respect to certain activities within its jurisdiction, the competition mandated by the Sherman Act is inappropriate for valid state public policy reasons. But there is nothing in the doctrine that would prevent the antitrust laws from prevailing when there is a conflict between a necessary antitrust remedy in a case in which the federal antitrust court has jurisdiction and in which the antitrust laws have been validly applied as a substantive matter and state regulatory schemes which would prevent such a remedy from being implemented. To hold otherwise, would be to stand proper deference to the policy of another political entity under the American constitutional system on its head.

**116.** For example, the principal alternative to divestiture, a detailed injunction governing defendants' operations, would certainly conflict with state laws even more directly and on a continuing basis. While the remedy of damages would presumably still be available, it would not necessarily force defendants to cease any anticompetitive conduct. Moreover, there is no indication in the statute or in any court decision that the damages remedy is broader than the power to grant injunctive relief. The States' other alternative—an immediate spin-off of the Bell Operating Companies—would not open the telecommunications market to competition and would have severe adverse effects upon the national telephone system. See Part XI(D) *infra.*

**117.** Nothing in the proposed decree would require a State to replace its regulatory system with a system of competition: it may continue to require a regulated monopoly in, say, local telephone service or intrastate toll service.

**118.** See Joint Comments of Alabama and twenty-three other States at 12.

Sherman Act does not mean that the Court is free to ignore the States' legitimate interests.

■ It is well established that interference with state interests is not a favored approach; it is a measure to be employed only when necessary to vindicate federal law. Thus, a judicial remedy may infringe upon state law only to the extent necessary effectively to protect the federal interest. See *Milliken v. Bradley,* 433 U.S. 267, 280–81, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977); *Morgan v. McDonough, supra,* 540 F.2d at 534.[119] Moreover, in exercising their discretion in fashioning antitrust remedies,[120] courts are obligated to minimize the impact of their decrees upon other public policies (see Part II *supra*), including, of course, the policy against unnecessary interference with state interests.

Were the Court to fashion its own remedy following a finding of liability, it would accordingly be obligated to minimize interference with state law to the extent that this may be done without vitiating or weakening the remedial measures required as a result of the findings made in the litigation. It is difficult to believe that when the parties arrive at a consent decree they have greater powers to override these principles than would the Court in drafting its own decree. In any event, whatever the parties may do, the Court would certainly be justified in taking the policy against unnecessary interference with state law and state policy into account when it passes upon the proposed judgment in a public interest proceeding.

It follows from what has been said that those provisions in the proposed decree which are necessary to vindicate the federal interest in the enforcement of the antitrust

laws will be approved notwithstanding the fact that they may conflict with the state laws or interests. However, in its overall consideration of the public interest, the Court will also take into account that a particular provision may be merely peripheral to the federal interest but have a substantial adverse impact on state laws.[121]

## IV

### The Divestiture

A key feature of the proposed decree is the divestiture of the Operating Companies from the remainder of AT & T. In order to determine whether that divestiture is in the public interest, the Court must decide first whether it is a remedy that is likely to eliminate anticompetitive conditions within the telecommunications industry. In addition, the Court must assess the efficacy of alternative remedies and it must weigh the effect of the divestiture on the public interest generally, particularly on the level of charges for local telephone service.

A. *Conditions Necessitating Antitrust Relief*

1. *Evidence of Anticompetitive Actions by AT & T*

In its complaint and in documents filed thereafter (*i.e.,* the several Statements of Contentions and Proof), the government asserted that AT & T monopolized the intercity telecommunications market and the telecommunications product market in a variety of ways in violation of the Sherman Act.

■ The evidence that was produced during the *AT & T* trial indicates that, at least with respect to several of the government's claims, this charge may be well tak-

**119.** It is presumably in reliance on these principles that the Department of Justice has conceded that "the Court should assure itself that the provisions of the proposed [decree] will not unnecessarily conflict with important state interests." Brief at 70. Another manifestation of the respect accorded to state interests is the courts' reluctance to impute to Congress an intent to bar the States from an entire field of regulation. See, *e.g., Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 128, 98 S.Ct. 2207,

2215, 57 L.Ed.2d 91 (1978); *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963).

**120.** See, *e.g., Ford Motor Co. v. United States, supra,* 405 U.S. at 573, 92 S.Ct. at 1149; *United States v. E.I. duPont de Nemours & Co., supra,* 366 U.S. at 322, 81 S.Ct. at 1248.

**121.** See Part VII *infra.*

en. It would be inappropriate for the Court at this juncture to draw definitive conclusions with regard either to the sufficiency of the evidence to sustain a finding of liability or to the validity of AT & T's various legal and factual defenses. The Court is not called upon, in this public interest proceeding, to render a final judgment on this case; indeed, not all the evidence that may bear on the issues has yet been adduced.[122] It is not improper, however, for the Court to consider whether the state of proof at trial was such as to sustain this divestiture as being in the public interest. See 15 U.S.C. §§ 16(b)(2), (e).

In its intercity case, the government alleged that AT & T used its control over its local monopoly to preclude competition in the intercity market. The government proved *inter alia* that after 1968 AT & T included a "customer premises" provision in its interconnection tariff which deterred potential competitors from entering that market;[123] that it refused to provide FX and CCSA services to specialized common carriers and domestic satellite carriers until 1974 when the FCC specifically ordered it to do so;[124] and that it attempted to prevent competitors from offering metered long distance service that would compete with AT & T's own regular long distance service.[125]

AT & T's basic rationale for these policies was that it was attempting to prevent competitors from "creamskimming."[126] As viewed by AT & T, it would have been able successfully to combat creamskimming if it had priced each of its routes on the basis of the costs for operating that route. However, it concluded that the FCC had rejected this approach when it endorsed national rate averaging in the interest of promoting the goal of universal service. Accordingly, AT & T argued that, since rate averaging is inconsistent with competition, and since the basic rate averaging policy had been required by the FCC as being in the public interest, it was acting reasonably under the Communications Act in preventing competition as best and as long as it could.[127]

What this line of reasoning fails to consider is that, at least by the mid-1970s, the FCC had clearly begun to promote competi-

**122.** See p. 140 *supra.*

**123.** Under this provision, a competitor could interconnect with the AT & T network only if the interconnection occurred in switching equipment located on the customer's premises where the telecommunication originated or terminated. The effect of this restriction was to prevent competitors from entering the intercity market gradually, and thus effectively from entering the market at all. For example, because of this restriction, a customer whose sole office was in St. Louis could not choose to use the services of an AT & T competitor for part of a route (*e.g.,* from St. Louis to Chicago), and then AT & T's services for the remainder of the route (*e.g.,* from Chicago to Bethesda, Md.) because the St. Louis customer did not have the "premises" in Chicago that AT & T required for interconnection. Thus, to receive service for Bethesda as well as for Chicago, the customer was required to purchase both services from AT & T. See *United States v. AT & T, supra,* 524 F.Supp. at 1354.

**124.** FX (foreign exchange) service permits a customer to make or receive local calls through a distant switching center by effectively providing a long extension cord in the form of a dedicated line between the customer's location and a telephone company switching system in the distant location (the foreign exchange).

See *United States v. AT & T, supra,* 524 F.Supp. at 1355 n. 77. CCSA (common control switching arrangement) is essentially a miniature AT & T long distance network, except for the fact that it is used by only one customer, albeit a customer, such as the federal government, with large telecommunications needs.

**125.** The government also alleged *inter alia* that AT & T discriminated against competitors in providing access to local exchange facilities; that it conducted interconnection negotiations with competitors in bad faith; and that it engaged in predatory behavior to eliminate at least one company as a provider of digital data transmission services. *United States v. American Telephone and Telegraph Co., supra,* 524 F.Supp. at 1355–56.

**126.** Creamskimming is a term the Bell System used during the *AT & T* trial and elsewhere to describe the practice of its competitors to concentrate their intercity services on routes where the volume of business is high and the costs of service are low.

**127.** See, *e.g.,* testimony of John D. deButts (August 27, 1981); Mark Garlinghouse (December 11, 1981); and William Ellinghaus (August 12, 1981).

tion in telecommunications. The government contended during the trial—correctly, in the Court's view—that AT & T had an obligation to follow the more recent FCC policy rather than the Commission's previous policies which may have suited it better,[128] particularly since there was never a direct FCC rule against de-averaging. Moreover, even if, because of the lack of definite guidance from the FCC, AT & T's actions were to be regarded as reasonable under the Communications Act standards, it does not at all follow that these same actions were immunized under the standards of the Sherman Act.[129]

What is significant about these events is that AT & T was able to adopt the policies described above in large part because of its control over the local exchange facilities. For example, it was because of its ownership and control of the local Operating Companies—whose facilities were and are needed for interconnection purposes by AT & T's competitors—that AT & T was able to prevent these competitors from offering FX and CCSA services. Similarly, AT & T was able to deter competition by manipulat-

ing prices for access to the Operating Company networks.[130]

AT & T's control over the local Operating Companies was central also to the anticompetitive behavior alleged with respect to the second facet of the government's case, that involving customer-provided terminal equipment.

The government proved that AT & T prohibited the attachment of competitors' equipment to the network except through a protective connecting arrangement (PCA). There was evidence that some experts (including a panel of the National Academy of Sciences)[131] believed that such a PCA was necessary[132] if the nationwide telephone network was to be protected from a variety of harms.[133] On the other hand, the government's evidence indicated that AT & T required PCAs for equipment that in all probability could not harm the network; that there were delays in providing PCAs; that the PCAs were over-designed and over-engineered, and, thus, over-priced; that PCAs were required for competitive

128. Obviously, AT & T preferred to operate as a monopoly provider of intercity services rather than to be forced to compete with other common carriers. (This is particularly true because once the FCC adopted a policy of competition, AT & T would be required to allow competitors to interconnect with the AT & T network). Thus, AT & T's self interest dovetailed neatly with its public interest argument.

129. Under the antitrust laws, the burden would be on AT & T to show that what would otherwise be clearly unreasonable restraints on competition were cleansed by the regulatory directives. See, e.g., National Gerimedical Hospital and Gerontology Center v. Blue Cross, 452 U.S. 378, 101 S.Ct. 2415, 69 L.Ed.2d 89 (1981); Sound, Inc. v. AT & T, 631 F.2d 1324 (8th Cir.1980); Mid-Texas Communications Systems, Inc. v. AT & T, 615 F.2d 1372 (5th Cir. 1980); Essential Communications Systems, Inc. v. AT & T, 610 F.2d 1114 (3rd Cir.1979); United States v. AT & T, 524 F.Supp. at 1345, n. 14; United States v. AT & T, 461 F.Supp. at 1320–30.

130. See, e.g., United States v. AT & T, supra, 524 F.Supp. at 1364–65 n. 118; testimony of William Ellinghaus and Mark Garlinghouse on cross examination, note 127 supra. AT & T's cost data were often confusing, incomplete, and

inaccurate, and although some of its distinguished economists provided helpful and sophisticated economic analysis (e.g., William J. Baumol, December 7, 1981), others (e.g., Jules Joskow, October 23, 1981) did little to explain away the shortcomings of these data. At least on the basis of the evidence heard before the trial was recessed, the Court would be unable to conclude that AT & T's past pricing strategy did not pose anticompetitive problems.

131. See Technical Analysis of the Common Carrier/User Interconnections Area by the Panel on Common Carrier/User Interconnections, National Academy of Sciences (1970), PX781 (admitted in evidence on behalf of defendants at Tr. 13500, August 24, 1981).

132. See, e.g., testimony of Charles Elmendorf (November 17, 1981); Robert B. Brunson (August 25, 1981).

133. Throughout the trial, AT & T referred to four harms to the network: hazardous voltages, longitudinal imbalance, excess signal power, and improper network control signaling. These harms, it was alleged, could cause a variety of problems, ranging from severe physical injury to humans to a small amount of noise on a telephone line.

equipment while identical equipment sold by AT & T did not require their use; and that PCAs could not guard against all four potential harms to the network.[134]

Additionally, the alternative option of certification [135] was available but never seriously pursued by Bell.[136] Moreover, when ultimately certification was directly mandated by the FCC as a substitute for the protective connecting arrangement, the telephone network—AT & T's predictions to the contrary notwithstanding—did not cease to function in its customary fashion. Indeed, AT & T was unable during the trial to prove *any* actual harm to the network from the elimination of the PCAs.

In its procurement part of the case, the government alleged, and there was proof, that AT & T used its control over the local Operating Companies to force them to buy products from Western Electric even though other equipment manufacturers produced better products or products of identical quality at lower prices. Here, too, AT & T's control of the Operating Companies was central to the allegedly anticompetitive behavior.[137]

Without making definitive findings on any or all of the issues, it is certainly clear that—to the extent that the proposed decree is offered by the government on the premise that it will destroy the basis of past anticompetitive behavior—the Court would not be justified in rejecting it as constituting a remedy for non-existent anticompetitive acts.

### 2. Concentration of Power in the Telecommunications Industry

There is an additional reason, largely independent of the factors discussed above, which supports some type of antitrust relief in this case: AT & T's substantial domination of the telecommunications industry in general.

The antitrust laws are most often viewed as only a means for ensuring free competition in order to achieve the most efficient allocation of society's resources. See pp. 149–150 *supra*. However, Congress and the courts have repeatedly declared that these laws also embody "a desire to put an end to great aggregations of capital because of the helplessness of the individual before them." *United States v. Aluminum*

---

**134.** See, *e.g.,* direct and cross examination of Donald H. Erickson (August 6, 1981), Edward Goldstein (August 4, 1981), and William Ellinghaus (August 12, 1981). It should also be noted, however, that, with respect to a number of these problems, AT & T did provide factual explanations of varying degrees of persuasiveness. *Compare* the testimony of Lawrence A. Hohmann (August 24, 1981) *with* that of Robert B. Brunson (August 25, 1981) who was convincing notwithstanding severe cross examination by the government.

**135.** Under a certification program, non-Bell equipment may be connected directly to the AT & T network—without the use of a PCA—provided that the equipment has been certified as meeting certain technical standards.

**136.** There is some merit to AT & T's claim that it was the FCC, rather than AT & T, that was responsible for the delay in the development of standards. Specifically, although the question of certification as opposed to PCA arose as early as 1968, the FCC did not request technical comments on the standards it had proposed until 1975.

**137.** It should be noted, however, that the government's procurement case was not ex-

tremely strong. In the first place, it consisted only of sixteen individual "episodes." Measured against the large field of procurement decisions in which the Bell System was engaged, this was not a formidable number. It is difficult to evaluate, and the Court will not now evaluate, whether this relative paucity of evidence was due to intrinsic problems of proof when dealing with a company of the size of AT & T, or whether, having conscientiously and carefully surveyed Bell's activities, the government was simply unable to produce more than sixteen questionable episodes because no more even arguably anticompetitive activity had taken place. Moreover, even as to those sixteen episodes the proof was not overwhelming. Where the government's evidence tended to demonstrate anticompetitive acts, AT & T's market share was generally not high; where market share was high, there was relatively little evidence of anticompetitive acts.

The part of the case dealing with pricing of equipment sold by Western Electric was dismissed on September 11, 1981. See, *United States v. AT & T, supra,* 524 F.Supp. at 1380–81.

*Company of America,* 148 F.2d 416, 428 (2d Cir.1945) (footnote omitted). See also *Standard Oil Co. v. United States,* 221 U.S. 1, 50, 31 S.Ct. 502, 511, 55 L.Ed. 619 (1911); *United States v. Trans-Missouri Freight Ass'n,* 166 U.S. 290, 323–24, 17 S.Ct. 540, 552, 41 L.Ed. 1007 (1897).

The legislators who enacted the Sherman Act voiced concerns beyond the effects of anticompetitive activities on the economy: they also greatly feared the impact of the large trusts, which then dominated the business world, on the nation's political system, and they regarded the power of these trusts as an evil to be eradicated. Thus, Senator Sherman stated:

If the concentrated powers of [a] combination are intrusted to a single man, it is a kingly prerogative, inconsistent with our form of government, and should be subject to the strong resistance of the State and national authorities. If anything is wrong, this is wrong. If we will not endure a king as a political power we should not endure a king over the production, transportation, and sale of any of the necessaries of life.

21 Cong.Rec. 2457 (1890).[138]

These views have been repeatedly echoed since that time, as, for example, during the congressional debates at the time of the enactment of the 1950 amendments to the Clayton Act. See 96 Cong.Rec. 16450 (1950) (Remarks of Sen. Kefauver); 95 Cong.Rec. 11494 (1950) (Remarks of Rep. Bryson); 95 Cong.Rec. 11486 (1949) (Remarks of Rep. Celler). See also *Brown Shoe Co. v. United States,* 370 U.S. 294, 344, 82 S.Ct. 1502, 1534, 8 L.Ed.2d 510 (1962). As Justice Douglas stated in his dissenting opinion in *United States v. Columbia Steel Co.,* 334 U.S. 495, 536, 68 S.Ct. 1107, 1128, 92 L.Ed. 1533 (1948):

Power that controls the economy should be in the hands of elected representatives of the people, not in the hands of an industrial oligarchy. Industrial power should be decentralized. It should be scattered into many hands so that the fortunes of the people will not be dependent on the whim or caprice, the political prejudices, the emotional stability of a few self-appointed men. The fact that they are not vicious men but respectable and social-minded is irrelevant. That is the philosophy and the command of the Sherman Act. It is founded on a theory of hostility to the concentration in private hands of power so great that only a government of the people should have it.[139]

Our political system is designed so that the power of one group may be checked by the power of another. The antitrust laws require this same approach in the economic sphere. Obviously, if one company controlled an essential part of the economy, it would be in a position to gain an undue influence over economic decisions and, as a result, most likely over political decisions. Thus, the antitrust laws seek to diffuse economic power in order to promote the proper functioning of both our economic and our political systems. See generally, A.D. Neale, *The Antitrust Laws of the United States of America,* 422–23 (1962); Blake & Jones, *Antitrust Dialogue: Defense,* 65 Colum.L.Rev. 337, 384 (1965).

The significance of these concepts is accentuated by the context in which the Court must consider the public interest in these cases. The telecommunications industry plays a key role in modern economic,

---

138. See also 21 Cong.Rec. 2460, 2569 (1890) (Remarks of Sen. Sherman); 21 Cong.Rec. 2598 (1890) (Remarks of Sen. George).

139. A number of distinguished commentators have challenged this interpretation of the antitrust laws, claiming that the promotion of consumer welfare through ensuring free competition is their sole goal. See R. Bork, *The Antitrust Paradox* 50–89 (1978); 1 P. Areeda & D. Turner, *Antitrust Law, supra* at §§ 103–112. Resolution of this dispute may be crucial when the two objectives point to different solutions. Here, where the remedy necessary to promote free competition is also likely to reduce the concentration of economic power, consideration of the latter would appear to be less controversial. In any event, the cases and the legislative history of the Tunney Act empower the Court to consider broad public interest goals, such as this one, in evaluating the need for an antitrust remedy.

social, and political life. Indeed, many commentators have asserted that we are entering an age in which information will be the keystone of the economy[140] as steel was when Justice Douglas wrote in the *Columbia Steel Co.* case.[141]

The only pervasive two-way communications system is the telephone network. It is crucial in business affairs, in providing information to the citizenry, and in the simple conduct of daily life. In its present form, AT & T has a commanding position in that industry. The men and women who have guided the Bell System appear by and large to have been careful not to take advantage of its central position in America's economic life. There is no guarantee, however, that future managers will be equally careful.[142] In any event, it is antithetical to our political and economic system for this key industry to be within the control of one company.

For these reasons, the Court concludes that the loosening of AT & T's control over telecommunications through the divestiture of the Operating Companies will entail benefits which transcend those which flow from the narrowest reading of the purpose of the antitrust laws.

B. *Effect of the Divestiture*

■ The remedy in an antitrust action—whether imposed by a court or agreed upon between the parties—is measured both by how well it halts the objectionable practices and by its prospects for minimizing the likelihood that such practices will occur in the future. See Part II *supra.* Where, as here, the Court has heard substantially all of the evidence, it is appropriate that it weigh the proposed remedy against the evidence in that context.

As indicated in Part IV(A) *supra,* the ability of AT & T to engage in anticompetitive conduct stems largely from its control of the local Operating Companies. Absent such control, AT & T will not have the ability to disadvantage competitors in the interexchange and equipment markets.

For example, with the divestiture of the Operating Companies AT & T will not be able to discriminate against intercity competitors, either by subsidizing its own intercity services with revenues from the monopoly local exchange services, or by obstructing its competitors' access to the local exchange network. The local Operating Companies will not be providing interexchange services, and they will therefore have no incentive to discriminate. Moreover, AT & T's competitors will be guaranteed access that is equal to that provided to AT & T, and intercity carriers therefore will no longer be presented with the problems that confronted them in that area. See Part VIII, *infra.*

Abuses will also be unlikely in the equipment interconnection area, for the simple reason that the Operating Companies will not manufacture equipment and will therefore lack AT & T's incentive to favor the connection of one manufacturer's equipment over that of another. Even as to the part of the government's case dealing with procurement, the divestiture of the Operating Companies will go a long way toward eliminating the potential for anticompetitive behavior. Any pro-Western Electric

---

140. See, *e.g.,* G. Robinson, ed., *Communications for Tommorrow* (1978).

141. Commentators from a wide range of the ideological spectrum agree on this conclusion. Thus, Professor Arthur Schlesinger, Jr. has been quoted as stating that "Karl Marx held that history is shaped by control of the means of production; in our times history is shaped by control of the means of communication." T. White, *America in Search of Itself* at 101 (1982). Charles Marshall, AT & T executive vice president, and consumer advocate Ralph Nader have likewise both noted the displacement of the industrial age by the information

age. *Telecommunications Act of 1982: Hearings on H.R. 5158 Before the Subcomm. on Telecommunications, Consumer Protection, and Finance of the House Comm. on Energy and Commerce (Part 2),* 97th Cong., 2d Sess. 111, 587 (1982).

142. One may speculate, for example, on the effect on the political life of this nation if a company or group with strong political or ideological opinions were to gain effective control of the present Bell System (particularly if the company, additionally, were not precluded from entry into information and electronic publishing services). See Part VI(C) *infra.*

bias on the part of these companies will be eliminated once the intra-enterprise relationship between the Operating Companies and Western Electric is broken.[143]

To the extent, then, that the proposed decree proceeds on the assumption that the structural reorganization will make it impossible, or at least unprofitable, for AT & T to engage in anticompetitive practices, it is fully consistent with the public interest in the enforcement of the antitrust laws. The soundness of this remedy becomes even more apparent when it is compared with other relief alternatives.

#### C. Alternative Remedies

■ In order to determine whether the divestiture proposed by the parties is the remedy which will most effectively fulfill the goals of the antitrust laws, it is appropriate for the Court to evaluate the various alternative remedies that may have been considered or proposed. See 15 U.S.C. § 16(e)(1).

Three alternatives to the divestiture of the Operating Companies emerged in the course of the *AT & T* litigation. The first would have required the divestiture of

Western Electric and Bell Laboratories from AT & T.[144] The second, similar in concept if not in detail, would have had as its most salient feature the divestiture from AT & T of portions of Western Electric and Bell Laboratories and of several Bell Operating Companies.[145] The third was a strictly injunctive, non-structural remedy, which would have imposed detailed constraints upon AT & T's activities.[146] None of these alternatives would be as efficacious as the divestiture of the Operating Companies embodied in the proposed decree.[147]

#### 1. Divestiture of Western Electric and Bell Laboratories

The divestiture of all or part of Western Electric and Bell Laboratories from AT & T, with or without the divestiture of some, but not all, of the Bell Operating Companies,[148] suffers from several defects in comparison with the parties' present proposal: (1) it would not be as effective in eliminating anticompetitive conduct, and (2) it would have a greater adverse impact on future contributions of the Bell System to the national economy.

---

**143.** Any cross subsidization of AT & T's intercity services and equipment manufacturing operations with revenue from its monopoly local exchange services will likewise be eliminated.

**144.** This remedy was first proposed in the government's complaint. See Complaint at 14.

**145.** Competitive Impact Statement at 50–51. The Operating Companies retained by AT & T would have been required to provide local telephone service through a separate subsidiary; several other problems would have been dealt with by injunctive provisions.

This proposal was considered by the parties in early 1981, just prior to the start of the trial in the *AT & T* action. At that time, in a successful effort to secure a continuance (see p. 140 *supra*), the parties advised the Court that a concrete settlement had been reached, with no substantive issues remaining to be resolved. See *Memorandum Order filed January 16, 1981.* However, the Competitive Impact Statement indicates that, to the contrary, no proposal was ever drafted. Competitive Impact Statement at 50.

**146.** *Id.* at 161–162. This proposal was discussed by the parties "shortly prior to the negotiations that gave rise to the [present settle-

ment]." *Id.* at 161. It would have required AT & T to grant non-discriminatory access for intercity carriers to the Bell Operating Companies' local exchange facilities, and it would have imposed limits on Western Electric's sales to the Bell System, in addition to limiting the dissemination of information and the rotation of personnel within the Bell System. These injunctive provisions would have been monitored by special masters appointed by the Court.

**147.** The Court's evaluation of these remedies is conducted strictly in the context of its decision on the adequacy of a negotiated settlement. If the *AT & T* action were to proceed to final judgment and liability were found, the Court might determine that the measures discussed in this segment of the opinion are appropriate remedies, either as alternatives to the divestiture of the Operating Companies or in addition to such divestiture.

**148.** Because of their conceptual similarities, the first and second alternate remedies are being discussed together.

The inadequacy of the divestiture from the Bell System of its research and manufacturing arms as an antitrust remedy is obvious: it would not eliminate AT & T's ability and incentive to take anticompetitive actions against its competitors in the intercity market. The remedy would thus be ineffective in the very area in which the government's proof in the *AT & T* action was strongest.[149] In addition, this remedy would not eliminate AT & T's de facto control of the national telecommunications system. Although the company would no longer dominate the manufacturing and research markets, it would still control the essentials of American telecommunications—virtually all intercity and local services. The divestiture would thus not fulfill the goal of deconcentrating AT & T's vast economic power.

The divestiture of Western Electric and Bell Laboratories would suffer from an additional defect. Considerable evidence was adduced during the *AT & T* trial concerning the central role of Bell Laboratories—and to a lesser degree of Western Electric—in innovation in the telecommunications industry and, more broadly, in industrial research.[150] AT & T argued vigorously that the present structure of the Bell System was in significant part responsible for this admirable record because the researchers were linked with a manufacturer—Western Electric—and with two service organizations—the Operating Companies and the Long Lines Department.[151]

The Court is of the opinion that there is considerable merit to these contentions. Bell Laboratories has been a positive force both in basic and in applied research, and this research has had a beneficial effect on the nation's economic position in all of its varied aspects.[152] It also seems to be true that the links between Bell Laboratories and the manufacturing and service arms of the Bell System have been of assistance in the achievement of these technological successes.

On this basis, then, the separation of Bell Laboratories from all of these functions could have an adverse effect upon future research and development,[153] and it may for that reason be regarded as less desirable than the present proposal which would leave Bell Laboratories associated with a manufacturer and two service organizations—Long Lines and AT & T's new information services—which would supply the practical experience that would be useful in stimulating the research operations.

### 2. Injunction

The second major alternative to the proposed decree is an injunction which would be enforced by special masters appointed by and responsible to the Court. This alternative, too, suffers from a number of defects.

It would be difficult to formulate an order that would effectively deal with all of the different kinds of anticompetitive behavior that are claimed to have occurred over a considerable period of time, in various geographical areas, and with respect to many different subjects. There is evidence which suggests that AT & T's pattern during the last thirty years has been to shift from one anticompetitive activity to another, as various alternatives were foreclosed

149. The additional divestiture of several Bell Operating Companies would remedy this problem only as to the areas served by these divested companies.

150. Testimony of Solomon Buchsbaum (September 23, 1981); testimony of Edward E. David, Jr. (November 4, 1981); testimony of David Packard (November 6, 1981); see also Exhibit D–1–134.

151. Testimony of Morris Tanenbaum (September 8, 1981); testimony of William D. Nordhaus (November 5, 1981); testimony of Bruce C. Netschert (November 12, 1981); testimony of Paul R. Lawrence (November 6, 1981); testimony of Nathan Rosenberg (November 10, 1981).

152. This includes basic scientific advance, cheaper and better products for consumers, foreign trade, and national defense.

153. In light of AT & T's agreement to divest the Operating Companies, the predictions made by a number of eminent witnesses regarding the dire consequences certain to follow from such divestiture appear in retrospect to have been vastly overrated.

through the action of regulators or the courts or as a result of technological development.[154] In view of this background, it is unlikely that, realistically, an injunction could be drafted that would be both sufficiently detailed to bar specific anticompetitive conduct yet sufficiently broad to prevent the various conceivable kinds of behavior that AT & T might employ in the future.[155]

An even more formidable obstacle is presented by the question of enforcement. Two former chiefs of the FCC's Common Carrier Bureau, the agency charged with regulating AT & T, testified that the Commission is not and never has been capable of effective enforcement of the laws governing AT & T's behavior.[156] In their view, this inability was due to structural, budgetary, and financial deficiencies within the FCC as well as to the difficulty in obtaining information from AT & T. Whatever the true cause, it seems clear that the problems of supervision by a relatively poorly-financed, poorly-staffed government agency over a gigantic corporation with almost unlimited resources in funds and gifted personnel are no more likely to be overcome in the future than they were in the past.[157]

These difficulties would be exacerbated if enforcement of a broad injunction were vested in court-appointed special masters.

To be sure, such officials have proved in the past to be capable of performing relatively narrow, short-term responsibilities, and to perform them well. But the type of broad injunctive relief that would be needed in these cases would require quasi-permanent supervision of all of AT & T's activities by not one or two special masters but by a vast staff. In short, what would be required would be a re-creation of the FCC's Common Carrier Bureau in the guise of an arm of the Judiciary. Such a development would be undesirable for many different reasons.[158] Furthermore, there is no reason to believe that, in the end, a judicially-created bureaucracy would be any more capable than the FCC itself of performing the unending task of vigilance and oversight that would be required to ensure that an integrated Bell System did not engage in anticompetitive conduct.

## D. Effect of the Divestiture Upon Other Interests

A number of individuals have written to the Court and to the Department of Justice urging the rejection of the proposed decree. They contend that AT & T in its present, integrated form has rendered excellent and affordable telephone service to the citizens of this nation, including those with modest

154. It is claimed, for example, that after the legal defense against interconnection of non-Bell equipment became impossible to sustain, AT & T shifted to claims that inferior equipment was being produced by non-Bell manufacturers; alleged that harms to the network would result from such equipment; and sought regulation by state as distinguished from federal agencies; and the like. See Plaintiff's Memorandum in Opposition to Defendants' Motion for Involuntary Dismissal in the *AT & T* action at 296–359.

155. For these reasons, and because of the enforcement problems discussed below, courts have generally rejected this type of detailed injunction in favor of the "surer, cleaner remedy of divestiture." *United States v. E.I. duPont de Nemours & Co., supra,* 366 U.S. at 334, 81 S.Ct. at 1254. See also *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 165–75, 68 S.Ct. 915, 932–37, 92 L.Ed. 1260 (1948); *United States v. Crescent Amusement Co., supra,* 323 U.S. at 189–90, 65 S.Ct. at 262.

156. Testimony of Walter Hinchman (June 18, 1981); testimony of Bernard Strassburg (October 14, 1981). Other persons with expertise in telecommunications regulation expressed similar views. Testimony of William Melody (June 8, 1981); testimony of Nina Cornell (June 19, 1981); testimony of Bruce Owen (June 22, 1981).

157. Recent developments in governmental policy point to a further reduction in the funding, the authority, and hence the effectiveness of regulatory agencies such as the FCC.

158. From a philosophical point of view, such a remedy could contravene the separation of powers doctrine because it would involve the creation of a substantial quasi-legislative, quasi-executive bureaucracy within the Judicial Branch of the government. Practically, the remedy could be impossible to administer because of the need for substantial budgetary authority and a large administrative apparatus.

incomes and those who live in sparsely populated areas. Many note that AT & T's securities have been a mainstay of the small investor, with a long history of stable prices and dividend payments. Given that record, the argument goes, the break-up of AT & T could not possibly be in the public interest. While the Court has very carefully considered these concerns,[159] it has concluded that they are not sufficient to overcome the considerations supporting divestiture.

The divestiture of the Operating Companies will not necessarily have an adverse effect upon the cost of local telephone service.[160] The decree would leave state and federal regulators with a mechanism—access charges—by which to require a subsidy from intercity service to local service. By means of these access charges, the regulators would be free to maintain local rates at current levels or they could so set the charges as to increase or decrease local rates.[161]

As to the second claim, there is simply no evidence or reason to believe that, funding aside, the quality of service will decline as a result of divestiture. The divested Operating Companies will not be technical backwaters: they will have substantial incentives to upgrade their networks and to provide high-quality interconnections for other carriers in order to maximize revenues from access charges and from local rates.

As noted above, it is unlikely that the divestiture will impair the research capabilities of Bell Laboratories. See pp. 147–149 *supra.* The scientists and engineers working in that organization will retain their incentive to improve the equipment and technology used to provide local telephone service, if only because the largest potential customers of Western Electric—Bell Laboratories companion in the "new" AT & T complex—will be the divested Operating Companies.[162] In addition, AT & T's information services and interexchange services can be provided to customers only over the Operating Companies facilities, again creating large incentives for continued improvement and upgrading of these facilities.[163]

In the final analysis, it is apparent that, as with so many public issues, a choice must be made.

159. Careful consideration and independent analysis have been particularly appropriate because these objections were primarily voiced by individual citizens who lacked the resources to present detailed briefs.

160. There is a dispute, reflected at the trial as well as in other forums, over the question whether local telephone services has ever actually been subsidized by intercity service as AT & T has consistently claimed. See Testimony of John D. deButts (August 27, 1981); testimony of William J. Baumol (December 7, 1981). The government contended that, to the contrary, local telephone revenues have subsidized AT & T's intercity rates (see Testimony of William H. Melody (June 8, 1981); testimony of Nina Cornell (June 19, 1981); testimony of Bruce Owen (June 22, 1981)) and since the trial was aborted by the settlement, no final decision was reached on this issue.

161. Although the decree requires the Operating Companies to file "cost justified" tariffs for access charges, it leaves to the regulators the decision as to what costs should be included within this calculation. Department of Justice Response to Comments at 106–107; AT & T· Reply Brief at 22–23. If the regulators chose to retain the cost allocation presently used in the separations and settlements process, the subsidy, if any, from interexchange revenues to local rates would remain at current levels. Under the proposed decree, state regulators will set access charges for intrastate interexchange service and the FCC will set access charges for interstate interexchange service. Department of Justice Response to Comments at 106–107; AT & T Reply Brief at 22–23. If a subsidy is required beyond that implicit in the access charges, it may be provided by state or federal legislation. See, *e.g.,* H.R. 5158, 97th Cong., 2d Sess. § 234 (proposal for a National Telecommunications Fund).

162. Indeed, their incentive may be even greater after divestiture than it was before, since after divestiture Western Electric will have lost its anticompetitive advantage and will instead be forced to compete with other manufacturers on the basis of quality and price for the Operating Companies' business.

163. The concerns of investors are similarly unfounded. They will retain all their legal remedies for any improper actions by AT & T in connection with the divestiture. See Part IX *infra.*

There has long been a debate over the relative merits of regulation and competition. The evidence adduced during the *AT & T* trial indicates that the Bell System has been neither effectively regulated nor fully subjected to true competition. The FCC officials themselves acknowledge that their regulation has been woefully inadequate to cope with a company of AT & T's scope, wealth, and power. The efforts of various arms of government to introduce true competition into the telecommunications industry have been similarly feeble. The antitrust suit brought by the Department of Justice in 1949 ended in 1956 with a consent decree which imposed injunctive relief that was patently inadequate. It took from 1968 when the *Carterfone* decision [164] was handed down by the FCC to 1978 when the United States Court of Appeals decided *Execunet II* [165] to establish even the very principle of competition so that it was beyond dispute by AT & T. Future regulatory and injunctive remedies are unlikely to be more successful than were similar efforts in the past. In short, the choice is between a Bell System restrained by neither regulation nor true competition and a Bell System reorganized in such a way as to diminish greatly the possibility of future anticompetitive behavior.

The history of the American economic system teaches that fair competition is more likely to benefit all, especially consumers, than an industry dominated by a single-company monopolist. There is no reason to believe that the experience of the telecommunications industry will be contrary to that rule.

For all of these reasons, the Court concludes that the divestiture from AT & T of companies providing local telephone service is in the public interest.

V

*Absence of Restrictions on AT & T*

Under the terms of the proposed decree, the line of business restrictions and the licensing requirements imposed by the 1956 consent decree in the *Western Electric* case would be removed and AT & T would be free to compete in all facets of the marketplace.[166] Some of the opponents of the proposed decree argue that several of the restrictions contained in the 1956 decree should not be eliminated, and others contend that the Court should also impose additional restrictions, not present in the 1956 decree. For the reasons explained in this part of the opinion and Part VI below,[167] the Court finds that, with one exception (see Part VI(B) *infra*), the imposition of restrictions on AT & T would not be in the public interest.

The antitrust laws do not require that a company be prohibited from competing in a market unless it can be demonstrated that its participation in that market will have anticompetitive effects. Past restrictions on AT & T were justified primarily because of its control over the local Operating Companies. With the divestiture of these local exchange monopolies, continued restrictions are not required unless justified by some other rationale.

### A. AT & T Power in the Interexchange Market

Virtually all those who suggest that restrictions beyond those in the proposed decree be imposed on AT & T make the same general arguments. Their basic claim is that AT & T still possesses monopoly power in the interexchange market [168] and that it will leverage this power by cross subsidizing its competitive services with monopoly reve-

---

**164.** 13 F.C.C.2d 420 (1968).

**165.** *MCI Telecommunications Corp. v. FCC,* 580 F.2d 590 (D.C.Cir.1978).

**166.** The only limitation regarding AT & T's business activities is that it may not reacquire the Operating Companies.

**167.** This part of the opinion considers general restrictions on AT & T; Part VI deals with restrictions on the provision of information services.

**168.** See Part V(C) for a discussion of the claim that AT & T has monopoly power in the equipment manufacturing market.

nues.[169] These interexchange monopoly revenues, it is said, will subsidize a variety of business activities, ranging from competitive interexchange routes to equipment manufacturing to alternative local distribution facilities.

The validity of these arguments depends, of course, upon the soundness of the claim that after the divestiture AT & T will still possess monopoly power in the interexchange market. If AT & T lacks such power, it would be unable to reap supracompetitive profits with which to support its other activities; it would only recover a profit commensurate with its interexchange operations.

There can be no doubt that AT & T's market share in the interexchange market is high. Although it is not possible to focus on a precise figure inasmuch as the number of market share estimates is almost as varied as the number of persons submitting comments, even AT & T concedes that as late as 1981 its share of interexchange revenue was around 77 percent.[170] But the inquiry of whether AT & T possesses monopoly power in the interexchange areas does not end with a description of AT & T's size or its market share.

As defined by the Supreme Court, monopoly power is "the power to control prices or exclude competition." *United States v. Grinnell Corp., supra*, 384 U.S. at 571, 86 S.Ct. at 1704 (1966); *United States v. duPont & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1004, 100 L.Ed. 1264 (1956). Although monopoly power may be inferred from a firm's predominant share of the market, size alone is not synonymous with market power, particularly where entry barriers are not substantial. *United States v. Grinnell, supra*, 384 U.S. at 571, 86 S.Ct. at 1704;

*United States v. AT & T, supra*, 524 F.Supp. at 1347; Posner, *Market Power in Antitrust Cases*, 94 Harv.L.Rev. 937, 947–51 (1981).

Both the Department of Justice and AT & T contend that competition in the interexchange market is growing and that this increase in competition demonstrates an absence of monopoly power.[171] There is some validity to this claim. The interexchange market is now being served not only by relatively young businesses but also by subsidiaries of such well established firms as ITT, Southern Pacific, and IBM.

That is not to say, however, that competition has flourished without impediment or that it would soar if the Bell System were not broken up. There is substantial merit to the suggestion that, absent divestiture, AT & T would still possess significant monopoly power, and that whatever competition developed in the past did so despite anticompetitive conditions. See Part IV *supra*. But the overriding fact is that the principal means by which AT & T has maintained monopoly power in telecommunications has been its control of the Operating Companies with their strategic bottleneck position. The divestiture required by the proposed decree will thus remove the two main barriers that previously deterred firms from entering or competing effectively in the interexchange market.

First. AT & T will no longer have the opportunity to provide discriminatory interconnection to competitors. The Operating Companies will own the local exchange facilities. Since these companies will not be providing interexchange services, they will lack AT & T's incentive to discriminate. Moreover, they will be required to provide all interexchange carriers with exchange access that is "equal in type, quality, and price to that provided to AT & T and its

---

169. In addition to advancing the cross-subsidization argument, those who advocate restrictions on AT & T also raise contentions based on discrimination. However, because these discrimination claims take on a variety of forms dependent on the context, the Court will address them in its discussion of the specific restrictions that have been proposed.

170. Estimates submitted by others were significantly higher, some contending that AT & T's market share exceeds 90 percent. It is unnecessary for purposes of this proceeding to resolve the conflict, for the precise amount of the market share is not decisive to the Court's holding.

171. The Department took a contrary position during the *AT & T* trial.

affiliates." Proposed Decree, Section II. See Part VIII *infra*.

Second. Once AT & T is divested of the local Operating Companies, it will be unable either to subsidize the prices of its interexchange service with revenues from local exchange services or to shift costs from competitive interexchange services.

With the removal by the decree of all these burdens on competition, the number of firms entering the interexchange market is thus likely to increase.[172] This development should be further assisted by the reduction of other barriers to entry. For example, although the cost of entering the telecommunications business is still substantial, the size of the required capital investment is not as great as it once was.[173] In addition, as more competitors begin to offer more services that are comparable to those offered by AT & T,[174] entrenched customer preferences in favor of AT & T will decrease.

With the removal of these barriers to competition, AT & T should be unable to engage in monopoly pricing in any market. To be sure, there are a number of routes for which AT & T is the sole interexchange carrier. However, several of these routes serve sparsely populated areas and appear to be only marginally profitable. On the other hand, should it turn out that these routes are in fact lucrative and that AT & T is nevertheless charging monopoly prices, then, following divestiture, market forces should fairly rapidly remedy the situation: because of the elimination of entry barriers, new entrants will be attracted to these markets, and prices, in turn, will fall to their competitive levels.

For these reasons, it appears that after divestiture, AT & T will largely lack the monopoly power that the opponents of the decree suggest,[175] and the trend of increasing competition may therefore be expected to continue.[176]

Thus, unless proposed restrictions on AT & T are premised on more than the claim that AT & T has monopoly power in the

**172.** It must be remembered that the regulatory decisions which introduced competition into the interexchange market are themselves relatively recent. It was not until 1978 that the provision of regular long distance telephone service (*i.e.*, MTS/WATS type service) became subject to competition. For a survey of the decisions leading to full competition in the interexchange market, see Docket 11866, *Allocation of the Frequencies in the Bands Above 890 Mc.*, 27 F.C.C. 359 (1959); Docket 16509, *Microwave Communications, Inc.*, 18 F.C.C.2d 953 (1969), 21 F.C.C.2d 190 (1970); Docket 18920, *Specialized Common Carriers*, 29 F.C.C.2d 870 (1971), aff'd sub nom. *Washington Utilities and Transportation Commission v. F.C.C.*, 513 F.2d 1142 (9th Cir.1975); Docket 16495, *Establishment of Domestic Communications Satellite Facilities by Non-Governmental Entities*, 35 F.C.C.2d 844 (1972); *MCI Telecommunications Corp. v. FCC*, 561 F.2d 365 (D.C. Cir.1977) (*Execunet I*); *MCI Telecommunications Corp. v. F.C.C.*, 580 F.2d 590 (D.C.Cir. 1978) (*Execunet II*). The FCC decisions allowing interexchange carriers to expand their service offerings by reselling and sharing AT & T services have likewise been in force only for the last several years. *Regulatory Policies Concerning Resale and Shared Use of Common Carrier Services*, 60 F.C.C.2d 261 (1976), *reconsidered*, 62 F.C.C.2d 588 (1977), aff'd sub nom. *AT & T v. F.C.C.*, 572 F.2d 17 (2d Cir.1978); *Regulatory Policies Concerning Resale and Shared Use of Common Carrier Domestic Pub-*

*lic Switched Network Services*, Docket No. CC 80–54, 83 F.C.C.2d 167 (1981).

**173.** This reduction in the amount of capital investment is due in part to the development of new technologies, such as satellites and microwave towers, and in part to the recent regulatory decisions allowing for the resale and sharing of AT & T services. See note 172, *supra*.

**174.** See, *e.g.*, *MCI v. FCC*, 561 F.2d 365 (D.C. Cir.1977); *MCI v. FCC*, 580 F.2d 590 (D.C.Cir. 1978); *MTS & WATS Market Structure*, CC Docket 78–72, Report & 3rd Supplemental Notice of Inquiry and Proposed Rulemaking, 81 F.C.C.2d 177 (1980).

**175.** The Court does not find that there is *no* possibility that AT & T will use its still considerable market share in an anticompetitive manner. It does find, however, that for the reasons cited, both the incentive and the opportunity for anticompetitive conduct will after divestiture and on account of divestiture be greatly reduced.

**176.** To the extent that AT & T still has some potential for engaging in anticompetitive behavior, there is of course nothing in the proposed decree to immunize it from its obligations under the regulatory decisions or the antitrust laws.

interexchange area, they will have to be rejected.

## B. *Interexchange Restrictions*

Some of those who have commented on the proposed decree [177] urge that the Court require a modification which would add a clause guaranteeing access to AT & T's interexchange network for its competitors, and another which would require AT & T's Long Lines Department to be placed in a fully separated subsidiary. The imposition of such modifications is not warranted.

Those who argue for these restrictions essentially cite no reason other than AT & T's share in the interexchange market to support their demands and, as discussed *supra,* that alone is insufficient.

Additionally, the proposed restrictions are substantively deficient. As the proponents of a clause which would guarantee access to AT & T's interexchange competitors concede,[178] such access is already required by existing FCC decisions and regulations. These regulations make it possible for competing carriers to interconnect freely and to expand their facilities by "piecing out" AT & T's network, that is, by using AT & T's facilities to complete portions of routes that must traverse low density, sparsely populated, and hence presumably not very profitable territory. See note 172 *supra.* There is no basis for simply repeating in the decree [179] precisely that which is already contained in the FCC regulations.

The second proposed restriction—that Long Lines be placed in a separate subsidiary—is likewise unsupported either by necessity or by adequate reasoning. This restriction is required, it is said, to prevent AT & T from using its interexchange revenues to subsidize its competitive services. But as the Court has stated elsewhere (see Part VII *infra*), if cross subsidization is a problem, a separate subsidiary will not resolve it. Moreover, AT & T's opportunity for any cross subsidization will become increasingly curtailed as interexchange competition increases; excessive profits from that service with which to subsidize other activities would quickly attract lower-priced competitors into the interexchange field or stimulate existing competitors into expanding their networks to displace AT & T.

For these reasons, the proposed interexchange restrictions must be rejected.

## C. *Equipment Restrictions*

The restrictions that are suggested in the area of equipment manufacturing are of three basic types: that AT & T's equipment manufacturing and marketing operations be placed in a separate subsidiary or even, in the view of some of those who submitted comments, divested;[180] that AT & T be required to disseminate its network standards and technical information; and that procurement quotas be imposed on the Operating Companies and on AT & T's Long Lines Department.

In addition to justifying these restrictions on the basis discussed above—that is, on AT & T's interexchange market share—their proponents support their position on two other grounds: that AT & T possesses monopoly power in the equipment market, and that the association with Bell Laboratories

---

177. Most of those who have submitted briefs or comments—including AT & T's most major interexchange competitors (*e.g.,* MCI Corp.)—either did not address the subject of restrictions on AT & T at all or they agreed with the decree's provisions as drafted.

178. *E.g.,* Topic 3 briefs submitted by Association of Data Communications Users and the Utilities Telecommunications Council at 11; Mobile Marine Radio Inc. at 10; and Satellite Business Systems at 17.

179. Such duplication might actually have its drawbacks, for it would make it impossible to alter the present requirements should they no longer appear to be in the public interest; (*i.e.,* should the FCC find that, because conditions had become more competitive, the present interconnection requirements are no longer warranted). With the divestiture of the Operating Companies, regulation of interexchange services will in all probability become more effective since AT & T will no longer be able to shift costs in the manner that the government has alleged it has done in the past.

180. Additional reasons for a rejection of this proposal are discussed in Part IV *supra.*

and Long Lines provides Western Electric with anticompetitive advantages in the manufacturing of equipment. The Court will examine each of the arguments in turn.

There is no merit to the claim that after divestiture AT & T will possess monopoly power in the area of equipment manufacturing. In reviewing the proof on anticompetitive behavior in the equipment market—even before divestiture—the Court found that the government's evidence on that aspect of the case was less convincing than, for example, on that involving intercity services. As explained in Part IV *supra,* where the government was able to show that AT & T's market share was high, it was generally unable to demonstrate significant anticompetitive behavior; where evidence of behavior was more damning, it had difficulty establishing market power. Thus, at a minimum the factual predicate for drastic restrictions in the equipment area is not as apparent as it might be with respect to other subjects.

After divestiture, AT & T's position in the equipment market will be further diminished, and that market is certain to become more competitive.[181] To the extent that prior to divestiture AT & T was able to engage in anticompetitive conduct in the equipment market, that ability stemmed basically from its control of the Operating Companies. Once these local companies are divested, Western Electric will lose its captive customers. Not only does the proposed decree eliminate the Operating Companies' intra-enterprise incentive to purchase West-

ern Electric equipment, but it also includes specific provisions that prohibit these companies from discriminating in the procurement of equipment. One of these provisions requires that within six months after the reorganization of AT & T, each Operating Company must submit to the Department of Justice compliance procedures explaining how that company plans to carry out its equipment procurement obligations. Proposed Decree, Sections II(B) and (C). If an Operating Company discriminates in procuring equipment, that act will constitute a violation of the decree, and an enforcement action may be brought against it.

There is likewise no merit to the argument that Western Electric will have an anticompetitive edge in the production of new equipment because its affiliation with Bell Laboratories and Long Lines will give it early access to technical information and network standards. This claim ignores the fact that after divestiture, the Operating Companies, not AT & T, will control the information necessary for local exchange and exchange access services. Thus, if equipment manufacturers need information about interconnecting their equipment to the local exchange network, it will be provided by companies that are not engaged in the manufacturing of equipment.[182]

There is no competitive basis, therefore, for imposing any of the proposed restrictions on AT & T in the area of equipment manufacturing and marketing.[183]

---

**181.** In the interexchange equipment market, for example, Western Electric has a variety of competitors which produce switches and microwave equipment. In the area of equipment manufacturing for computers and computer-related services, far from being the dominant firm, Western Electric will be a new entrant forced to compete with well established domestic and foreign firms.

**182.** To the extent that manufacturers need information from Long Lines, market forces will help to ensure their access: since Long Lines will increasingly be forced to compete with other interexchange competitors, it will have the incentive to purchase the best equipment at the lowest prices without regard to corporate affiliation. It will therefore be in Long Line's

own interest to disseminate its own technical information and standards as broadly as possible to enable it to choose from among the widest range of products. Finally, as technology in interexchange services advances and carriers turn increasingly to the use of microwave towers and satellites, reliance on the AT & T network will decline and the need for obtaining information about the AT & T network will increasingly be reduced.

**183.** Far from enhancing competition, the establishment of quotas would produce anticompetitive results: the Operating Companies and Long Lines would be precluded from making purchasing decisions on the basis of quality and price.

## D. *Bypass*

A considerable number of persons [184] have suggested that the Court prohibit AT & T from using new local distribution technologies that would allow it to "bypass" the networks of the Operating Companies to reach its local subscribers directly.[185] The fear is that, early on, use of this technology will tend to exert pressure on Operating Companies rates and their ability to levy access charges on interexchange carriers, and that, in time, the new technology will render the Operating Companies and their plant obsolete.

The suggestions for a modification to prohibit bypass would be worthy of implementation only if two premises were accepted: (1) that if AT & T does not develop the technology required for bypass, it will not be developed by anyone, and (2) that it is desirable as a matter of public policy to curtail this technological development. Neither premise is well taken.

AT & T is not the only carrier to possess the technical know-how necessary for bypassing the Operating Companies' local networks. Imposition of this restriction on AT & T is thus unlikely to be effective.[186] Furthermore, because other interexchange carriers possess this technology, to prohibit only AT & T from developing and using it would artificially and unfairly restrict competition—an action antithetical to the purposes of the antitrust laws.[187]

Even if the Court, by a simple modification of the decree, could stop bypass technology from developing, it would not be justified in doing so. This technology is a threat to the Operating Companies presumably because, when it is developed, it will be more advanced and less expensive than the present method of transmission which depends upon a cumbersome system of poles and wires. Bypass would provide telecommunications service directly to the subscriber by means of satellites, microwave towers, or other advanced technological innovations at a lower cost than such service is available now. If indeed this should prove to be the case—there is general agreement that truly large-scale use of bypass technology is still some time into the future—the answer is not to call a halt to these developments but to make certain that the benefits will not be distributed in such a way as to undermine the goal of universal service.

Neither the Court nor those who object to the decree can halt the electronic revolution any more than the Luddites could stop the industrial revolution at the beginning of the last century. If and when bypass technology becomes technically and economically feasible for widespread use, it should have the effect of reducing telephone costs and charges across the board, to the benefit of consumers, the economy, and the nation. Should it turn out instead that, as some fear, this technology will be used to reduce charges unevenly so as to threaten the goal of universal service, then those with legislative authority may at that time wish to take steps, through a program of subsidies, special charges, or other regulatory means, to make the benefits of the new technology available to all, including those who are relatively low-volume users of telephone

---

184. Including the members of the House Telecommunications Subcommittee of the House Committee on Energy and Commerce who wrote to the Court on July 27, 1982. See note 63 *supra.*

185. Initially, this capacity would presumably be used primarily to connect to high-volume users; eventually the bypass technology may permit interconnection to all subscribers.

186. Indeed, the protection afforded by a ban on AT & T alone would probably be minimal because it is the carrier least likely to exploit the new technology to the fullest inasmuch as its facilities were designed to interconnect with those of the Operating Companies. Moreover, there is a safety valve against overreaching: before AT & T, or any other carrier, may install the facilities necessary to connect directly to the ultimate customers, it must secure approval from the state regulators. If these regulators find for public interest reasons unrelated to competition that bypass should be prohibited, they may do so irrespective of the decree in these cases.

187. To the extent that the local exchange facilities constitute monopoly bottlenecks, the development of alternative facilities actually furthers the competitive purposes of these laws.

service. But there is no warrant for preventing the development of this technology through a ban on its use by AT & T or otherwise.

### E. Patent Licensing Requirements

Under the terms of the 1956 consent decree, AT & T is required to grant to all applicants non-exclusive licenses for all existing and future Bell System patents. 1956 Consent Decree, Section X. In addition, the decree requires that, upon the payment of reasonable charges, AT & T must furnish to those with licenses for AT & T patents the technical information necessary to manufacture the equipment for which the applicant obtained the patent license. Section XIV. These licensing requirements [188] would be eliminated by the proposed decree, and the Court must determine whether such elimination is in the public interest.

A prime reason for the imposition of the mandatory licensing requirement in 1956 was AT & T's anticompetitive hold on telecommunications and electronics technology.[189] But this technology has advanced rapidly since then, and has become much more widely dispersed, so that AT & T now faces significant challenges in research and development both from established domestic firms and from powerful foreign competitors. The need for continued compulsory licensing of patents, therefore, is diminished on this basis alone.

Divestiture of the Operating Companies may be expected vastly to accelerate this trend. Until now, AT & T's research and development have been financed primarily through the licensing contracts with the local Operating Companies. As long as rate-payer-financed local exchange revenues were supporting this research and development, it made sense to require AT & T to share the fruits of its monopoly financing with others. But under the proposed decree, the licensing contracts will be terminated, and this rationale for exclusive licensing thus falls.

Moreover, AT & T would be forced after divestiture to fund its research and development just like other competitive enterprises—without an artificial subsidy from captive ratepayers. That being so, unless compulsory licensing is eliminated, AT & T would be placed at a significant disadvantage vis-a-vis its competitors: of all those who would be active in the development of new technology, it alone would be compelled to furnish its patents to those who might be interested,[190] including all of its domestic and foreign competitors.[191]

Some of AT & T's competitors contend next that compulsory licensing is necessary to ensure that equipment manufacturers and interexchange carriers receive the interface information necessary to interconnect with the local exchange network. There is no basis for such claims. As stated in Subpart C *supra,* after the divestiture, the local Operating Companies, not AT & T, will possess and generate the information necessary for interconnection. The proposed decree requires AT & T to provide

---

188. The proposed decree does nothing to affect existing licensing contracts, most of which last for the life of the patent and contain provisions for the licensing of related new patents issued within five years of the execution of the contract. In addition, licenses held by the Operating Companies may be sublicensed to others.

189. The complaint in the *Western Electric* action alleged that AT & T engaged in anticompetitive behavior in licensing its own patents and in acquiring the patents of others as part of its efforts to monopolize the telecommunications equipment market. *United States v. Western Electric, supra,* Complaint at 18–19. The 1956 consent decree contains no finding of patent abuse, but simply states that the terms of the judgment are consented to "without . . .

constituting any evidence or admission by any party in respect of any such issues." 1956 Consent Decree at 1.

190. At the same time, AT & T's new-found need to finance its research and development like other competitive firms will exert some pressure on it to license its patents to others so that, reciprocally, it may receive patents and technical information from them.

191. Indeed, this disadvantage could discourage AT & T from spending funds for research and development. The resulting diminution of Bell Laboratories' research effort would not be in the public interest. See Part IV *supra.*

these Operating Companies with, *inter alia,* sufficient technical information to permit them to perform their exchange telecommunications and exchange access functions. Proposed Decree, Section I(A)(1). The Operating Companies, in turn, are prohibited from discriminating in the "establishment and dissemination of technical information and procurement and interconnection standards." Section II(B)(2).[192] And since the Operating Companies will neither manufacture equipment nor provide interexchange services, they will have no incentive to favor Western Electric or Long Lines to the detriment of other intercity service providers and equipment manufacturers.

For these reasons, the Court concludes that the provisions in the proposed decree which would eliminate the patent licensing provisions imposed in 1956 are not inconsistent with the public interest.[193]

Somewhat different considerations apply to licensing relationships between AT & T and the local Operating Companies. These companies have not only relied on the research of Bell Laboratories; through the licensing contracts they have provided direct financial support for that research. In addition, access to the patents and technical information owned by AT & T is necessary if the Operating Companies are to perform properly their exchange telecommunications and access functions. For these reasons, the Court would be reluctant to approve the proposed decree were the Operating Companies to be spun off without patent and research resources. That, however, is not the case.

Under the terms of the proposed decree, the Operating Companies must be given the technical information needed to perform their functions. Proposed Decree, Section I(A)(1).[194] As part of its compliance with this requirement, AT & T has proposed

granting to the Operating Companies, on a royalty-free basis, all existing patents and all patents issued for a period of five years following approval of the proposed decree. See, *e.g.,* AT & T Reply Comments at 123. AT & T has also agreed to provide the Operating Companies with non-patentable technical information that has been funded by the license contracts. Specifically, it has stated (AT & T Reply Comments at 123–34, n. **):

> To the extent License Contract work in progress upon the date of divestiture yields useful technical information thereafter, such information shall also be made available to the BOCs for an appropriate period after divestiture. In addition, technical information concerning Western Electric products and systems will be made available to the extent necessary for the BOCs to procure, or otherwise contract for, compatible equipment and systems from other manufacturers.

Finally, the parties have assured the Court that the Operating Companies will have the right to sublicense the AT & T patents and technical information to those providing them with goods and services. See, *e.g.,* Department of Justice Response to Comments at 38–39.

These representations are adequate to support the conclusion that the Operating Companies will possess the necessary patent and technical information resources. The assurances must, of course, be implemented by means of appropriate details in the reorganization plan, and when that plan is submitted pursuant to the procedures set forth in Part XI *infra,* the Court will evaluate these details to make certain that they conform to the general principles implied by these assurances.

---

**192.** In addition, the FCC requires the Operating Companies to make available network interface information necessary for interconnection. See, *e.g.,* 47 C.F.R. § 68.110.

**193.** Should AT & T misuse its patents—for example by improperly refusing to license them—the aggrieved parties would be free to pursue their remedies under the patent and

antitrust laws: there is nothing in the decree to diminish any of these rights and remedies.

**194.** In addition, until September 1, 1987, the Operating Companies may call upon AT & T, Western Electric, and Bell Laboratories to provide "on a priority basis all research, development, manufacturing, and other support services." Proposed Decree, Section I(C).

## VI

### *The 1956 Decree and Line of Business Restrictions*

The basic agreement embodied in the 1956 consent decree in the *Western Electric* case [195] was that AT & T would not be required to divest itself of Western Electric, provided that AT & T would restrict its operations to the provision of common carrier communications services [196] and that Western Electric would manufacture only the types of equipment used by the Bell System.[197]

The decree which has now been submitted by the parties would eliminate all of the restrictions of the 1956 consent judgment. If that decree is entered by the Court, AT & T would be free to enter the computer market as well as to provide the full range of so-called *information services*.[198]

There has been no serious opposition to the entry of AT & T into manufacturing and marketing of computers and other electronic equipment, and there is no question that this development would be in the public interest.[199] It will accordingly be ap-

---

**195.** See Part I *supra*.

**196.** Section V of the 1956 decree provides,

[t]he defendant AT & T is enjoined and restrained from engaging, either directly, or indirectly through its subsidiaries ... in any business other than the furnishing of common carrier communications services; provided, however, that this Section V shall not apply to ... businesses or services incidental to the furnishing by AT & T or such subsidiaries of common carrier communications services.

Under Section II(i) of the 1956 decree, common carrier communications services are defined as "communications services and facilities, ... the charges for which are subject to public regulation under the Communications Act of 1934."

**197.** Section IV of the 1956 decree states that

[t]he defendants are each enjoined and restrained from commencing, directly or indirectly, to manufacture for sale or lease any equipment which is of a type not sold or leased ... to Companies of the Bell System, for use in furnishing common carrier communications services.

**198.** Although the Court need not at this juncture decide the question whether AT & T could provide any of these information services were the 1956 consent decree to remain in effect, it would appear that, unless that decree is vacated, AT & T would be precluded from offering most, if not all, of these services. Specifically, it is difficult to imagine how the Court could find either (1) that the provision of computer services or electronic news services in competition with others satisfies the 1956 decree's requirements that AT & T provide only common carrier communications services the charges for which are subject to public regulation under the Communications Act or (2) that these services are "incidental" to the furnishing of common carrier communications services.

Similarly, it appears that under the 1956 decree, AT & T would be precluded from offering

the services described in the FCC's *Computer II* decision. In that decision, the FCC ruled that AT & T could offer so-called "enhanced services" (which are essentially the equivalent of the "information services" described in the proposed decree), and customer premises equipment on a non-tariffed competitive basis, provided that AT & T does so through a fully separate subsidiary. The Commission's decision simply means that AT & T is authorized, as opposed to required, to offer these services *under the Communications Act;* it does not relieve AT & T of its obligations under the *antitrust laws,* and more specifically under the 1956 decree. (The Commission's decision is presently on review—see *Computer & Communications Industry Ass'n v. FCC,* D.C. Civ. No. 80–1471 (filed May 15, 1981)—but the appeal does not alter the underlying legal effect of the Commission's decision in relation to the action before this Court.)

Finally, it should be noted that, if presented with the issue of whether AT & T is precluded by the 1956 decree from offering these non-tariffed competitive services permitted under *Computer II,* this Court would be deciding that issue *de novo,* because the opinion and order issued by Judge Biunno construing the decree to permit AT & T to offer these services has been vacated by order of the Court of Appeals for the Third Circuit. See note 17 *supra.*

**199.** Without control of the local exchange monopolies, AT & T will have no improper advantage over other competitors. See Part IV(B) *supra*. It will not be able to subsidize its offerings with monopoly profits in the interexchange or telecommunications equipment markets (see Part V, *supra*) and there is little likelihood of customer discrimination because these products and services, unlike information services, are not closely dependent upon access to the telecommunications network.

If a potential competitor poses no threat to the development of a healthy competitive market it should obviously not be barred from

proved. By contrast, others who have submitted comments object to AT & T's entry into the information services market.

"Information services" are defined in the proposed decree at Section IV(J) as:

> the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing or making available information which may be conveyed via telecommunications . . . .

Two distinctly different types of information services fall within this general category: services which would involve no control by AT & T over the content of the information other than for transmission purposes (such as the traditional data processing services), and services in which AT & T would control both the transmission of the information and its content (such as news or entertainment). Because these two types of services raise different concerns, they will be addressed separately.

### A. *Data Processing and Other Computer-Related Services*

As technology has advanced, the line between communications and data processing has become blurred. Advances in communications technology, for example, now allow otherwise incompatible computers to converse with each other. New sophisticated telephone equipment located on a customer's premises not only performs switching and call routing functions but it also retrieves information much as does a traditional computer. Even ordinary telephones may be capable of performing functions that formerly required the support of a separate computer.[200]

Providers of data processing services—like others who have commented on the decree in other contexts—contend that AT & T should be prohibited from entering these fields because of its market power in

the area of interexchange services. Shaping the argument to support their particular interests, these persons contend that AT & T will use the monopoly profits from its interexchange services to subsidize its computer-related services, and that it will use its control over the interexchange network to discriminate against other data processing competitors in providing access to that network.

As explained in Part V *supra,* there is little possibility that AT & T will be able to use its revenues from the interexchange market to subsidize its prices for computer services. That being true, AT & T would not possess any anticompetitive advantages over competitors on this basis, and the possibility of cross subsidization as a basis for rejecting this portion of the proposed decree may therefore be completely discounted.

The discrimination argument is slightly more serious. Since AT & T will be offering its own computer-related services, it may well have an incentive to discriminate in transmitting competitors' services. But what defeats the objections is that AT & T's actual ability to discriminate is quite remote. This segment of the information services industry is already well established, comprised of some of the nation's leading corporate giants, as well as of many smaller concerns. The FCC has found that "[t]here are literally thousands of unregulated computer service vendors offering competing services connected to the interstate telecommunications network." *Computer II, supra,* 77 F.C.C.2d at 426. These strongly competitive conditions will limit AT & T's ability to practice discrimination in two ways. First, AT & T's competitors will have the economic resources necessary to combat any attempt at discrimination. Second, the growing demand for informa-

---

entering that market. The greater the number of competitors, the more likely it is that consumers will reap the benefits of lower prices and product improvements. AT & T is likely to be an especially potent competitor given its manufacturing expertise and the resources of Bell Laboratories.

**200.** Other examples of these services include AT & T's Custom Calling II (which allows advance calling and call answering), telephone-operated burglar alarm systems, and office management systems (which may provide such diverse functions as inventory control, temperature control, and inter-office data communications).

tion services will necessarily increase the demand for transmission facilities for these services. Such an increase in demand is likely to stimulate AT & T's interexchange competitors to offer satisfactory alternatives to the AT & T network,[201] and any attempt by AT & T to discriminate would only further enhance this eventuality.

This fairly limited possibility of discrimination clearly does not outweigh the substantial advantages to the public that would be gained by allowing AT & T to develop this new technology. AT & T's entry into these technologically sophisticated fields will stimulate competition, and it is therefore likely to produce further technological advances, new products, and better services—all of which are likely to benefit the American consumer, American foreign trade, and national defense.

Since AT & T's participation in these areas will foster the traditional objectives of the Sherman Act and is not likely to lead to anticompetitive practices,[202] the Court

will not sustain the objections to this aspect of the proposed decree.[203]

## B. *Electronic Publishing Services*[204]

The second type of information service which AT & T would be permitted to provide under the proposed decree are those services in which it would control, or have a financial interest in, the content of the information being transmitted. Those services are generally referred to as electronic publishing or information publishing services.[205]

A number of organizations have objected to entry of the proposed decree unless it is modified to include a ban on electronic publishing. However, the decree itself does not specifically refer to the concept of electronic publishing, let alone provide a suitable definition. In order to conduct a meaningful discussion of the relevant issues, therefore, electronic publishing must first be defined. After drawing on various sources,[206] the Court has concluded that, for

---

**201.** Indeed, some of the providers of these information services may themselves have the resources to construct such transmission systems.

**202.** Absent the divestiture of the Operating Companies, that conclusion might, of course, be quite different.

**203.** For the reasons stated in Part VII *infra,* the Court also rejects the suggestion that AT & T be required to offer these services through a separate subsidiary.

**204.** The discussion of electronic publishing under the topic heading "1956 Consent Decree and Line of Business Restrictions" is for the sake of convenience only. The Court's decision—that permitting AT & T to become an electronic publisher is not in the public interest—was made solely on the basis of the proposed decree here under review and without consideration of whether AT & T could offer these services under the terms of the 1956 decree. But see note 198 *supra.*

**205.** For purposes of this discussion, the Court will use the term electronic publishing. Use of this term is not meant to imply a limitation to a particular kind of transmission technology.

**206.** The kinds of services here under review have been discussed under a variety of labels in a number of forums. The telecommunications bill introduced in the House of Representatives,

for example, used the term "information publishing service" which was defined as:

provision to any unaffiliated person of any information—

(A) which the publisher has (or has caused to be) authored, originated, gathered, collected, produced, compiled, edited, categorized, or indexed; or

(B) in which the publisher has a direct or indirect financial or proprietary interest.

H.R. 5158, 97th Cong., 1st Sess. § 263(f)(3) (1982). (The bill was withdrawn by Congressman Wirth on July 20, 1982.)

A Senate bill on the same subject referred to "cable service" and "mass media services." The former term was defined as "the retransmission of any television or radio broadcasting signal, or program origination, for distribution by cable or any other closed transmission medium to multiple subscribers who pay to receive such service." Mass media services were defined as follows:

The term 'mass media' includes television and radio broadcasting, pay television, and printed or electronic publications (including newspapers, periodicals, and any service or product like or similar to a newspaper or periodical). Such term does not include—

(A) telephone number or address listings and directory assistance (limited to telephone number, address, and business category);

purposes of this opinion, electronic publishing [207] will be regarded as:

> the provision of any information which a provider or publisher has, or has caused to be originated, authored, compiled, collected, or edited, or in which he has a direct or indirect financial or proprietary interest, and which is disseminated to an unaffiliated person through some electronic means.[208]

A number of persons have argued that because of potential dangers to competition and to First Amendment values, AT & T should be prohibited from engaging in such activities. For the reasons stated below, the Court agrees.

The threat to competition that is claimed to be posed by AT & T in this industry is that, through the use of cross-subsidization and customer discrimination, it will use its power in the interexchange market to disadvantage competing electronic publishers.[209] While the possibility of cross-subsidization is as remote here as it is with respect to other subjects considered herein,[210] there is a real danger that AT & T will use its control of the interexchange network to undermine competing publishing ventures.

AT & T could discriminate against competing electronic publishers in a variety of ways. It could, for example, use its control over the network to give priority to traffic from its own publishing operations over that of competitors. A second concern is that, inasmuch as AT & T has access to signalling and traffic data, it might gain proprietary information about its competitors' publishing services. Furthermore, it appears that AT & T would have both the incentive and the opportunity to develop technology, facilities, and services that favor its own publishing operations and the areas served by these operations rather than the operations of the publishing industry at large. Similarly, AT & T could discriminate in interconnecting competitors to the network and in providing needed maintenance on competitors' lines. Finally, AT & T might submit tariffs that would have the effect of favoring AT & T's publishing operations to the disadvantage of competing concerns.

AT & T and the Department of Justice provide the same response to these arguments that they make in other contexts: that market forces will curtail AT & T's ability effectively to engage in these practices. In the absence of special problems

---

> (B) weather, time, or sports information;
> (C) any information service which AT & T or any affiliate was engaged in on April 7, 1981; or
> (D) printed or electronic directory advertising.

S. 898, 97th Cong., 1st Sess. § 229(f) (1981). Some persons who have commented in this proceeding have urged the Court to adopt the definition used in H.R. 5158; others have proposed their own definition. The National Association of Broadcasters, et al. (Topic 6 Brief at 2), for example, urges that electronic publishing be defined as

> the provision of any information which the provider (the publisher), has, or has caused to be, originated, created, compiled, produced or selected, and which is intended for members of the public and is distributed via electronic means.

**207.** In addition to the one-way dissemination of information that is the norm in print publishing, electronic publishing also includes interactive transaction services. These services allow a consumer not only to receive information at home but also to send information back to the publisher. Thus, consumers using a "shop-at-

home" service, for example, could use their home terminals to call up information on products being offered by a particular merchant, and then place their orders for the desired products by using their terminals to key in the necessary ordering information.

**208.** The kinds of information referred to in this definition include news, business and financial reports, editorials, columns, sports, features, and electronic advertising. The means of transmission include pay television, radio and television broadcasting, and electronic publications which appear either by audio means, on video screens, or in printed form. But see note 223 *infra.* See also S.Rep. No. 97–170, 97th Cong., 1st Sess. 42–44 (1981).

**209.** These are the same problems that have been claimed to exist in other markets, but as is apparent from discussion below, they take on a different and more serious complexion in this context.

**210.** See Parts V(A) and VI(A) *supra.*

and concerns relating only to the electronic publishing industry, the Court probably would, as it has in other instances, accept that response. However, in the view of the Court a different conclusion is appropriate here, for the peculiar characteristics of the electronic publishing market would both render anticompetitive acts more damaging to AT & T's competitors in that market and insulate such acts from correction by market forces.

The electronic publishing industry is still in its infancy. Although this business may some day be a very significant part of the American communications system, at present, and most likely for the next several years, a small number of relatively small firms will be experimenting with new technology to provide services to an American public that is, for the most part, still almost totally unfamiliar with them. There can be no doubt that, if AT & T entered this market, the combination of its financial, technological, manufacturing, and marketing resources would dwarf any efforts of its competitors.[211] In fact, AT & T's mere presence in the electronic publishing area would be likely to deter other potential competitors from even entering the market.

It is also readily apparent that competitors in the electronic publishing industry— far more so than competitors in any other industry—could easily be crushed were AT & T to engage in the types of anticompetitive behavior described above. Unlike most products and services, information in general and news in particular are by definition especially sensitive to even small impediments or delays. Information is only valuable if it is timely; by and large it is virtually worthless if its dissemination is delayed. This quality is especially important in electronic publishing because up-to-date information and constant availability are the features likely to be sought by subscribers.

The trial record in the *AT & T* case reveals many instances when AT & T was slow to respond to the needs of competitors, both in providing essential products or parts and in servicing these products and parts.[212] Any delays of that kind, were they to occur in the context of the transmission of electronic publishing information, would quickly cause subscribers to desert their unreliable publishers and thus cripple AT & T's competitors in that business.

Finally, electronic publishers remain more dependent upon the AT & T network than others in the telecommunications business. In some areas, AT & T is the sole provider of intercity services. Elsewhere, where competition does exist, the other common carriers—although capable of handling voice transmissions—frequently lack the sophisticated facilities necessary to meet the needs of the electronic publishers.[213] Systems that are specifically designed to transmit data do not provide a satisfactory solution; most of these systems lease part, if not all, their facilities from AT & T. Nor are satellites the answer, for at least for the present they do not appear to present a realistic alternative, given their restricted availability, potential transmission problems, and high costs.

Thus, even if AT & T should engage in anticompetitive activity, publishers would

211. AT & T has already played a major role in developing technical standards for that industry as evidenced by its involvement in writing the "Presentation Level Protocol" which will be used to code electronic publishing signals and which may become the major protocol used by publishers in the United States.

212. See, *e.g.,* Testimony of Lowell Hoxie (March 10, 1981); Pier Abetti (March 11, 1981); and Luther R. Hinton (March 20, 1981).

213. For example, the networks of the other common carriers may not be extensive enough to connect a publisher, or a publisher's customers, to the required data bases without relying at least in part on facilities provided by AT & T. Moreover, because competing facilities are not as extensive as AT & T's, the likelihood of congestion on their transmission lines, which causes the calls to receive busy signals, is far greater.

It is of course possible that these publishers could use any alternate transmission systems developed to service the needs of providers of other types of information services. However, it is not clear that those networks will develop in ways which will meet the needs of electronic publishers. Therefore, they cannot be relied upon to serve as a check upon AT & T's power.

have no realistic alternative transmission system by which to reach their subscribers. The low level of demand for these services that exists at present makes it unlikely that competing interexchange carriers would construct transmission systems to be used solely for the delivery of electronic publishing services, and publishers would therefore be forced to accept the inferior services provided by AT & T.

Based on competitive considerations alone, therefore, the Court might well be justified in barring AT & T from electronic publishing industry. Beyond that, AT & T's entry into the electronic publishing market poses a substantial danger to First Amendment values.

The goal of the First Amendment is to achieve "the widest possible dissemination of information from diverse and antagonistic sources." *Associated Press v. United States,* 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945). See also *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 795, 98 S.Ct. 2096, 2112, 56 L.Ed.2d 697 (1978). This interest in diversity has been recognized time and again by various courts. In *Red Lion Broadcasting v. FCC,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969), for example, the Supreme Court observed that

> [i]t is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market.

See also *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). Judge Learned Hand, speaking for the Court of Appeals for the Second Circuit, similarly noted that the media serve "one of the most vital of all general interests: the dissemination of news from as many different sources, and with as many different facets and colors as possible." [214] *United States v. Associated Press,* 52 F.Supp. 362, 372 (S.D.N.Y.1943), *aff'd,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1945).[215]

The striving for diversity in sources of information has found expression not merely in the traditional and constitutional prohibition on control of news by government but also in some private contexts, notably in regard to the broadcast media. The Federal Communications Commission is charged by the Communications Act with granting broadcast licenses in the "public interest, convenience and necessity." 47 U.S.C. §§ 301, 303, 307, 309. Pursuant to that public interest standard, the Commission has time and again adopted rules designed to promote diversity among the broadcast media.[216] These rules, and the policies underlying them, have repeatedly been sustained by the Supreme Court and the Court of Appeals for this Circuit.

For example, in *United States v. Storer Broadcasting Co.,* 351 U.S. 192, 201–04, 76 S.Ct. 763, 769–771, 100 L.Ed. 1081 (1956), the Supreme Court, recognizing the impor-

---

**214.** The court further explained that this diversity is essential because the First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we staked upon it our all." *Id.*

**215.** Both the chairman of the House Subcommittee on Telecommunications, Consumer Protection, and Finance and AT & T agree with this principle. Congressman Timothy E. Wirth has aptly pointed out that "the information market provides much more than economic good, for assuring a diversity of information sources is critical to the proper functioning of the entire democratic system." Hearings on H.R. 5158, *supra,* note 141, at Part 3, at 1. Similarly, Charles Marshall, an AT & T execu-

tive vice president, recently testified before the same subcommittee that "the best way to assure a diversity of these kinds of information services to the American public is to assure a diversity of sources." Hearings on H.R. 5158, *supra,* note 141, at Part 2, at 137.

**216.** FCC policies prohibit formation or transfer of co-located newspaper-broadcast combinations (*FCC v. National Citizens Committee for Broadcasting, supra,* 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697; common ownership of more than one broadcast station in the same area (47 C.F.R. §§ 73.35, 73.240, 73.636); operation of cable systems by a telephone company (47 C.F.R. § 63.54); and ownership of cable systems by a television network (47 C.F.R. § 74.1131).

tance of diversity and the authority of the FCC to determine the public interest, upheld rules placing limitations on the total number of broadcast stations a person may own or control. See also, *National Broadcasting Co. v. United States,* 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943). Likewise, in *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978), the Court sustained regulations which banned the award or transfer of a broadcast license where there was a common ownership of a broadcast station and a daily newspaper located in the same locality, stating (436 U.S. at 801–02, 98 S.Ct. at 2115),

> ... the Commission has acted 'to enhance the diversity of information heard by the public ....' The regulations are a reasonable means of promoting the public interest in diversified mass communications.[217]

Certainly, the Court does not here sit to decide on the allocation of broadcast licenses. Yet, like the FCC, it is called upon to make a judgment with respect to the public interest and, like the FCC, it must make that decision with respect to a regulated industry and a regulated company.

In determining whether the proposed decree is in the public interest, the Court must take into account the decree's effects on other public policies, such as the First Amendment principle of diversity in dissemination of information to the American public. See Part II *supra.* Consideration of this policy is especially appropriate because, as the Supreme Court has recognized, in promoting diversity in sources of information, the values underlying the First Amendment coincide with the policy of the antitrust laws. *FCC v. National Citizens Committee for Broadcasting, supra,* 436 U.S. at 800, n. 18, 98 S.Ct. at 2114, n. 18.

Applying this diversity principle to the issue here under discussion, it is clear that permitting AT & T to become an electronic publisher will not further the public interest.

During the last thirty years, there has been an unremitting trend toward concentration in the ownership and control of the media. Diversity has disappeared in many areas; newspapers have gone out of business; others have merged; and much of the flow of news and editorial opinion appears more and more to be controlled and shaped by the three television networks and a handful of news magazines and metropolitan newspapers.

This concentration presents obvious dangers even today. Unless care is taken, both the concentration and the attendant dangers will be significantly increased by the new technologies. Indeed, it is not at all inconceivable that electronic publishing, with its speed and convenience will eventually overshadow the more traditional news media, and that a single electronic publisher would acquire substantial control over the provision of news in large parts of the United States. See also Part IV(A) *supra.*[218]

---

**217.** The Court of Appeals, speaking in the same case, was even more explicit.

> ... Congress moved under the spur of a widespread fear that in the absence of governmental control the public interest might be subordinated to monopolistic domination in the broadcast field [citing case] .... The First Amendment "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public [citing case]. The 'public interest' standard necessarily invites reference to First Amendment principles ...." Although no provision of the Communications Act expressly grants the Commission authority to restrict newspaper ownership of broadcast stations, such express authority is not essential to the validity of Commission regulations. 47 U.S.C. § 309(a) requires the Commission to find the 'public interest, convenience and necessity will be served' by the grant of a license.

*National Citizens Committee for Broadcasting v. FCC,* 555 F.2d 938, 948–51 (D.C.Cir., 1977), *aff'd in part,* 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978).

**218.** De Tocqueville observed with his usual prescience long ago that revolutions by means of the press would most likely come about from its centralization in a few powerful organs. A. de Tocqueville, *Democracy in America* (1835) chapter XI. Richard Reeves who recently retraced de Tocqueville's travels, took note of the

The concentration that now exists in the media has presumably been brought about by impersonal economic and technological forces, and it is obviously beyond the concern of this or any other court. But the particular concentration that may emerge from the proposed decree is subject to the Court's jurisdiction in this antitrust case as part of the instant proceeding. Not only is AT & T a regulated company, and not only does the proceeding stem directly from serious charges of anticompetitive conduct, but the Court has been mandated not to approve the proposed decree unless it finds it to be in the public interest. AT & T's ability, described above, to use its control of the interexchange network to reduce or eliminate competition in the electronic publishing industry is the source of this threat to the First Amendment principle of diversity.

In sum, for a variety of reasons, the entry of AT & T into electronic publishing involves risks to the public interest that are greater than those which would be involved by that company's entry into other markets.

Since under the Sherman Act, it is appropriate to bar a company from a market if the restriction is necessary to permit the development of competition in that market (Ford Motor Co. v. United States, supra, 405 U.S. at 577–78, 92 S.Ct. at 1151–52),[219] and since First Amendment values, too, support a ban on electronic publishing by AT & T, the Court will require that the company be prohibited from entering that market.[220]

At the same time, a prohibition on electronic publishing does not impose an undue burden on AT & T.[221] The company is free to enter all the other computer, computer-related, and information services markets; and it will simply be barred from the creation or control of the information to be transmitted.[222] AT & T may thus fulfill its traditional function of providing a delivery system for information which others wish to transmit, and it may also manufacture and market equipment for the electronic publishing industry and provide transmission services for other electronic publishers.[223]

development of two-way telecommunications which allowed citizens instantaneously to record their thoughts on the political issues of the day, and he commented that

[w]hoever decides which questions are to be asked and how they are to be worded has enormous power .... The results of these instant referenda would then be flashing in front of each legislator. A member of Congress, knowing public opinion in the district or the country, would then have the dubious honor and politically dangerous duty of voting, perhaps testing his or her conscience against the recorded will of the majority. R. Reeves, American Journey 89–90 (1982).

219. The Court explicitly rejected Ford's argument that the manufacturing prohibition removed a potential competitor from the market, finding that the restriction was necessary to allow the development of competition in the industry. Id.

220. Such a prohibition will not have anticompetitive consequences because AT & T has no special expertise in creating information which would make it a potent competitor in this market. It could overwhelm competitors only because of its ability to engage in anticompetitive conduct.

221. The Court notes that AT & T has stated that, although it does not wish to be legally

bound, "it now has no intention to provide information services that would be competitive with the news and features of newspaper or with broadcasting or traditional cable television services." AT & T Reply Brief at 116.

222. AT & T may engage in this activity if the information is delivered over transmission facilities in which AT & T has no interest. In that case, there would be no possibility of anticompetitive activity, because AT & T would have no control over the transmission of its publishing services.

223. Beyond that, the Bell System has long been engaged in providing a variety of services which, although relatively minor in character, could loosely be regarded as falling into the category of electronic publishing. Because of that involvement without significant adverse consequences, it is not necessary in the public interest that AT & T be precluded, and AT & T will not be precluded, by the modification required below, from offering the following: electronic directory services including listings of general product and business categories, and of the service or product providers under these categories, and their names, telephone numbers, and addresses; such traditional Bell System services as time, weather, and such other audio services as are being offered as of the date of the entry of the decree to the geograph-

The restriction on electronic publishing—like any limitation on competition—should only remain in effect for the period necessary to establish conditions conducive to free and fair competition. Since it is not likely that the factors enumerated above which militate against AT & T's immediate entry into the electronic publishing market will continue to exist indefinitely, the Court will place a time limit on its prohibition. See *Ford Motor Co. v. United States, supra,* 405 U.S. at pp. 562, 575 n. 10, 92 S.Ct. at pp. 1142, 1150 n. 10, where the Court upheld an antitrust decree that prohibited Ford from entering the spark plug manufacturing business but limited that prohibition to a period of ten years.

Section VII of the proposed decree allows modifications to be made in its provisions upon the application of a party or an Operating Company. It is the intention of the Court to remove the prohibition on electronic publishing at the end of seven years from the entry of the decree should application for such removal be made pursuant to Section VII. That seven-year period should be sufficient for the development of electronic publishing as a viable industry, for the acquisition of sufficient strength by individual publishers adequate to permit them to compete, and for the development of means other than the AT & T network for the transmission of the messages of electronic publishers. During that same period, the new AT & T will also have acquired a track record with respect to behavior toward its competitors in other areas of the telecommunications business.[224]

## VII

### Restrictions on the Divested Operating Companies

The proposed decree limits the Operating Companies, upon their divestiture, to the business of supplying local telephone service. In addition to a general prohibition against the provision of "any product or service that is not a natural monopoly service actually regulated by tariff," there are more specific restrictions in Section II(D) which deny the Operating Companies the opportunity to engage in the following activities: (1) the provision of interexchange services; (2) the provision of information services; (3) the manufacture of telecommunications products and customer premises equipment; (4) the marketing of such equipment and (5) directory advertising, including the production of the "Yellow Pages"[225] directories.[226]

Restrictions of this type may validly be imposed if they are necessary to prevent the occurrence or recurrence of anticompetitive conduct. *Ford Motor Co. v. United States, supra,* 405 U.S. at 577–78, 92 S.Ct. at 1151–52. See Part II *supra.* However, as the Department of Justice[227] concedes, such restrictions deserve "the most careful scrutiny" to ensure both that they will have the desired effect and that they will not actually limit competition by unnecessarily barring a competitor from a market. Department of Justice Response to Comments at 56.

---

ic areas of the country receiving those services as of that date; and the dissemination of information to and from AT & T's affiliates.

**224.** The Court expects to allow any opponents of the removal of the prohibition to comment on the question whether its continuation will be in the public interest, and, should they be able to show that competitive conditions clearly require the maintenance of the ban, it will not be lifted. However, the burden will at that time be on such opponents to demonstrate that the public interest requires the continued exclusion of AT & T from electronic publishing.

**225.** These are the directories currently produced by the Operating Companies or under their auspices, for each geographic region which

they serve. These directories contain subscriber listings grouped by subject matter along with advertisements.

**226.** No specific provision of the proposed decree deals with directory advertising, but the parties have stated that the general prohibition against provision of non-monopoly services includes production of the Yellow Pages. See Competitive Impact Statement at 29 n. 24.

**227.** It appears that the Department is the principal proponent of the restrictions on the Operating Companies. AT & T has generally taken the stance that it agreed to these restrictions as part of the overall settlement.

These restrictions are justified, according to the Department, because the Operating Companies will have "both the ability and the incentive" to thwart competition in these markets by leveraging their monopoly power in the intraexchange telecommunications market.[228] In the absence of the restrictions, it is reasoned, the Operating Companies will be able (1) to subsidize their prices in competitive markets with supracompetitive profits earned in the monopoly market, and (2) to hinder competitors by restricting their access to the intraexchange network. In short, it is the Department's view that the divested Operating Companies may appropriately be equated with the present Bell System complex in that, if permitted to enter competitive markets, they may be expected to engage in the same type of anticompetitive behavior that was the crux of the *AT & T* lawsuit.

The government's approach, while not without conceptual neatness, fails to take account of circumstances far more complex than these undifferentiated rules acknowledge. The Bell System is a vast, vertically integrated company which dominates local telecommunications, intercity telecommunications, telecommunications research, and the production and marketing of equipment. Each of the divested Operating Companies will have a monopoly in only one geographic portion of one of these markets—local telecommunications. In addition, the Bell System as presently constituted has few powerful competitors in any of the activities in which it is engaged. The Operating Companies, by contrast, will, if permitted to enter competitive markets, be faced with the most potent conceivable competitor: AT & T itself. Thus, the only similarity between the divested Operating Companies and the present Bell System is that both possess a monopoly in local telecommunications.

That single circumstance—important though it may be—is not a sufficient basis upon which to restrict competition generally in the name of the antitrust laws. If this were the case, all monopolies might have to be barred from competitive industries, and even the Department of Justice acknowledges that this drastic remedy is not required. See Response to Comments at 55. The Tunney Act's public interest standard permits the Operating Companies to be barred from a competitive market only if there is a substantial possibility that they will use monopoly power to impede competition in that market. Two basic factors are relevant to this determination.

The restrictions are based upon the assumption that the Operating Companies, were they allowed to enter the forbidden markets, would use their monopoly power in an anticompetitive manner. It is accordingly necessary for the Court first to determine whether these companies will actually have the incentive and opportunity to act anticompetitively.[229] Second, the restrictions are, at least in one sense, directly anticompetitive because they prevent a potential competitor from entering the market. The Court must accordingly also consider the extent to which the participation of the Operating Companies would contribute to the creation of a competitive market.[230]

In addition, the Court must assess the effect of the restrictions upon other important public policies. Many persons,[231] including particularly the States, claim that

---

**228.** Response to Comments at 54. See also *id.* at 53–61; Competitive Impact Statement at 27.

**229.** The Court cannot accept the proposition advanced by some that state and federal regulation alone will eliminate the possibility of anticompetitive abuses by the Operating Companies. If regulation could effectively prevent these practices, there would have been no need for the *AT & T* action. See Part IV *supra.*

**230.** There is no basis for the government's contention that the participation of the Operating Companies in these markets would be of little competitive value. Their expertise in telecommunications and their large customer base would make them natural competitors in these fields.

**231.** Including the members of the House Subcommittee on Telecommunications, Consumer Protection, and Finance who submitted their views to the Court. See note 63 *supra.*

these restrictions would have adverse consequences in that they would either undermine the financial viability of the divested Operating Companies, or produce substantial increases in the rates for local telephone service, thus eroding the statutory goal of universal telephone service for all Americans. See 47 U.S.C. § 151.[232] This factor, to be sure, cannot preclude the imposition of a restriction necessary to preclude the anticompetitive activity; but to the extent that a restriction does not have a procompetitive effect, it may not be imposed if it infringes upon other important public policies. See generally Part II *supra.*

The Court will examine the various substantive provisions in light of these general principles.[233]

### A.  *Interexchange Services*

The proposed decree prohibits the divested Operating Companies from providing interexchange services. This restriction is clearly necessary to preserve free competition in the interexchange market.

Access to the local exchange is essential for all interexchange carriers and, as the evidence in the *AT & T* action has suggested, there are many ways in which the company controlling the local exchange monopoly could discriminate against competitors in the interexchange market. See Part IV *supra.* After divestiture, the incentive of those who control the local networks to engage in such activity will remain un-

changed: they would stand to gain business if other carriers were disadvantaged by poor access arrangements and high tariffs.

To permit the Operating Companies to compete in this market would be to undermine the very purpose of the proposed decree—to create a truly competitive environment in the telecommunications industry. The key to interexchange competition is the full implementation of the decree's equal exchange access provisions. See Part VIII *infra.* If the Operating Companies were free to provide interexchange service in competition with the other carriers, they would have substantial incentives to subvert these equal access requirements. The complexity of the telecommunications network would make it possible for them to establish and maintain an access plan that would provide to their own interexchange service more favorable treatment than that granted to the other carriers. Such a result would perpetuate the very inequalities that the proposed decree is designed to eliminate. Finally, the Operating Companies would also have the ability to subsidize their interexchange prices with profits earned from their monopoly services.

Those who object to this restriction suggest (1) that the Operating Companies would provide additional competition in the interexchange market and (2) that revenues from interexchange operations would increase that viability and reduce the need for local rate increases. These objections

---

**232.** Evidence introduced during the *AT & T* trial indicated a definite correlation between increases in local telephone rates and the number of homes with a telephone. See Testimony of Louis J. Perl (November 23, 1981); Exhibit D–4–1518.

**233.** Some have contended that the Court should not assess the propriety of the restrictions without holding evidentiary hearings with regard to the need therefor, their effect upon local rates, and related matters. The legislative history of the Tunney Act indicates that the court reviewing a proposed consent decree has broad discretion in fashioning the procedures for the public interest review. Both congressional committees stated, "Only where it is imperative that the court should resort to calling witnesses for the purpose of eliciting additional facts should it do so." S.Rep. No. 93–

298, *supra,* at 6–7; H.R.Rep. No. 93–1463, *supra,* at 8, U.S.Code Cong. & Admin.News 1974, p. 6539. The record in the *AT & T* action contains extensive information about the competitive structure of the entire telecommunications industry. This Court has relied upon that record in assessing the competitive significance of the proposed restrictions, and an evidentiary hearing concerning such matters is therefore not necessary.

Similarly, there is no need for a hearing concerning the effect of the restrictions upon local rates. Any testimony on that issue could only be speculative and would be unlikely to assist the Court in its public interest determination. In addition, the effect of the restrictions upon local rates does not represent the crux of the Court's decision on these questions.

have little merit in this context. If the Operating Companies entered the interexchange market and competed fairly, without exploiting their local monopoly positions, the resulting increase in competition would not be substantial.[234] Moreover, the Operating Companies could realistically recoup substantial profits from their interexchange operations only by using their monopoly power to disadvantage competitors.[235] But that, of course, would be precisely the behavior which brought about the 1974 lawsuit against AT & T and the current proposal for a decree. In short, there are clear, and indeed overwhelming, pro-competitive justifications for this restriction.[236]

## B. *Information Services*

The proposed decree prohibits the Operating Companies from providing information services, an umbrella description of a variety of services including electronic publishing and other enhanced uses of telecommunications.[237] This prohibition is necessary for reasons similar to those justifying the restriction on interexchange services, as well as for additional reasons not relevant to the interexchange problem.

All information services are provided directly via the telecommunications network. The Operating Companies would therefore have the same incentives and the same ability to discriminate against competing information service providers that they would have with respect to competing interexchange carriers. Here, too, the Operating Companies could discriminate by providing more favorable access to the local network for their own information services than to the information services provided by competitors, and here, too, they would be able to subsidize the prices of their services with revenues from the local exchange monopoly.[238]

There is also the effect on the configuration of the local networks to consider. Many of the competitive problems in the interexchange market resulted from the fact that competition was introduced after AT & T had designed the local networks to service only its own Long Lines department. If the Operating Companies are excluded from the information services market, they will have an incentive, as time goes on, to design their local networks to accommodate the maximum number of information service providers, since the greater the number of carriers the greater will be the Operating Companies' earnings from access fees. Thus, competition will be encouraged from the outset. If, however, the Operating Companies were permitted to provide their own information services, their incentive would be the precise opposite: it would be to design their local net-

---

234. The Operating Companies would simply be additional competitors in a market that is already quite competitive. See Part V *supra.*

235. Competition in the interexchange market would tend to drive prices close to costs. Thus, absent anticompetitive activity, it is unlikely that the Operating Companies would be able to earn a profit large enough to provide any meaningful subsidy to local rates.

236. The proposed decree's clauses permitting AT & T to provide some intraexchange services in competition with the Operating Companies are not inconsistent with this result. AT & T will not have the power to disadvantage the Operating Companies because the local companies do not require access to AT & T's network to provide exchange telecommunications. It is AT & T that will be dependent upon the Operating Companies for access to its customers, not vice versa.

237. For a full discussion of the meaning of this term see Part VI *supra.*

238. For similar reasons, the Court rejects the argument that the Operating Companies can most efficiently provide information services by taking advantage of various economies (such as using the same equipment for exchange telecommunications and for information services). It would be impossible to determine at any time whether the Operating Companies' advantages were due to inherent efficiencies, or to efficiencies created by structuring the network so as to hinder competition. The experience with AT & T's activities with regard to interexchange competition indicates that the latter is a possibility which would be difficult to detect or prevent.

works to discourage competitors, and thus to thwart the development of a healthy, competitive market.[239]

The restriction on the provision of information services by the Operating Companies has been attacked on the ground that it will remove their incentive to upgrade the local networks and will cause them to become technological backwaters.[240] This claim underrates the role of the Operating Companies under the proposed decree. These companies will carry traffic between the information service providers and their subscribers; their networks will therefore have to be capable of carrying these technologically advanced services; and they will have a financial incentive to create this capability because they will earn access charges for providing this service.[241]

For all of these reasons, the imposition of this restriction is fully consistent with the antitrust laws.

### C. Manufacture of Equipment

The provision in the proposed decree which prohibits the Operating Companies from manufacturing telecommunications equipment and customer premises equipment (CPE)[242] is also an outgrowth of the government's case in the *AT & T* action. The basic rationale of the procurement portion of that case was that

> a combination of vertical integration and rate-of-return regulation ... tended to generate decisions by the Operating Companies to purchase equipment produced by Western [Electric] that is more expensive or of less quality than that manufactured by the general trade.

*United States v. AT & T, supra,* 524 F.Supp. at 1373. The government presented evidence to support this theory, which tended to show that AT & T headquarters and the service components of the Bell System—the Bell Operating Companies and the Long Lines Department—engaged in systematic efforts to disadvantage outside suppliers. *Id.* at 1371–74. See also Part IV *supra.* That theory and that evidence directly support the proposed prohibition on the manufacture of equipment by the Operating Companies.

There is a substantial likelihood that, should the Operating Companies be permitted to manufacture telecommunications equipment, nonaffiliated manufacturers would be disadvantaged in the sale of such equipment and the development of a competitive market would be frustrated. The Operating Companies would have an incentive to subsidize the prices of their equipment with the revenues from their monopoly services as well as to purchase their own equipment, even though it was more expensive and not of the highest quality. In that respect, the Operating Companies lack the competitive restraints that ordinarily prevent the typical vertically-integrated company from engaging in such practices: the absence of competition in the end product market—exchange telecommunications— immunizes these purchasing decisions from competitive pressures. The Operating Companies therefore would be able to pay inflated prices for poor quality equipment and to reflect these costs in their rates without suffering a diminution in revenues.

---

**239.** The reasons underlying the ban on provision of electronic publishing services by AT & T provide further support for restricting the Operating Companies from this activity. See Part VI *supra.*

**240.** It cannot be claimed that this restriction will result in rate increases: the Operating Companies do not now provide such services on any large scale, and it is not at all clear that they would be a great source of profit to them in the future.

**241.** Entry of the Operating Companies into this market is not necessary to provide competition for AT & T. The large amount of interest generated by this growing industry indicates that there will be a number of competitors. See Part V(A) *supra.*

**242.** Telecommunications equipment is used by a carrier to provide telecommunications services. Proposed Decree, Section IV(N). Customer premises equipment is used on subscriber's premises to originate, route, or terminate telecommunications (*e.g.,* telephone sets, answering machines). Section IV(E).

See *United States v. AT & T, supra,* 524 F.Supp. at 1373.[243]

Moreover, if they were permitted to manufacture CPE, the Operating Companies would have substantial incentives to favor their own manufacturing arms by providing to them information regarding changes in network standards, thus permitting them to gain an advantage over non-affiliated manufacturers.[244] In addition, they could subsidize the price of this equipment with revenues from the exchange monopoly.

The risks of anticompetitive behavior are not quite as severe as those which exist in connection with the provision of interexchange and information services. However, they are sufficient to support the imposition of the restriction, especially because the entry of the Operating Companies into this market would not provide any substantial impetus to competition or make any significant contribution to the reduction of local rates. The CPE manufacturing industry already contains numerous competitors, including large domestic and foreign firms, and it is wholly unlikely that the Operating Companies could earn supracompetitive profits in this market that would enable them to subsidize local telephone service. The minimal additional competition which they could provide does not outweigh the substantial possibility that they will engage in anticompetitive conduct.

**243.** This rationale does not require the divestiture of Western Electric from the Bell System because AT & T's end products—interexchange services and information services—will be subject to competitive pressures. If AT & T paid a higher price for its equipment and that cost was reflected in higher rates, consumers would switch to a carrier with prices which reflected purchasing decisions based upon the principles of best quality and least cost.

**244.** The Department of Justice acknowledges that the registration program established by the FCC, see 47 C.F.R. §§ 68.1 *et seq.* (1981), would somewhat limit the Operating Companies' opportunities to obstruct the attachment to their networks of equipment manufactured by others. Response to Comments at 67–68. However, it seems possible that, where the Operating Company is the manufacturer of a type of equipment, it would still be able to impose interconnection requirements designed

### D. Marketing of Customer Premises Equipment

The proposed decree would also prohibit the Operating Companies from selling or leasing customer premises equipment.[245] While the Department of Justice's comments and briefs tend to blur the distinction between manufacturing and marketing, in fact the restrictions on the two activities present wholly different considerations. Based upon a realistic assessment, marketing of CPE presents little potential for anticompetitive behavior by the Operating Companies. While the Operating Companies would have the theoretical ability to engage in the types of anticompetitive activities which support the prohibition on manufacturing of CPE, their incentives and their practical ability to do so would be minimal.

Anticompetitive activities undertaken by two separate corporations rather than by two components of the same corporation are likely to be far more difficult to accomplish because of increased problems of coordination and the greater possibility of detection. For example, it would be quite difficult for an Operating Company to conspire successfully with a manufacturer to provide advance information about revised network standards or to impose interconnection restrictions which favored that manufacturer's products and no one else's.[246]

to favor that equipment. In addition, the Operating Companies retain the ability to discriminate against equipment manufactured by others with respect to types of interconnections, testing, maintenance and similar matters.

**245.** The proposed decree further prohibits the selling or leasing of telecommunications equipment. However, few objections have been raised against this prohibition. There would appear to be little incentive for the Operating Companies to act as retailer for this equipment, since the only purchasers would be telecommunications carriers. In the absence of any reasons for removing the restriction, the need to guard against coordination between manufacturers and the Operating Companies is sufficient justification for this prohibition.

**246.** Such interconnection restrictions would be unlikely in any event. See note 244 *supra.* It

The possibility of successful subsidization of CPE prices with local exchange revenues appears remote for several reasons. First, since the two businesses are so completely different, the Operating Companies would have little ability to engage in cross subsidization by the sharing of common costs. Second, the participation of a second company would probably make cross subsidization far easier to detect.[247] Third, the second company's participation in most of the schemes would most likely reduce the profits which the Operating Companies could reap. When these increased risks of detection are combined with the decreased financial gain, it is clear that the incentives for participation of the Operating Companies in cross subsidization schemes are substantially reduced.

As against these relatively slight risks to competition from Operating Company involvement in the marketing of CPE must be weighed the very substantial contribution these companies could make to vigorous competition in the customer premises equipment market. Under the proposed decree, AT & T will retain both the embedded customer premises equipment and the existing network of retail outlets.[248] These factors, combined with Western Electric's large market share, will, at a minimum, ensure its continuation as a formidable provider of CPE for a considerable period of time. The Operating Companies, with their existing relationship to telephone users, are more likely than any other competitive entity to provide an effective counterbalance to AT & T's market strength and thereby to promote a genuinely competitive market.[249]

The Court concludes that, for the reasons stated,[250] the prohibition on marketing by the Operating Companies of customer premises equipment is not in the public interest, and it will therefore require that

would be even more difficult, if not impossible, to draft an interconnection standard that favored a piece of equipment sold by an Operating Company but did not likewise favor the same equipment when sold by a competing retailer. Even if an Operating Company were the exclusive retailer of certain equipment, it probably could not realistically so tailor the standards as to favor the manufacturer of that particular equipment and, should it attempt to do so, the anticompetitive nature of the standard would be apparent on its face.

247. The rules governing CPE pricing imposed by the FCC's *Computer II* decision will also make it more difficult to engage in cross subsidization.

248. There is no reason to change the allocation of these assets provided for in the proposed decree. The embedded CPE consists primarily of Western Electric equipment, and it is therefore appropriately allocated to AT & T. As for the retail stores, there is no basis for concluding that the retention of these assets by AT & T will be anticompetitive. The Operating Companies will have substantial retail access through their contact with the individual telephone subscribers, and they should be able to build their own retail outlets on this basis alone to compete with those of AT & T and others.

Some parties have suggested that the embedded CPE should not be transferred to AT & T, claiming that such a transfer would have a substantial impact upon the Operating Companies' revenues from interexchange activities.

This argument apparently proceeds on the theory that the transfer will reduce the Operating Companies' rate bases and therefore also reduce the amount they are entitled to receive under the so-called separations and settlements process for the use of their equipment by interstate traffic. However, the proposed decree eliminates the division of revenues process and mandates its replacement by a system of access charges. Regulatory authorities may set the access charges so as to guarantee the Operating Companies the same amount that they received under the separations process irrespective of the rate base. In addition, the FCC's decision in *Computer II* will, if ultimately upheld on appeal, result in the eventual deregulation of all CPE and its removal from Operating Companies' rate bases in any event.

249. The Operating Companies may be expected to serve as outlets for many of the small equipment manufacturers, providing a stimulus both for price competition and for innovative design and manufacturing. The competitive nature of this market makes it unlikely that the restriction will have an effect upon local rates.

250. Additionally, as is also true with respect to the prohibition on the production of the Yellow Pages directories (see Subpart E *infra*), the avoidance of an unnecessary intrusion into matters of direct interest to the States and state regulators supports removal of the prohibition.

the proposed decree be modified to eliminate this prohibition.[251]

### E. *Directory Advertising*

Each Bell Operating Company presently publishes Yellow Pages directories for its service area.[252] The proposed decree would bar the divested Operating Companies from all activities related to directory advertising, including the production of the so-called Yellow Pages.[253] This restriction lacks an appropriate basis and is not in the public interest.

Neither of the reasons underlying the other restrictions on the Operating Companies—the need to prevent cross subsidization and the importance of preventing competitor discrimination—has any relevance to the printed directory market.[254]

All parties concede that the Yellow Pages currently earn supra-competitive profits. See, *e.g.*, the Department of Justice Response to Comments at 71. There is no

warrant therefore for proceeding on the premise that the advertising prices charged by the Operating Companies are artificially low as the result of a subsidy from local exchange service. Similarly, there is no possibility of improper discrimination by the Operating Companies against competing directory manufacturers since access to the local exchange network is not required for production of a printed directory.[255] In short, the Operating Companies would have little or no ability to discriminate against competitors in the printed directory market, and this restriction thus has no procompetitive justification whatever.[256]

To the contrary, the prohibition on directory production by the Operating Companies is distinctly anticompetitive in its effects, for at least two reasons. In the first place, the production of the Yellow Pages will be transferred from a number of smaller entities to one nationwide company—AT & T.[257] This type of concentration is itself

251. A number of persons have urged that, in the event that it is determined that particular restrictions are not in the public interest, the Operating Companies be required to conduct competitive activities through a separate subsidiary. A separate subsidiary does not eliminate *economic* incentives for anticompetitive conduct; it is simply a method of revealing intracompany transactions so that regulators may more effectively prevent cross subsidization and other improper behavior. See *NARUC v. FCC,* 525 F.2d 630, 637 (D.C.Cir.1976); *Second Computer Inquiry, supra* note 17, 77 F.C.C.2d 384, 462 (1980). In any event, since separate subsidiaries are essentially a regulatory device, it does not seem appropriate, except in the most unusual circumstances, for an antitrust court to impose such a requirement. If the legislators or the regulators should conclude, for their own reasons, that a separate subsidiary would be appropriate, they may, of course, impose this requirement in the exercise of their own responsibilities.

252. In some cases the directory is published by an independent organization under contract with the Operating Company.

253. The Operating Companies are appropriately prohibited from producing electronic versions of the Yellow Pages, for the reasons stated in Subpart B *supra.*

254. The Department of Justice conceded that "we're not so much worried about competition in print." Hearing on June 29, 1982, Tr. 25184.

255. These competitors only require access to the Operating Companies' subscriber listings, and there is no claim that the Operating Companies have withheld the lists to stifle competition. In fact, under the proposed decree, they would retain control of the listings. *Department of Justice Response to Comments at 71.*

256. It does not even seem to be true that, as the Department of Justice assumes, the Yellow Pages fall as a purely formalistic matter on the competitive side of the monopoly-competition dichotomy. See, *e.g.,* Telecommunications Act of 1982 Hearings, *supra* note 141, at Part 1, pp. 551–52.

257. Although in theory the Yellow Pages would not be directly transferred to AT & T but would merely be made available to the highest bidder, it is clear that AT & T would in reality become the sole publisher of the Yellow Pages in the United States. Under the proposed decree AT & T will retain all of the personnel who have the experience in producing and marketing the Yellow Pages. Moreover, ingrained customer preferences being what they are, it would appear that, if the Operating Companies are not permitted to publish these directories, the only other widely-known telephone company (AT & T itself) will become the natural heir of this enterprise. This is so particularly since that company, with its financial resources, will inevitably be able to outbid anyone else who seriously considered entering this traditional Bell

anathema to the antitrust laws. Furthermore, possession of the franchise for the printed directories will give AT & T a substantial advantage over its competitors in providing electronic directory advertising [258] —a market in which the Operating Companies will not be engaged.

In addition to these factors directly related to competition, there are other reasons why the prohibition on publication of the Yellow Pages by the Operating Companies is not in the public interest. All those who have commented on or have studied the issue agree that the Yellow Pages provide a significant subsidy to local telephone rates. This subsidy would most likely continue if the Operating Companies were permitted to continue to publish the Yellow Pages.

The loss of this large subsidy would have important consequences for the rates for local telephone service. For example, the State of California claims that a two dollar increase in the rates for monthly telephone service would be necessary to offset the loss of revenues from directory advertising.[259] Other states assert that increases of a similar magnitude would be required.[260] Evidence submitted during the *AT & T* trial indicates that large rate increases of this type will reduce the number of households with telephones and increase the disparity, in terms of the availability of telephone service, between low income and well-off

citizens.[261] This result is clearly contrary to the goal of providing affordable telephone service for all Americans.[262]

In addition, as noted in Part III(C) *supra,* the Court must take care to intrude upon state regulation only to the extent necessary to vindicate the federal interest embodied in the antitrust laws. Where, as here, that interest is not furthered, intrusion constitutes an impermissible imposition upon the States.

For these various interrelated reasons, the Court concludes that the prohibition, express or implied, on publication by the Operating Companies of the Yellow Pages directories is not in the public interest. It will therefore require that the proposed judgment be modified to specify that there will be no such prohibition.[263]

### F. Removal of the Restrictions

█ It is probable that, over time, the Operating Companies will lose the ability to leverage their monopoly power into the competitive markets from which they must now be barred. This change could occur as a result of technological developments which eliminate the Operating Companies' local exchange monopoly or from changes in the structures of the competitive markets. In either event, the need for the restrictions upheld in Subparts A through C will disap-

business. The parties do not dispute the conclusion that the business opportunities represented by the Yellow Pages would be transferred to AT & T. AT & T would hardly undertake to guarantee the Operating Companies' net revenue from the Yellow Pages if it did not expect to obtain the contract. See Defendants' Reply Brief at 35.

**258.** The large amount of information received by AT & T, combined with the economies of scale, would give it a natural and in all likelihood insuperable edge in the electronic Yellow Pages market.

**259.** Topic 2 Brief of People of California, *et al.* at 8–9.

**260.** Topic 2 Brief of State of Oregon at Appendix A; Topic 2 Brief of State of Florida at 8; Topic 2 Brief of Virginia State Corporation Commission at 12; Topic 2 Brief of Kentucky, *et al.* at Attachment B, p. 2.

**261.** See Testimony of Louis C. Perl (November 23, 1981); Exhibit D–4–1518.

**262.** Neither AT & T nor the Department of Justice has provided any assurance that this loss of revenue will not occur. AT & T's promise to guarantee the revenues from Yellow Pages for four years is only a short-range solution. The Department of Justice has retreated from its earlier claims that the Operating Companies will receive equivalent revenues under its scheme for the production of Yellow Pages, and it is now apparently unable to predict the level of receipts. Response to Comments at 71–72.

**263.** The assets used in the production of these printed directories will accordingly have to be allocated to the Operating Companies. See Part IX *infra.*

pear, and the decree should therefore contain a mechanism by which they may be removed.[264]

Recognizing this fact, the Department of Justice has undertaken to report to the Court every three years concerning the continuing need for the restrictions imposed by the decree. Response to Comments at 62. In addition, both parties have agreed that the restrictions may be removed over the opposition of a party to the decree when the Court finds that "the rationale for [the restriction] is outmoded by technical developments." Department of Justice Brief at 32–33; AT & T Brief at 18.

The standard for removal of restrictions proposed by the parties incorporates the Department of Justice's view that the restrictions are justified by the mere existence of monopoly power. However, in the opinion of the Court, the removal of the restrictions should be governed by the same standard which the Court has applied in determining whether they are required in the first instance. Thus, a restriction will be removed upon a showing that there is no substantial possibility that an Operating Company could use its monopoly power to impede competition in the relevant mar-

ket.[265] See pp. 187–188 *supra*. To avoid any question about the appropriate test[266] the standard for removal of the restrictions should be explicitly incorporated into the decree.[267]

## VIII

### *Equal Exchange Access*

One of the government's principal contentions in the *AT & T* case was that the Operating Companies provided interconnections to AT & T's intercity competitors which were inferior in many respects to those granted to AT & T's own Long Lines Department. There was ample evidence to sustain these contentions. See Part IV *supra*.

Although after divestiture the Operating Companies will no longer have the same incentive to favor AT & T, a substantial AT & T bias has been designed into the integrated telecommunications network, and the network, of course, remains in that condition. It is imperative that any disparities in interconnection be eliminated so that all interexchange and information service providers will be able to compete on an equal basis.

---

264. If the restrictions were to continue in effect, their sole effect would be to limit competition by preventing the entry of a viable competitor.

265. This standard necessarily differs from the one governing the termination of the restrictions against AT & T's participation in the electronic publishing industry because different considerations are involved. See Part VI *supra*.

266. The test usually applied to a contested modification of a consent decree was set forth in *United States v. Swift & Co.,* 286 U.S. 106, 118, 52 S.Ct. 460, 463, 76 L.Ed. 999 (1932). In that case, the Supreme Court held that the applicable standard was whether there were "unforseen conditions" that indicated the modification was appropriate. Some parties contend that a different standard may not be applied to the removal of the restrictions. However, there appears to be no reason why the decree itself cannot contain provisions governing the expiration of some of its restrictions.

267. Some interested persons, including the FCC, contend that the restriction limiting the

divested Operating Companies to regulated natural monopoly activities is overbroad because these companies should only be barred from activities in which they may be able improperly to utilize their monopoly power in exchange telecommunications, and that these companies should be free to operate unrelated businesses (*e.g.,* restaurants or department stores). A modification along these lines is not appropriate, if only because it would be extremely difficult to draw a comprehensive definition of the areas in which the Operating Companies' activities must be limited. Moreover, such a definition is unnecessary if the parties include in the proposed decree the Court's standard for the removal of restrictions on the activities of the divested Operating Companies. A divested Operating Company which sought to engage in an unrelated industry could then petition the Court for removal of the restriction as it pertains to that industry, and if there was no realistic possibility of abuse of monopoly power, the Court could simply grant the petition.

The Court has examined the equal access provisions of the decree and it is satisfied that, with limited exceptions, they meet the public interest standard.

## A. *General Principles*

The governing principle established by the proposed decree is that by September 1, 1986, the Operating Companies must provide access services [268] to interexchange carriers and information service providers which are "equal in type, quality, and price" to the access services provided to AT & T and its affiliates. Section II(A). This broad guarantee of equal treatment, when implemented, will effectively remove any interconnection-type obstacles to free competition between AT & T and the other carriers; [269] it therefore comports with the public interest and will be endorsed and enforced by the Court. [270]

---

**268.** These are the services which permit the origination or termination of an interexchange telephone call and similar transmission assistance for information services.

**269.** Several radio common carriers and owners of private communications systems contend that the equal access requirement should also apply to their interconnections with the Operating Companies instead of only to interconnection by the interexchange carriers and information services providers. The Court finds justified the parties' decision not to address these specialized demands.

The access services required by these carriers are likely to differ from those needed by interexchange carriers and to differ also from carrier to carrier. For example, unlike interexchange carriers, owners of private systems are generally satisfied with their present interconnection arrangements (see Comments of Association of American Railroads at 8) but radio carriers wish their services to receive interconnection as would a Bell System Class 5 Switch (see Comments of Telocator Network of America at Appendix E). The decree could not establish all the various standards for interconnection for the large number of systems which seek access to the local networks of the divested Operating Companies. Nor is this necessary, for there is no support for the underlying premise of these carriers' contentions that the divested Operating Companies will have an incentive to alter the existing connecting arrangements for private systems. The question of proper interconnection of radio carriers has been addressed by the FCC and is currently before the Court of Appeals for this Circuit. *Cellular Communications Systems,* 86 F.C.C.2d

---

As indicated, the equal access requirement does not become effective immediately. There is a phase-in period: the Operating Companies must begin offering equal access by 1984; carriers must be able to obtain equal access for one-third of their subscribers by 1985; and such access must be furnished to all subscribers "upon bona fide request" by 1986. The decree also fails to specify the manner in which equal access will be provided; rather, it permits each Operating Company to devise an appropriate plan to fulfill this requirement. [271]

The Court finds these provisions to be reasonable and not inconsistent with public interest. Major changes in switching equipment—such as those that will be necessary to provide equal access to all interexchange and information providers—realistically take months or in some instances

---

469 (1981), *on reconsideration,* 89 F.C.C.2d 58 (1982), *appeal pending sub nom. Millicom, Inc. v. FCC,* No. 81–1404 (D.C.Cir.). For these reasons, the Court will not require the parties to *modify the proposed decree specifically to address these concerns.*

**270.** As is true with respect to all of the principles and promises underlying the decree, they acquire meaning only through implementation. The Department of Justice may be expected, in the first instance, to see to it that there is appropriate implementation but, as described in Part XI *infra,* the Court also intends to see to it that all these principles and premises are actually carried out.

**271.** The divested Operating Companies must file tariffs for their access services. Revenues collected pursuant to these tariffs will substitute for funds currently received by the Operating Companies under the division of revenue process, which allocates interstate toll revenues between the operating companies and the Long Lines Division. See Proposed Decree at Appendix B(B). Tariffs for intrastate interexchange access services will be filed with the state regulatory commissions, tariffs for interstate interexchange access services with the FCC. The proposed decree requires the Operating Companies to file tariffs which are cost-justified, but it does not limit the authority of the regulators to allocate costs pursuant to their regulatory policies. Thus, these tariffs may be set at a level which continues the current allocation of interexchange revenues. See also note 161 *supra.*

years to accomplish.[272] For that reason, the Court could not expect equal access to be achieved immediately or to be phased-in on a more expedited basis than is contemplated in the proposed decree.[273] Similarly, since the Bell System network is both vast and complex, a variety of approaches will in all probability be necessary to achieve equal access. Imposition by the Court of a single procedure applicable to all areas and all interconnection requirements is likely to create inefficiencies and impose added costs on the Operating Companies without achieving superior results.

The Court therefore finds that, generally speaking,[274] the means provided in the proposed decree to achieve equal access are adequate to protect the public interest.

### B. *Exceptions to Equality*

The proposed decree contains some exceptions to the broad mandate of equality. These exceptions must be closely scrutinized to determine whether they will give AT & T an unjustified advantage over other carriers and thus obstruct the development of free competition.[275]

First. Long distance calls may presently be placed over the AT & T network by dialing ten or eleven digits while twenty-two or twenty-three digits are necessary to use the facilities of the other interexchange carriers. This substantial disparity in dialing convenience has had a significant negative impact on competition.[276] Under the proposed decree, this disparity will be drastically reduced, but some difference in the number of digits will remain: fourteen digits will be needed for the use of the facilities of a competing carrier while ten or eleven will be required for calls placed over the AT & T network.[277]

The reason given by the parties for this continued distinction is that full dialing parity is impossible without a change in the national area numbering plan. It appears, furthermore, that a change in that plan for all the telephone instruments in the United States would be both difficult and costly. When the FCC orders a revision in that plan—which it apparently has the authority to do at any time—the dialing parity which is in keeping with the equality principles of the proposed decree will in fact be achieved.

It is inappropriate for the Court to order such a change in advance of the FCC-required change-over; the difference in the required number of digits simply does not present an obstacle to competition sufficient to require the expense and effort involved in an early change in the plan.[278]

---

272. Testimony of Irwin Dorros (November 24, 1981). For similar reasons, the provision permitting the Operating Companies to seek Court permission not to provide equal access services where, as a result of technologically outdated switches "such access is not physically feasible except at costs that clearly outweigh potential benefits to users of telecommunications services," is also a justifiable deviation from absolute equality. Proposed Decree, Appendix B(A)(3).

273. The decree does not, however, preclude the Operating Companies from providing equal access more expeditiously if they are capable of doing so.

274. See Subpart B *infra*.

275. Both AT &T and the Department of Justice cite this Court's ruling during an earlier phase of the *AT & T* proceedings with regard to *interconnection* to AT & T's network that "absolute equality of access to essential facilities . . . is not mandated by the antitrust laws." *United States v. AT & T, supra,* 524 F.Supp. at

1360. The Court's statement has reference to the access necessary to avoid antitrust liability. It is not necessarily the appropriate standard for evaluating an antitrust remedy. A remedy must impose the requirements reasonably necessary to open the relevant markets to competition. See Part II *supra*.

276. Testimony of Bert C. Roberts, Jr. (April 27, 1981); Testimony of Jeffrey J. Kushan (May 1, 1981); Testimony of George Vasilakos (June 16, 1981).

277. Proposed decree at Appendix B(A)(2). While the proposed decree states only that the "minimum number of digits" will be used, AT & T has indicated that fourteen digits will be required. See AT & T Reply Brief at 40.

278. Somewhat similar considerations apply to the facilities-sharing question. After divestiture, AT & T will necessarily share facilities with the Operating Companies because the physical components of the nationwide network cannot be neatly divided between them.

This conclusion is buttressed by the requirement in the proposed decree that the divested Operating Companies provide a service which will permit a subscriber to route his calls automatically to a single interexchange carrier other than AT & T. Appendix B(A)(2)(ii).[279] By means of this service, the subscriber will be able to use that carrier's network by dialing only the same ten or eleven digits that are required of an AT & T subscriber.

Second. Another exception to full equality is a provision which will permit the Operating Companies to provide billing services for only one interexchange carrier[280] which presumably will be AT & T.[281] Unquestionably, it would impose a considerable expense and any administrative burden upon the Operating Companies to require them to provide billing services for all intercity carriers, and in the view of the Court this would not be in the public interest. Another alternative for the achievement of complete equality would be to prohibit the Operating Companies from providing billing services to any carrier (including AT & T). If this were done, AT & T would, of course, have to do its own billing.

The parties claim, and the Court agrees, that if AT & T had to establish its own billing system, it could do so only on the basis of a surcharge to its monthly telephone bills similar to the charges now imposed by interexchange carriers other than AT & T. Such a charge would be quite substantial,[282] and it would impose a significant burden upon telephone subscribers, particularly those—who are the majority of the users—whose monthly long distance bills are relatively small. It has been estimated that an additional charge of this type could double the long distance bills of many of these citizens.[283]

As indicated, the proposed decree resolves this problem by allowing the Operating Companies to engage in joint billing with AT & T. This solution would provide AT & T with an advantage over its competitors in two ways: (1) AT & T would have lower billing costs than its competitors;[284] (2) as the intercity carrier with access to Operating Company billing, AT & T might be perceived by the public as the "official" or approved intercity carrier.

As concerns the cost problem, the joint billing allowed by the proposed decree represents a reasonable trade-off: AT & T's

It would be inappropriate to require, in the interest of symmetry, that the Operating Companies also to share facilities with the other interexchange carriers. This requirement would severely limit the Operating Companies' freedom to design their own networks and, as the number of carriers increases, such sharing could become physically impossible.

The decree appropriately ameliorates AT & T's advantages resulting from sharing by requiring the Operating Companies' charges to other carriers to be equal to those charged to AT & T when that company's facility is close to an AT & T switch. See Appendix B(B)(3). This provision will remain in effect until 1991, by which time it is likely that AT & T's advantages will have been reduced by changes in the configuration of the local network. As to colocation in facilities constructed after divestiture, all carriers stand on the same footing: sharing is permitted, but not required.

**279.** To be sure, the Operating Companies may impose a charge for this routing option, but not only would the charge most likely be minimal but it would also be temporary. As stated above, as soon as the FCC decides to change

the national numbering plan, the entire problem will be resolved.

**280.** An Operating Company would be free to provide billing services for more than one interexchange carrier; but it would not be required to do so.

**281.** The divested Operating Companies will have the obvious incentive to provide billing services to the interexchange carrier with the greatest volume of calls so as to obtain the largest possible reimbursement for billing services.

**282.** It could be as much as five dollars per month per subscriber. Testimony of Irwin Dorros (November 24, 1981).

**283.** Testimony of Irwin Dorros (November 24, 1981).

**284.** AT & T would be required to reimburse the Operating Companies for the cost of billing. Proposed Decree at Appendix B(C)(2). However, this amount would presumably be less than that required if AT & T were to provide its own billing.

competitors will suffer a slight competitive disadvantage, but vast numbers of consumers will benefit from lower costs as a consequence of joint billing economies. In the opinion of the Court, the public interest does not require that millions of telephone customers, particularly those with low usage (who presumably will be the less affluent) be in effect penalized by a fairly substantial extra charge in order to eliminate what to AT & T's competitors will not be a significant cost differential.[285]

The confusion that would be created in the public's mind by joint billing, and the probability that many consumers would select AT & T by default simply because it appeared on the same bill with the monopoly Operating Company presents a more serious problem. However, that problem can be resolved, or at least sufficiently alleviated, without the drastic remedy of requiring AT & T to initiate its own billing operation, by allowing continued joint billing but requiring the Operating Companies to include on the interexchange portion of their bills a legend to the effect that

> This portion of your bill is provided as a service to AT & T. There is no connection between this company and AT & T. You may choose another company for your long distance telephone calls while still receiving your local telephone service from this company.

Therefore, the Court will not approve the proposed decree unless it is modified to incorporate this requirement. With this

change, the degree of disparate treatment of interexchange carriers is permissible. To require more would be to place burdens upon the public not commensurate with the remaining slight disparities.

Third. The proposed decree would permit the Operating Companies to charge all interexchange carriers the same amount for access services during the interim period when AT & T still receives services superior to those provided to the other carriers. On its face, this provision appears patently anticompetitive. It will be difficult for AT & T's competitors to attract business if they are forced to pay the same amount in access charges as AT & T but receive inferior service. No persuasive justification has been given for this provision.[286] In fact, it seems clear that there should be no exception from the general rule that rates should vary depending upon costs. If therefore the cost of providing access services to the other carriers is less than that of providing access services to AT & T, the Operating Companies will have to file tariffs reflecting that difference,[287] and the Court will require that the proposed decree be modified accordingly.[288]

Fourth. Under Section I(A)(1) of the proposed decree the divested Operating Companies must be given whatever facilities are necessary to provide equal access to all interexchange and information service providers. There was considerable comment and controversy during the public interest proceedings over the use by the Oper-

**285.** The difference in cost is not likely to have a substantial effect on consumer choice for the high volume user which, for the present at least, appears to be the principal customer of AT & T's competitors.

**286.** AT & T states that lower costs could not be required because there was actually no difference in costs between the two types of access. See AT & T Reply Comments at 118. The Department of Justice contends that any such requirement would force the Court to value the diminished quality of access provided to AT & T's competitors. Department of Justice Brief at 35.

**287.** If there is no difference in the cost of providing these services, it would be appropriate for charges to AT & T to be increased to reflect

its higher quality connection. The Court will not impose this requirement because it lacks the expertise and flexibility to determine the amount of such a premium, but regulators remain free to insist on such a differential.

**288.** The alternative chosen by the Court avoids the problems raised by the parties. See note 286 *supra*. It requires that the Operating Companies file tariffs which reflect to lower rates for interexchange carriers other than AT & T only to the extent that the costs for such access are lower than the cost of access provided to AT & T. The Operating Companies will not be required to provide access services at below-cost rates, and the Court will not have to place a monetary value on the lower quality service.

ating Companies of so-called Class Four switches in the provision of such access.[289]

The switching of telephone calls in the nationwide network is divided into five functions depending upon the complexity of the switching tasks. However, a single physical unit will often perform more than one switching function. The Class Four function—the routing of toll calls—is generally regarded as a function of the interexchange network, but the physical switching unit which performs this function may be the most appropriate site for the interconnection between the Operating Companies and the other interexchange carriers.

There initially appeared to be some divergence of opinion between AT & T and the Department of Justice regarding the use by the Operating Companies of switches performing the Class Four function for the interconnection between the Operating Companies and AT & T's intercity competitors. The Department has always taken the position that these switches could be used for this purpose if the Operating Companies determined that this was the most efficient method for the provision of access equal in type and quality to that provided to AT & T. Response to Comments, pp. 89–92. AT & T suggested, however, that these switches are an integral part of AT & T's interexchange network and that the division between exchange and interexchange functions occurs at a different level of the network.[290] Ultimately, however, there was general agreement on the Department of Justice's formulation. Hearing on June 29, 1982 (Tr. 25201–03). The Court expects this principle to be implemented, both in the plan of reorganization and otherwise. See Part XI *infra.*

Fifth. AT & T's interexchange competitors have also urged the Court to withhold its approval of the decree until AT & T agrees not to seek increases in the level of Operating Company charges to interexchange carriers set by the FCC. See *Exchange Network Facilities (ENFIA),* 90 F.C.C.2d —— (No. 82–208, April 30, 1982), *review pending, MCI Telecommunications Corp. v. FCC,* No. 82–1554 (D.C.Cir.).

The ENFIA agreements were initially negotiated between AT & T and the other intercity carriers under the aegis of the FCC, and the Commission recently extended these agreements for an additional two years. *Exchange Network Facilities (ENFIA),* 90 F.C.C.2d —— (No. 82–180, April 14, 1982), *review pending MCI Telecommunications Corp. v. FCC,* No. 82–1553 (D.C.Cir.). AT & T filed new tariffs to implement that decision, but these tariffs were challenged by the other carriers. The Commission then suspended the tariffs and imposed an arbitrary interim rate to take effect until it determined the proper rate under the ENFIA agreements. It is clear from this history that the present rate is not within AT & T's discretion, but has, in fact, been set by the FCC and is under active review by the Commission and the courts. It would be improper for this Court to interfere with those proceedings.

For the reasons stated, the Court finds that, with the exceptions noted above, the equal access provisions of the proposed decree are adequate to protect the public interest.

### IX

### *Division of Assets*

Under the terms of the proposed decree, AT & T is required to divest itself of its Bell Operating Companies and to transfer to them (or to a newly-created entity or entities acting on their behalf) "sufficient facilities, personnel, systems, and rights to technical information to permit [them] to perform, independently of AT & T, exchange telecommunications and exchange

---

**289.** This matter is important because, in the view of the various intercity carriers, the Class Four switch provides the only gateway for toll quality transmission of interexchange traffic within the local exchange.

**290.** AT & T's Reply Comments at 107–08. According to AT & T, that division does not occur between the Class Four switching function and higher level switching functions but between the local end office (Class Five) function and the Class Four function.

access functions."[291] AT & T has proposed the following tentative procedure for effecting the reorganization required by this provision.[292] Initially, each Operating Company will establish three new subsidiaries, one for interexchange assets, another for customer premises equipment assets, and the third for directory advertising assets.[293] After the appropriate assets are transferred to these new subsidiaries,[294] each Operating Company will spin off ownership in the subsidiaries to AT & T by declaring a dividend of the new subsidiaries' stock. At the same time, AT & T will transfer to the Operating Companies, or to an entity owned by them, any additional assets necessary for the performance of their telecommunications and exchange access functions. Once this transfer of assets is completed, the Operating Companies will be reorganized into seven regional Operating Companies, and the stock in these seven companies will be spun off to the AT & T shareholders. See AT & T Reply Comments at 4–5; AT & T Brief at 61.

Opponents to the proposed decree claim that this method of dividing the assets is defective in several respects and they propose that the Court insist on the following modifications: (1) that AT & T be required to compensate the Operating Companies for assets removed from their balance sheets; (2) that the transfer of the assets be effected at market value rather than at net book value; and (3) that stronger procedures be established to prevent AT & T from manipulating the division of assets and liabilities to the detriment of the Operating Companies. Each of these issues is addressed below.

### A. Compensation and Transfer of Assets

■ Those who claim that the Operating Companies should be compensated for assets transferred to AT & T misperceive both the law and the nature of the proposed reorganization. Under long-established general legal principles, the transfer of assets between a parent and its subsidiary is not an arm's length transaction for which compensation is required. Corporate law holds that such a transfer constitutes an intra-enterprise exchange for which compensation is not necessary.[295] The reason for this rule is simple: both before and after the transfer, the same shareholders maintain the same ownership interests in the same assets. The sole difference is that before the spin-off the shareholders' interests are represented by shares of stock in one company, while after the spin-off their interests are represented by shares in more than one company.

291. Section I(A)1.

292. Although under the proposed decree AT & T is not required to explain its procedures in this regard until it submits its plan of reorganization, it has announced this tentative proposal to inform the Court as well as other interested persons of its probable course of action.

293. The Court has concluded that the Operating Companies may produce printed directory advertising. See Part VII *supra.* Establishment of the directory advertising subsidiary may therefore be unnecessary because those assets will be retained by the Operating Companies.

294. At the time of the transfer of assets, the Operating Companies may also transfer a portion of their debt issue to the new subsidiaries or to AT & T.

295. This rule applies regardless of the direction in which the transfer occurs. A transfer of assets from a parent to a subsidiary is treated as a contribution to capital for which the subsidiary is not required to provide consideration to the parent. See, *e.g., United States v. Chicago, Burlington & Quincy Railroad Co.,* 412 U.S. 401, 405–06, 93 S.Ct. 2169, 2172, 37 L.Ed.2d 30 (1973); *Abegg v. Commissioner,* 429 F.2d 1209, 1215–18 (2d Cir.1970). The transfer of assets from a subsidiary to a parent is treated as a distribution or dividend for which likewise no compensation is required. See, *e.g., Prescott, Ball & Turben v. LTV Corp.,* 531 F.Supp. 213, 214–15, 220 (S.D.N.Y.1981). Apparently the only limitation on these rules is that a transfer may not impair the rights of interested third parties, such as creditors. See, *e.g., Superintendent of Insurance of New York v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 168, 30 L.Ed.2d 128 (1971); *Pepper v. Litton,* 308 U.S. 295, 307, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939); *Hanraty v. Ostertag,* 470 F.2d 1096, 1099 (10th Cir.1972); *Guaranty Trust Co. of New York v. Grand Rapids G.H. & M. Ry. Co.,* 7 F.Supp. 551 (W.D.Mich.1931), *mod. on reh.,* 85 F.2d 331 (6th Cir.1936).

This general rule has routinely been applied to divestitures such as the one involved in these cases. For example, in *Western Union Telegraph Co. v. United States,* 267 F.2d 715 (2d Cir.1959), Western Union, a carrier regulated under title II of the Communications Act, was ordered by the FCC to divest itself of its international telegraph operations as a prerequisite to a merger with another domestic telegraph company. In discussing how the company could comply with the FCC's order, the Court of Appeals stated that, should the divestiture be accomplished by a spin-off, there would be no "necessity of fixing a figure as [to] the value of the Western Union cables, since each Western Union stockholder would have the same pro rata interest in both Western Union landlines and Western Union cables following divestment, as prior to divestment." [296]

A similar approach was followed in *Pittsburgh Terminal Corp. v. Baltimore & Ohio Railroad, et al.,* 680 F.2d 933 (3d Cir.1982). There, the C & O Railroad sought to develop its non-rail business free from restrictions imposed by the Interstate Commerce Commission, and it therefore undertook a reorganization plan similar to the one proposed by AT & T. C & O owned almost all of the common stock of the B & O Railroad, a corporation which had both rail and non-rail assets. To remove the non-rail assets, B & O created the Mid-Allegheny Corporation (MAC) as a new wholly-owned subsidiary, and it transferred to MAC all of the B & O non-rail assets in exchange for MAC stock. It then spun off ownership in MAC to its parent, the C & O, by declaring a dividend of MAC stock. At no time during the reorganization was any valuation or compensation procedure involved or required. [297] Just as it was unnecessary for the C & O to "pay" the B & O for the transfer of ownership of the non-rail assets, so, too, it is unnecessary for AT & T to compensate the Operating Companies for the transfer of those assets which are not needed for the performance of the local exchange and exchange access functions. [298]

It is worth noting in this connection that the state regulators, who are the principal opponents of the reorganization method prescribed by the proposed decree, have traditionally treated AT & T and the Operating Companies as a single enterprise rather than as separate corporations dealing with each other at arm's length. [299]

---

**296.** 267 F.2d at 719–20. The fact that Western Union ultimately decided to accomplish the divestiture through a sale rather than a spin-off (see *Western Union Telegraph Co.,* 30 F.C.C. 323 (1961)) in no way undermines the Court of Appeals' general characterization of a spin-off as a compensation-free transfer.

**297.** Although the Court of Appeals reversed the District Court's finding that holders of convertible debentures were not entitled to notice of the plan for reorganization, it did not in any way question the propriety of the corporate reorganization itself or the basic manner in which it was carried out.

**298.** See also, *United States v. El Paso Natural Gas Co.,* 358 F.Supp. 820 (D.Colo.1972), aff'd, 410 U.S. 962, 93 S.Ct. 1440, 35 L.Ed.2d 697 (1973), where the court upheld a reorganization whereby El Paso transferred all of its pipeline assets at net book value to a newly-formed company in exchange for the new company's stock, then sold twenty percent of this stock, placed the remainder in a voting trust, and distributed participation certificates in the voting trust to El Paso shareholders, without any compensation between El Paso and the new company; and *United States v. United Fruit*

*Co.,* 1958 Trade Cas. ¶ 68,941 (E.D.La.1958), where the court ordered the defendant either (a) to create a new corporation capable of competing with the defendant and then to distribute the new company's stock to defendant's shareholders or (b) to sell sufficient assets to a third party in order that this third party could compete with the defendant.

**299.** The debt-equity ratio that is used by state regulators in calculating rates of return, for example, is not that for the individual Operating Company being directly regulated but rather the consolidated debt-equity ratio for the entire Bell System. The reason for this approach is clear: the regulators recognize that the debt ratio of each Operating Company is the result of AT & T's distribution of its debt and equity capital among the entities in the Bell System, and that the consolidated ratio is therefore a better reflection of the Operating Company's actual financial condition. As the New York Public Service Commission said:

Using a consolidated capital structure is correct here because AT & T and its subsidiaries conduct their financings on a centralized, coordinated basis, which leaves largely to

Opponents of the settlement rely on *Democratic Central Committee v. Washington Metropolitan Transit Commission,* 485 F.2d 786 (D.C.Cir.1973), as allegedly requiring a different result.[300] To be sure, the Court of Appeals held in that case that capital gains realized on the disposition of assets do not automatically flow to the firm's investors but instead inure to the benefit of ratepayers,[301] and opponents of the proposed decree conclude from that holding that AT & T must compensate the Operating Companies and thus, indirectly, local ratepayers. But there is a crucial difference between the disposition of assets that was involved in that case and the transfer of assets proposed here. In *Democratic Central Committee,* the assets were taken out of operation and out of the rate base; obviously, when this occurred a gain was realized and it then became necessary to determine to whom the benefit of that gain should inure.[302] But no assets are here being removed from public service: the same assets will continue to be used to provide the same services to the same ratepayers, and the assets will remain subject to the same ratemaking jurisdictions of the same regulators.[303]

There can thus be little doubt that, as a matter of the law, the transfer of assets contemplated by the proposed decree is no more and no less than the usual kind of intra-enterprise exchange for which no compensation is necessary.

This result also makes sense from a practical point of view, for several reasons.

In the first place, were the Court to require AT & T to compensate the Operating Companies for the removed assets, it would in essence place AT & T in the anomalous position of having to repurchase assets it already owns. There is no warrant whatever for such a course. Second, a requirement that AT & T pay the Operating Companies for the transferred assets—which are valued at many billions of dollars—would produce a severe, if not crippling, financial strain on AT & T. Third, payment of compensation would convert what would otherwise be a tax-free transfer into a taxable exchange, thus exposing the Operating Companies to possibly billions of dollars in federal and state tax liabilities. See 26

---

chance the market conditions prevailing when a particular subsidiary is scheduled to issue securities.

*New York Tel. Co.,* 23 P.U.R.4th 554, 562 (N.Y. Pub.Serv.Comm'n.1977). See also, *Chesapeake & Potomac Tel. Co.,* 10 P.U.R.4th 211, 218 (Md. Pub.Serv.Comm'n.1975); and *New England Tel. & Tel. Co.* 95 P.U.R.3d 71, 83 (N.H.Pub. Util.Comm'n.1972).

**300.** See also *Bebchick v. Washington Metropolitan Area Transit Commission,* 485 F.2d 858 (D.C.Cir.1973).

**301.** Said the court (485 F.2d at 821):

Transit's farepayers have long been saddled with the burdens incidental to the properties in issue while they remained in operating status. Theirs were the expenses of ordinary maintenance and depreciation, and the risks of loss from casualty and obsolescence, associated with those properties .... And Transit's investors have profited, not only from these arrangements of burdens, but also from favorable treatment of the operating assets in other ways. By our assessment, these circumstances tip the scale in favor of Transit's farepayers, so much as to earn for them the gains beyond the shadow of a doubt.

**302.** See also *Bebchick v. Washington Metropolitan Area Transit Commission, supra,* 485 F.2d 858.

**303.** The FCC concurs in this position. It has advised the Court that "implementation of the proposed decree will not inevitably produce any retirement from service" of any of the Operating Companies' assets. Topic 4 Brief of FCC at 7. The proposed decree will not in any way disturb the authority of regulators to determine the proper valuation of assets regulated by their jurisdictions. For example, assets used to provide intrastate interexchange service will not be deregulated by the decree but will remain under regulation by the state commissions. These assets may simply be owned by a different corporate entity.

It is irrelevant to these proceedings that certain assets, such as customer premises equipment, may in the future be removed from public service because of eventual deregulation under the FCC's *Computer II* decision or other regulatory action. If there will be problems as a result of the retirement of these assets from public service, they would arise at that time as a result of regulatory decisions; they would not stem from the proposed decree.

U.S.C. §§ 368(a)(1), 368(c).[304]  Finally, if the transfer of assets were treated as a sale negotiated at arm's length, it is entirely possible that AT & T would decline to purchase unattractive Operating Company assets, deciding instead to purchase more up-to-date or efficient property from some third party.  Since the Operating Companies would still· be obligated under the terms of the proposed decree to dispose of these assets, they could conceivably be forced to sell them at greatly reduced prices—if they could sell them at all—leaving ratepayers with the obligation to produce additional revenue to compensate for the deficiency.

## B. *Book Value vs. Market Value*

Related to the question of compensation is the question whether the transfer of assets should occur at net book value or at market value.  It is not necessary to decide whether, as a matter of law, all transfers of property between a parent and its subsidiary must be effected at book value; what is clear is that, in this case, net book value is the appropriate standard.[305]

Since the mid-1940s, regulators have almost universally relied on net book, rather than market, value for ratemaking purposes.  See, *e.g. Federal Power Commission v. Hope Natural Gas,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944);  *Re Southern Bell Tel. & Tel. Co.,* Docket No. 78–353–C, Order No. 79–90, 30 P.U.R. 4th 263, 271 (S.C.Pub. Serv.Comn.1979);  *Re New York Tel. Co.,* Case 25155, 84 P.U.R.3d 321, 339 (N.Y.Pub. Serv.Comn.1970);  *Re Pacific Tel. & Tel. Co.,* Case No. 7409, 53 P.U.R.3d 513, 543 (Cal.Pub.Utils.Comn.1964).  This method of valuation has also consistently been used in cases involving the transfer of assets between different Bell System entities, regardless of whether the transfers were relatively insignificant (such as those involving switching equipment or other properties) or whether they involved the total reorganization of an Operating Company (such as the separation of South Central Bell from Southern Bell or the separation of Pacific Northwest Bell from Pacific Bell).[306]

Apparently the primary reason for the general preference of net book value over market value is that it is readily ascertainable,[307] while market value is much difficult to compute.[308]  That reasoning has special

---

**304.** Treas.Reg. § 1.1002–1(c) (1956) holds that the underlying assumption in providing for tax-free reorganizations is that "the new property is substantially a continuation of the old investment still unliquidated; and, in the case of reorganizations, that the new enterprise, the new corporate structure and the new property are substantially continuations of the old still unliquidated."  See, *e.g., United States v. Adkins-Phelps, Inc.,* 400 F.2d 737, 740 (8th Cir. 1968); *Commissioner v. Wilson,* 353 F.2d 184, 186 (9th Cir.1965).  This assumption obviously would not apply if AT & T were required to pay for the assets.  The suggestion of some who object to the proposed decree that this tax liability could be avoided by an amendment of the current tax laws is entirely unpersuasive.  The Court applies the laws as they now exist, not as they may some day be.

**305.** There is a serious question whether a compensation-free transfer could realistically be effected other than at net book value.  Further, market valuation would probably entail a number of undesirable post-divestiture consequences (*e.g.,* calculation of the rate base, taxation of the exchange).

**306.** See, *e.g., Application of Illinois Bell Tel. Co.,* Docket 78–0121 (Ill. Commerce Comn.,

April 19, 1978) (sale of Illinois Bell switching equipment to AT & T at net book); *Application of Mountain States Tel. & Tel. Co.,* Docket 3999 (Tex.Publ.Utils.Comn., Nov. 13, 1977) (sale by Mountain Bell of plant to Southwestern); *Re Pacific Tel. & Tel. Co.,* Docket No. U–F–2286, 39 P.U.R.3d 132, 135–36 (Oregon Pub.Utils. Comn.1961).

**307.** It is computed simply by using the original cost and depreciation.

**308.** See, *e.g., Re Southern New England Tel. Co.,* Docket No. 10054, 42 P.U.R.3d 310, 320 (Conn.Pub.Utils.Comn.1962);  *Re New York Tel. Co.,* 91 P.U.R. (n.s.) 231, 257 (N.Y.Pub. Serv.Comn.1951).  Moreover, in a regulated firm, there is *the additional problem of an inter-dependence between rates and market value.*  Specifically, the market value of an asset depends upon the revenue it generates, but in a regulated industry the amount of revenue is dependent on the level of rates set by regulators.  As stated by the Supreme Court in *FPC v. Hope Natural Gas, supra,* 320 U.S. at 601, 64 S.Ct. at 287:

The heart of the matter is that rates cannot be made to depend upon "fair value" when

applicability here. If market value were to be used in the instant case, valuation proceedings would have to be conducted for all of the billions of dollars worth of AT & T's assets.

AT & T has correctly pointed out the overwhelming nature of this task by referring to the extensive, complex, and lengthy valuation proceedings in the *Conrail* case.[309] Valuation proceedings for the Bell System assets would necessarily be even more complicated and unmanageable than those involving Conrail, for the value of AT & T's assets is not only substantially greater than that of the Conrail assets, but the court there had at least the advantage of valuating assets from bankrupt estates.[310] In contrast, the Bell System is an ongoing business, and market dynamics would therefore be of much greater significance here than they were in *Conrail*.[311]

The Court finds that there is no justification for abandoning the well-established practice of valuing assets at net book for purposes of the proposed decree.[312]

## C. The Division of Assets and Debts

It has further been suggested by a number of interested persons that AT & T might manipulate the actual division of assets and liabilities to the detriment of the Operating Companies.

■■■■ Initially it may be observed that AT & T has the responsibility, separate and apart from the proposed decree, to ensure that the Operating Companies are spun off as financially viable entities. As their majority, and in some cases sole shareholder, AT & T has the fiduciary duty to protect all those with interests in these companies, including creditors. See *Pepper v. Litton,* 308 U.S. at 306, 60 S.Ct. at 245; see also *Superintendent of Insurance v. Bankers Life, supra,* 404 U.S. at 12, 92 S.Ct. at 168; *Hanraty v. Ostertag, supra,* 470 F.2d at 1099. Other shareholders are protected by similar principles. See *Kamin v. American Express Co.,* 86 Misc.2d 809, 383 N.Y.S.2d 807, 812, aff'd, 54 App.Div.2d 654, 387 N.Y.S.2d 993

the value of the going enterprise depends on earnings under whatever rates may be anticipated.

**309.** The Regional Rail Reorganization Act of 1973 mandates the transfer of assets from the estates of certain bankrupt railroads to the newly formed Conrail Corporation, and a Special Court was appointed to determine the value of the transferred assets. 45 U.S.C. §§ 743, 746. Despite the fact that the valuation proceedings for these assets began in the mid-1970s, they have yet to be completed. Indeed, the almost insuperable obstacles surrounding such proceedings led Judge Friendly to observe in 1977:

. . . we would be remiss if we did not advise the parties and also the lawmakers of our fears as to the length and cost of these proceedings if they are carried to a conclusion under the charter that has been given us, even with the simplifying limitations we have here imposed. Nearly four years have elapsed since the Rail Act was adopted and a year and a half have gone by since the conveyances. Yet despite earnest sincere efforts by all concerned, we are only at the start of the valuation problem.

*Matter of the Valuation Proceedings under Sections 303(c) and 306 of the Regional Rail Reorganization Act of 1973,* 445 F.Supp. 994, 1045 (Sp.Ct.1977). Despite the fact that over eighty percent of the case was settled by the parties, the Special Court concluded the rail-use phase of the valuation proceedings with the issuance of its 200 page opinion only in late 1981. See *Matter of the Valuation Proceedings,* 531 F.Supp. 1191 (Sp.Ct.1981). The nonrail-use phase of the proceedings has only begun: opening briefs will not be filed until October 2, 1982, and oral argument is not scheduled until January 4, 1983. *Matter of the Valuation Proceedings,* Misc. No. 76–1, Order (Sp.Ct. July 6, 1982).

**310.** Thus, the suggestion by some that the valuation process could be completed within six months (see Topic 4 Brief of People of California, *et al.,* at 35) is wholly unrealistic; and those who make these proposals are ultimately driven to the conclusion that the entire divestiture must be abandoned as impractical. Reply Brief of People of California *et al.* at 9.

**311.** The suggestion that the pitfalls of the *Conrail* case could somehow be avoided by allowing the state regulatory bodies to value the assets may readily be rejected. To permit forty-nine different forums to conduct forty-nine different proceedings would only exacerbate, not diminish, the problems.

**312.** This decision of course in no way affects the authority of regulators to use a different standard in valuing assets within their jurisdiction for ratemaking purposes.

(Ct.App.1976); *United Copper Securities Co. v. Amalgamated Copper Co.,* 244 U.S. 261, 263–64, 37 S.Ct. 509, 510, 61 L.Ed. 1119 (1917); *Lewis v. Anderson,* 615 F.2d 778, 782 (9th Cir.1979); *Rosengarten v. International Tel. & Tel. Corp.,* 466 F.Supp. 817, 822 (S.D.N.Y.1979); *Auerbach v. Bennett,* 47 N.Y.2d 619, 419 N.Y.S.2d 920, 927, 393 N.E.2d 994 (Ct.App.1979). Antitrust principles, too, impose a duty on the divesting corporation to establish the newly-divested business with a sound financial structure. *Utah Public Service Commission v. El Paso Natural Gas Co.,* 395 U.S. 464, 470, 89 S.Ct. 1860, 1863, 23 L.Ed.2d 474 (1969); *Ford Motor Co. v. United States,* 405 U.S. 562, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972); *Maryland Milk Producers' Assn. v. United States,* 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960). It should not lightly be assumed that AT & T's managers will violate this trust and expose themselves to substantial liability.

Beyond that, the Court is satisfied that, with some modifications, there are adequate safeguards to protect against abuse.

Perhaps the most important guarantee against improper manipulation is the one included in the proposed decree itself: that assets will be divided according to the functions they perform.[313] Thus, the Operating Companies will receive those assets necessary to perform exchange telecommunications and exchange access functions, and the remaining assets will be held by AT & T. There appears to be wide agreement that at least eighty percent of the assets may be readily identified and assigned on this basis. With respect to this portion of the assets it is therefore necessary only to ensure that the functional division will actually be carried out. A number of measures will serve this purpose.

First, in addition to its own review and approval of the division of assets, the Department of Justice has invited federal and state regulatory bodies as well as AT & T's competitors and other interested persons to examine the distribution of assets provided for in the plan of reorganization. See, *e.g.,*

Department of Justice Response to Comments at 15–21; Tr. 25,402. If it should appear that assets have been improperly assigned, the errors may be brought to the Department's attention, and it will then presumably take corrective action. Second, should the Operating Companies find, once they are divested, that they lack sufficient assets to perform their obligations under the decree, they may petition the Court under Section VII of the proposed decree for necessary relief. Third, the Court will continue its supervision of the decree, and it will in particular seek to ensure that the plan of reorganization is consistent with the decree's principles, including the principles which govern the distribution of assets. See Part XI *infra.* In view of the relatively ministerial nature of the task, these safeguards should be fully adequate to guarantee the proper allocation of the single-function assets.

A more substantial problem is presented by the valuation of the remaining twenty percent of the assets—those representing multifunction facilities (that is, facilities providing functions for services rendered both by AT & T and by the Operating Companies). These include such important assets as land and buildings, cables, central office switching facilities, warehouses, underground conduit, manholes, and toll terminals. The proposed decree provides in Section I(A)2 that "there shall be no joint ownership of facilities, but appropriate provision may be made for sharing, through leasing or otherwise, of multifunction facilities so long as the separated portion of each BOC is ensured control over the exchange telecommunications and exchange access functions."

The parties appear to differ in their interpretation of this provision. The Department of Justice states that the entity which makes predominant use of a facility will "generally" be entitled to its ownership.[314] AT & T, on the other hand, interprets this provision to mean that multifunction facilities will be allocated on the basis of "rea-

---

**313.** Section I(A)2.

**314.** Department of Justice Brief at 60.

sonable, neutrally applied criteria," without, however, specifying what these criteria would be.[315]

In the view of the Court, it is essential that the predominant use test proposed by the government be applied to multifunction assets. Like the functional test that will be used generally in the division of assets, the predominant use test is a clear-cut standard which minimizes subjective factors and thus the potential for improper manipulation of the allocation process. Moreover, such a test provides the Court with a readily reviewable standard should the division of these facilities be called into question.[316] By contrast, the test proposed by AT & T is vague and it leaves to that Company's management a vast amount of discretion precisely in the area where there is the most incentive for abuse. For clearly, it would be to AT & T's interest to select for itself assets of high utility and relatively low book value, while leaving to the Operating Companies the more costly but outmoded equipment, the least attractive real estate, and the underused plant. The possibility that AT & T will act on these incentives is too real to leave the distribution of the assets to AT & T's discretion under a "reasonable criteria" standard.

Because the predominant use test is an essential ingredient for the fair and successful implementation of divestiture, the Court will require in the public interest that the proposed decree be modified explicitly to incorporate that test. Such inclusion will permit the Court to oversee with some as-surance of success that the division of assets will be fairly carried out.[317]

Questions have also been raised regarding the appropriate debt-equity ratios to be assumed by the Operating Companies and AT & T. AT & T has stated that it is willing to divest the Operating Companies with debt ratios of approximately forty-five percent and to assume its representative share of the outstanding debt, by assuming debt issues that have interest rates and maturities which reflect the average terms of the particular Operating Company debt.[318] The Department of Justice endorses AT & T's statement of intentions adding, however, that the Operating Companies should be left with debt issues that reflect terms and conditions comparable to the debt held by the Bell System as a whole. Department of Justice Response to Comments at 30; Department of Justice Brief at 62.

The Court sees no reason for rejecting the parties' plan. The suggestions made by various third persons[319] do not differ significantly from those submitted by the parties, and these persons have certainly not shown that the parties' proposals are at all unreasonable. However, as is true with respect to several other matters, the Court considers that its Tunney Act responsibilities require it to demand more of the parties on subjects which have significant public interest aspects than statements of intentions embodied in briefs or written comments, or made during oral argument. Accordingly, the Court will require that the proposed

---

**315.** AT & T Brief at 88; AT & T Reply Brief at 92. AT & T acknowledges only that predominant use will be "a major criterion" in allocating ownership of the assets. Reply Brief at 92.

**316.** When this test is coupled with the provision allowing for cost-based leasing, it will assist in the division of multifunction facilities in a manner that is fair to both AT & T and the Operating Companies. Section I(A)2.

**317.** The required modification will provide the necessary flexibility in the event it is determined that in certain instances the predominant use test is inappropriate. See Part XII *infra*.

**318.** AT & T has stated that it will do so either by assuming a proportion of each debt issue or by assuming all of certain debt issues that have appropriate rates and maturities. See AT & T Reply Comments at 76–80; AT & T Brief at 90; AT & T Reply Brief at 95–96.

**319.** These persons have proposed different alternatives: some contend that no Operating Company should have a debt ratio over 50 percent; others that the Operating Companies should be spun off with the same debt ratio they had before divestiture; still others argue that, regardless of what ratio is chosen, it should be the same for all the Operating Companies so as to ensure that after divestiture they will have equal opportunities to attract new financing.

decree be modified to incorporate the forty-five percent debt ratio [320] and the government's and AT & T's representations with regard to the quality of the Operating Company debt,[321] to the end that on the basis of such a modification the Court will be in a position, if necessary, to insist that the statements of intention of the parties are actually implemented.

· The Court is satisfied that the provisions in the proposed decree, as modified, along with traditional corporate principles, provide a sound framework for the division of the assets and of the debt. The interests of the Operating Companies, including those of its creditors and future shareholders, will be protected by the functional division of assets, the predominant use test for multifunction facilities, and the guidelines established for the division of the corporate liabilities. The procedures established for the review of the reorganization plan and its implementation will further help to ensure that the principles of the decree will 'be carried out. See Part XI *infra*. Finally, the fact that AT & T has a fiduciary obligation, separate and apart from the decree, to approach the divestiture in good faith and to protect the interests of all involved will further help to guarantee that the division

of assets will be carried out in the public interest.

## X

### *Special Provisions and Concerns*

A number of those who have commented on the proposed decree have raised special problems which are outside the scope of the general categories discussed above. The Court has considered all of the issues presented by these comments, and it finds that none constitutes grounds for withholding approval of the proposed decree. Five of the most important concerns are discussed below.

#### A. *Department of Defense Concerns*

The comments of the Department of Defense indicate continued opposition to the concept of the divestiture of the Operating Companies, and they suggest that the Department prefers an integrated AT & T as a defense asset.[322] These comments ignore the testimony adduced during the *AT & T* trial, much of it by witnesses with close ties to the Defense Department,[323] to the effect that, far from relying directly or even primarily on AT & T, the Department and its allied agencies have in recent years increasingly placed their trust in their own, or in other non-AT & T sources for their commu-

---

**320.** Pacific Telephone currently has a substantially higher debt-equity ratio (at about 57 percent) due in large part to the actions of California's regulators. The Court will not require AT & T to reduce Pacific Telephone's debt to 45 percent, but will accept a reduction of Pacific's debt to around 50 percent. This 50 percent ratio appears to be acceptable to the State of California. See Topic 4 Brief of the State of California at 38.

**321.** In actual practice, there may be a distinction between the Department of Justice's proposal regarding the quality of the debt and that of AT & T. The Court expects that the plan of reorganization will provide each Operating Company with a debt portfolio that reflects the terms and conditions comparable to the debt held by the Bell System as a whole unless it can be shown that, with respect to a particular Operating Company, its own current debt provides a more equitable basis. In the event of a dispute, the chief executives of the new regional Operating Companies may be heard regarding this subject.

**322.** Thus, the Department states that the features of the integrated Bell System "have led us to express our view that divestiture of major components of the Bell System particularly structural separation between the local exchange and interexchange functions, would adversely impact system integrity and the Bell System's current ability to promptly provide emergency communications support and restoration." Department of Defense Comments at 16; see also, *id.* at 24.

**323.** *E.g.,* Secretary of Defense Harold Brown (December 17, 1981); former Deputy Secretary of Defense David Packard (November 6, 1981); Gerald P. Dineen, former Deputy Undersecretary of Defense for Research and Engineering (December 16, 1981); and former Air Force general Lee M. Paschall (November 6, 1981). All these individuals were called as witnesses on behalf of AT & T.

nications needs.[324] In any event, the Department now appears to recognize that its stated interests cannot override the government's basic divestiture decision, and it thus concentrates the bulk of its remarks on recommendations for achieving a telecommunications network that will be effective for national defense and emergency purposes once divestiture is accomplished.

Some of these recommendations require no action by the Court because they address matters of definition;[325] request the resolution of conflicts that are theoretical at best;[326] or discuss problems which have little to do with the settlement.[327] However, there is one series of comments that has substantial merit.

The Department notes that Section I(B) of the proposed decree directs the Operating Companies to "provide, through a centralized organization, a single point of contact for coordination of BOCs to meet the requirements of national security and emergency preparedness," and it correctly observes that there is no elaboration on the purpose and scope of the "single point of contact" requirement. The Department focuses on five specific areas in this regard, three of which constitute legitimate subjects of concern: (1) the lack of a requirement in the proposed decree that the Operating Companies commit specific resources to this point of contact; (2) the question of funding and regulatory treatment for this facility; and (3) the degree of authority the facility would possess to instruct the Operating Companies to cooperate in emergency situations, particularly in regard to the assignment to each other of necessary resources.[328] The Court expects that AT & T's plan of reorganization will resolve these issues in a manner which satisfies the Defense Department's legitimate needs without impairing the basic antitrust purposes of the judgment.[329]

## B. Interests of AT & T Employees

The Communications Workers of America[330] submitted both comments and briefs,

---

324. See, *e.g.,* the trial testimony of Dr. Dineen at Tr. 24538–39; General Paschall at Tr. 19699–711. Bell Laboratories continues to be an important supplier of sophisticated equipment to the Defense Department; however, the divestiture does not disturb its relationship to AT & T.

325. *E.g.,* whether such concepts as "emergency" and "customer premises" are adequately defined.

326. The proposed decree provides (in Section I(C)) that until 1987, AT & T shall provide research and development services to the Operating Companies on a priority basis, while under the Defense Production Act, 50 U.S.C.A. App. § 2061 *et seq.,* priorities may be assigned to contracts necessary or appropriate to the national defense. There is no reason why AT & T cannot satisfy both requirements.

327. The Department complains (Comments at 27–31) that interexchange carriers, but not customers of telecommunications carriers, are given the benefit of the provisions which prohibit the Operating Companies from discriminating in providing access. The proposed decree addresses a real problem: that the Operating Companies, because of their past ties to AT & T, might give special consideration to their former parent. It is difficult to believe that the Operating Companies would have an incentive to discriminate against their customers, particularly large customers such as the United States government.

328. A fourth recommendation is that AT & T be authorized and required to participate in the planning, administration, and operation of this "single point of contact" or any centralized administrative entity the Operating Companies may establish. The proposed decree quite properly rejects that concept since it would be antithetical to the basic theory and purpose of the decree. Similarly unacceptable, and for the same reasons, is the Defense Department's request that the Operating Companies be permitted to engage in coordination beyond the needs of national security and emergency preparedness.

329. Since the subjects covered in this section of the opinion concern intra-governmental matters, the Court assumes that accommodations can be worked out between the Department of Justice and the Department of Defense without the need for specific modifications of the decree. However, the Department of Defense will be afforded an opportunity, following the submission of the reorganization plan, to submit further comments to the Court, should it be dissatisfied with the arrangements made by AT & T and the Department of Justice.

330. This labor union represents over 500,000 employees of the Bell System, or 51 percent of all of the System's employees, in addition to over 70,000 employees in other telecommunications companies.

stating that it favors approval of the proposed decree. Its primary interest is in continued national bargaining in telecommunications following the reorganization of AT & T, and it requests that the proposed decree explicitly provide that nothing therein will preclude such a procedure. In the view of the Court, there is no need for such a modification. There is nothing in the proposed decree or in general principles of law which would preclude or interfere with such bargaining, and there accordingly is no reason whatever why, following the entry of the decree and the reorganization, such bargaining cannot continue as in the past.

The Communications Workers have further advised the Court that in August 1980 the union entered into a memorandum of understanding with AT & T [331] which specified that employees of the Bell System who were transferred to separate AT & T subsidiaries or affiliates would be entitled to certain protections.[332] Again, it is clear that, notwithstanding the separation of the Operating Companies from the Bell System, there will be no obstacle either to adherence by any of the restructured segments of the Bell System to the terms of existing collective bargaining agreements or to their abiding by such memoranda of understanding as may have been or may hereafter be negotiated with the union.[333]

The purpose of the divestiture is to establish conditions which will prevent the type of anticompetitive activities which the government has charged in its complaints in the two lawsuits presently before the Court. These activities, and hence the settlement of the lawsuits, do not involve AT & T's labor relations and, more particularly, they have nothing to do with the Communications Workers of America or its relationship with the Bell System. See also, 15 U.S.C. § 17; 29 U.S.C. § 52. It follows that the union, on the one hand, and AT & T, and the divested Operating Companies, on the other, will be entirely free to arrange their mutual labor relationships as the Bell System and the union did in the past, irrespective of the structural changes that may be brought about by the decree.

### C. *Prima Facie Effect of the Decree in Private Litigation*

Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a) provides that

a final judgment ... rendered in any ... proceeding brought by ... the United States under the antitrust laws to the effect that a defendant has violated such laws shall be prima facie evidence against such defendant [in a private action] as to all matters respecting which said judgment would be an estoppel as between the parties thereto.[334]

Several parties argue that they are entitled to the benefits of the presumption established by this provision in any suits they may have brought or may hereafter initiate against AT & T charging conduct similar to that involved in the government's *AT & T* action presently before this Court.[335]

---

**331.** This was done in anticipation of the establishment of separate subsidiaries or affiliated entities, presumably by requirement of the FCC.

**332.** These include the preservation of wages and net credited service of transferred employees for five years after the transfer; no reduction of pension, health, or other benefits as a result of the transfer; payment of reasonable travel and moving expenses for transferred employees; continued application of the collective bargaining agreement to these employees; preferential rehiring rights; advance notice to the union of any work group transfer; and continued recognition by the subsidiaries or affiliates of the Communications Workers of America as the exclusive bargaining representative of transferred employees.

**333.** Obviously, the divested Operating Companies and other successor AT & T entities may subsequently negotiate superseding collective bargaining agreements with the majority representatives of their employees.

**334.** The statute goes on to provide that it does not apply to consent judgments entered before any testimony is taken.

**335.** Other parties suggest that the Court should not enter the judgment without first making specific findings that might be used by private parties in subsequent litigation. There is no warrant for such findings. Although the vast majority of the evidence has been adduced, the trial has not been concluded, and the Court would therefore not be justified—absent a

AT & T presents two arguments in opposition to this suggestion.[336]

First, it contends that the proposed decree is only a modification of the 1956 decree, and that, since that decree was entered before any evidence had been taken in the *Western Electric* case, section 5(a) of the Clayton Act does not apply by its own terms. See note 334 *supra.* The Court has rejected this highly artificial argument in other contexts (see Part I *supra*) and it again rejects it here. The parties may not escape either the mandate of the law or the possibility of liability by the transparent device of attaching their settlement to an old, largely dormant case rather than to an action that is currently in litigation, especially where almost the entire settlement relates to the current lawsuit.

AT & T's second argument has considerably more merit. As indicated, the statute establishes a presumption usable in private litigation only on the basis of a judgment "to the effect that a defendant has violated [the antitrust] laws." Not only does the proposed decree fail to include a finding or admission that AT & T has violated these laws,[337] but Section III of the decree specifically provides that the judgment "shall [not] constitute any evidence against, an admission by, or an estoppel against any party or [Operating Company]." In view of that unequivocal provision, it would appear to this Court that the judgment herein would not have a prima facie effect in private litigation. However, as the Department of Justice correctly points out, the ultimate decision with respect to this issue must rest with the court in which such litigation may be brought. Response to Comments at 136. The Court will therefore decline to enter any specific decision or finding regarding this subject.

D. *Conflict with Federal Regulation*

Several interested parties have suggested that there may be a conflict between the proposed decree and regulation by the Federal Communications Commission, and that the decree therefore should not be entered unless and until the Commission has given its formal approval.

It is true that FCC certificates are required under the Communications Act for a number of transactions necessary to implement the divestiture. See 47 U.S.C. §§ 214(a), 221(a), 310(d). It is not likely, however, that a controversy will actually arise with respect to any of these matters. The FCC has already declared that "the basic settlement appears to be fair and reasonable," and it has suggested throughout its participation in these actions that there will be no difficulties with regard to implementation. Brief of FCC as amicus curiae at 9. The Supreme Court has admonished the lower courts not to adjudicate potential conflicts between an antitrust decree and a federal regulatory statute until there is a concrete case or controversy in that respect. *Otter Tail Power Co. v. United States,* 410 U.S. 366, 377, 93 S.Ct. 1022, 1029, 35 L.Ed.2d 359 (1973). Accordingly, the Court need not and will not decide specific questions of possible conflict at this time.

The Federal Communications Commission has suggested in a somewhat similar vein that the decree should accommodate the federal regulatory scheme by the addition of a clause modeled on the so-called *Terminal Railroad* proviso. In *United States v. St. Louis Terminal,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912) the Supreme Court directed the entry of a decree which, *inter alia,* changed some billing practices and eliminated a special charge for certain types of rail traffic. Because of a concern that

waiver by the parties or their refusal to produce additional evidence—to make findings of fact. See, *e.g., Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); *Emich v. General Motors Corp.,* 340 U.S. 558, 566–72, 71 S.Ct. 408, 412–15, 95 L.Ed 534 (1951).

**336.** The Department of Justice appears to take a position only on the second of AT & T's arguments. See Department of Justice Response to Comments at 134–36.

**337.** Likewise, nothing in this opinion is intended to constitute a finding of violation of the antitrust laws.

these provisions created a potential conflict with Interstate Commerce Commission regulation of interstate rail transportation, the Court ordered that a proviso be attached to the effect that the decree did not affect the ICC's powers. 224 U.S. at 412, 32 S.Ct. at 516. The District Court entered a decree in conformity with the Supreme Court directive (see *Terminal R.R. Ass'n v. United States,* 266 U.S. 17, 25, 45 S.Ct. 5, 6, 69 L.Ed. 150 (1924)); and it is a clause paralleling that decree that the FCC requests here.

It is not at all clear why the FCC asks for inclusion in the decree in these cases of the *Terminal Railroad* proviso. The Commission acknowledges that

> The addition of such a provision would not change the substance of the proposed [decree]. There is no reason to suppose that either party to the settlement ever intended to affect any Commission power. Moreover, the failure to add such a proviso would not expand the court's power or contract the Commission's power.

Brief of FCC as amicus curiae at 27–28.

The only reasons given for the FCC request is that, by adding the proviso, the Court would avoid misunderstandings, and that to do so would comply with the Supreme Court's expressed preference for conditional decrees.

The addition of a clause which, by the Commission's own concession, would have no effect either on the authority of the Commission or that of the Court, is more likely to create misunderstandings than to eliminate them. As for the alternate argument, the Court does not view the requirement of a proviso in a case decided sixty years ago under totally different circumstances to constitute an adequate reason for adding a similar clause here.

The Court has recognized and discussed the jurisdiction of the FCC ever since its opinion of September 11, 1978. *United States v. AT & T, supra,* 461 F.Supp. 1314. As the Court then decided, and subsequently reiterated,[338] none of the activities of AT & T which is the subject of these lawsuits is immunized from the antitrust laws by virtue of FCC regulation. The Court has also noted that there is no reason to anticipate a conflict between the decree and federal regulation, but that if such a conflict arose, it appeared likely that, in view of the Commission's limited authority in regard to structural matters in the telecommunications industry, the judgment of an antitrust court would prevail. *Cf.* Part III *supra.* Indeed, the FCC itself has conceded herein that it has limited authority with respect to the structure of the telephone industry. Memorandum of the FCC as amicus curiae in *United States v. AT & T,* reprinted at 62 F.C.C.2d 1102, 1117–18 (1977). For these reasons, a modification of the proposed decree along the lines requested by the FCC is unnecessary.

### E. *Cincinnati Bell*

The Ohio Office of the Consumers' Counsel and the City of Cincinnati, object to Section I(A)(3) of the proposed decree which requires termination of the license contracts, including the one with Cincinnati Bell.[339] These entities argue that in 1903, AT & T made an agreement[340] with Cincinnati Bell pursuant to which AT & T received approximately 29 percent of Cincinnati Bell's common stock[341] in exchange for a commitment by AT & T to provide Cincin-

---

**338.** See *United States v. AT & T,* 524 F.Supp. at 1357–60.

**339.** Cincinnati Bell is covered by the proposed decree notwithstanding the fact that it is not one of the twenty-two Operating Companies to be divested because Section I(A)(3) of the proposed decree calls for "the termination of the License Contracts between AT & T and the BOCs and other subsidiaries." Section IV of the proposed decree, in turn, defines subsidiary as "any organization or entity in which AT & T

has stock ownership, whether or not controlled by AT & T." Thus, these provisions include Cincinnati Bell as well as the Southern New England Telephone Company.

**340.** The minutes of a Board of Directors meeting are alleged to substantiate their claim.

**341.** There is some question whether the stock was worth $70 million or about one-half that amount.

nati Bell with the benefits of the license contracts in perpetuity. The proposed termination of all license contracts, including the one pertaining to Cincinnati Bell, is claimed to constitute a confiscation of the stock and a windfall to AT & T.

The Justice Department responds that negotiations between AT & T and Cincinnati Bell are under way to resolve this issue (Response to Comments at 38, n. *) and AT & T states that the license contracts will be terminated "on a reasonable and equitable basis," but that if Cincinnati Bell is dissatisfied with the outcome, it may bring a separate action and assert whatever contract remedies it may have. AT & T Reply Brief at 120, n. *.

The Court regards these responses as adequate, particularly because Cincinnati Bell itself has not complained of the termination of the license contracts or indicated that it expects the current negotiations to prove unsatisfactory. It may well be that the issue will, in fact, be resolved amicably between Cincinnati Bell and AT & T. If, after the plan of reorganization is submitted, Cincinnati Bell is dissatisfied with the terms of the termination, it may raise the issue,[342] and the Court will then determine whether the matter is appropriately addressed in the context of the reorganization or by way of a separate legal action.

## XI

### Future Proceedings

The Court has received a number of comments urging it to hold a variety of future proceedings in connection with the implementation of the proposed decree. Some go so far as to suggest that the Court withhold its approval of the decree until the contents of the reorganization plan are known; others argue more simply that the decree be modified to include mechanisms for Court and third-party involvement in both the implementation and the enforcement of the decree; still others contend that the Operating Companies be immediately drawn into the public interest process on an independent basis. Each of these issues is discussed below.

### A. Deferral of Approval of the Judgment

It has been widely contended that the Court should defer either approving or disapproving the parties' proposal, or that, at a minimum, it should grant only tentative approval until it has had an opportunity to review AT & T's plan of reorganization. Implicit in these suggestions is the premise that it is not possible now to determine whether the broad principles set forth in the proposed decree, even if fully implemented, comply with the Tunney Act's public interest standard, and that a *de novo* public interest evaluation must therefore be conducted after the plan of reorganization has been submitted.

There is no sound basis for such a course. Although, as discussed above, many important questions are left unresolved, the proposal does set forth the principles of the parties' agreement with sufficient particularity that the Court is able to make a decision now on the question of whether a judgment based on these principles would be in the public interest. Moreover, a deferral of approval or a grant only of tentative approval—essentially on the theory that once implementation begins, entirely new problems of concern to the public in general or to specific interests may emerge—would be unfair to the parties and to the public.

As AT & T correctly points out, "[d]elay holds the most serious consequences for the operation of the network and can only multiply the costs of uncertainty that have plagued the industry far too long." [343] Such a delay would disrupt AT & T's own operations; it would inhibit investment and other business decisions necessary to the maintenance and improvement of the telecommunications network; it would jeopardize the ability of the Bell System's components to raise the outside capital needed for the modernization and expansion of their net-

---

**342.** See Part XI *infra.*

**343.** AT & T Reply Comments at 3.

work; and it would adversely affect the entire telecommunications industry, and thus indirectly, the nation as a whole.

Because the principles set forth in the decree are specific enough for the Court to make its decision, and because delay, with all its adverse consequences, is unwarranted, the Court will not defer its ruling on whether the proposed decree is in the public interest.

This decision means, of course, that if the parties accept the Court's modifications, the decree as modified will be approved as being in the public interest, and the Court will be unable at some later stage to add new and different provisions.[344] It also follows that the enforcement procedures adopted herein (see *infra*) will be designed only to permit the Court to protect the provisions and principles of the judgment, as entered, against non-compliance and non-enforcement.

### B. *The Court's Continuing Enforcement Authority*

Although the principles underlying the proposed decree are clear, they are in sever-

al respects sufficiently general in nature that they could be implemented by the parties in a number of different ways.[345] As to some of these provisions, the parties have provided the Court with assurances regarding the approach they will follow.[346] As to others, only their future conduct will reveal whether the principles of the proposed decree are being followed.

The Court's public interest determination necessarily rests on the premise that the parties' assurances will be fully carried out and that the other principles included in the decree will be implemented in the manner most consistent with its purposes. However, no one can know at this time whether this premise is well taken, and it is therefore imperative that the Court retain the power to ensure that the parties comply in full with the principles mandated by the decree, both in formulating the plan of reorganization and in their conduct after divestiture.

■ The parties provide somewhat differing explanations as to why the Court should be unconcerned about the decree's

---

**344.** This limitation is without prejudice to the exercise by the Court of authority to modify the judgment stemming not from the decree itself but from general principles of law.

**345.** For example, section IV(G)(1) provides that the local exchange areas shall be drawn in such a way as to take account of "common social, economic, and other purposes, even where such configuration transcends municipal or other local governmental boundaries." It is nowhere spelled out what those conditions might be, or how they would be established, defined, or demonstrated. AT & T would thus be wholly free to draw the exchange area boundaries so as to further its own interests at the expense of those of the Operating Companies, at the expense of its various interexchange competitors, or both.

Similarly, section I(A)(1) provides that "sufficient facilities, personnel, systems, and rights to technical information" will be assigned by AT & T to the Operating Companies so as to permit them effectively to perform the functions assigned to them under the judgment. This clause, too, is more precatory than mandatory, more broad than precise, and in particular it leaves to AT & T wide discretion in the assignment and the configuration of common facilities. As indicated in Part IX, *supra*, the

multifunction facilities represent, by the parties' own estimates, about twenty percent of the total Bell System assets—meaning that they have a value of some $20 billion. Unless more definite guidelines are set, there is an obvious and substantial incentive and opportunity for manipulation by AT & T.

**346.** Among these principles are the following: (1) AT & T will grant to the Operating Companies on a royalty-free basis all existing patents and all patents to be issued for a period of five years following entry of the judgment; (2) the chief executives of the seven new Operating Companies will have full independence, without interference, from AT & T to provide to the Court their views regarding the plan of reorganization and otherwise; (3) switches providing Class Four functions will be available for the interconnection of AT & T's interexchange competitors if the Operating Companies conclude that this is the most efficient method of effecting the interconnection; (4) the "single point of contact," organized to meet national security and emergency preparedness needs will be sufficiently funded and supported; and (5) the local exchange areas will be drawn in accordance with objective principles and without discrimination.

implementation. AT & T baldly states that the Tunney Act authorizes the Court only to approve the decree, not "to assure that it will in fact be implemented."[347] That contention betrays a complete misunderstanding of the purpose of the Act and of the Court's equitable responsibilities. The Congress was concerned with the ever-present possibility of collusion between the Department of Justice and antitrust defendants, with their vast economic and political powers, and for that reason it interposed the Court's public interest authority between the parties and the entry of consent decrees. But that procedure would be largely meaningless if AT & T's understanding of the proper role of the Court were correct. Upon that view, the parties could simply enter into a consent decree which easily passed muster in the public interest proceeding, and then proceed with its implementation, or non-implementation, without fear of judicial interference. The Court rejects so self-defeating a construction of the law and of its responsibilities.

The Department of Justice's response is more sophisticated but no more satisfactory. The Department states that it will "be fully aware of all aspects of public concern"; that it will "review the plan of reorganization to ensure that [appropriate] arrangements are made"; and that the proposed decree properly "places [sole] responsibility for approval of divestiture in the Department of Justice."[348] In addition, counsel for the government have argued with some vigor that they are committed to this settlement and will do their best to implement and enforce it. The Court does not in the least doubt the good faith of the particular individuals involved. But this is not a matter of personalities—either the Court's or those of specific Justice Department officials.[349] The Tunney Act is addressed to institutions: the Congress determined, for reasons it considered good and sufficient, that, on balance, antitrust settlements involving the government shall be subject to the scrutiny of the Judiciary. The Court intends to see to it that this mandate is fully implemented in this case.

During the congressional hearings which led to enactment of the statute, the Department of Justice officials argued—just as they do here—that internal Department procedures were adequate to protect the public interest and that judicial involvement was for that reason unnecessary.[350] The Congress rejected that approach in favor of requiring the courts to become active participants in the process.[351] In light of that legislative determination, it would be inappropriate and insufficient for courts to rely exclusively on a Justice Department review as providing an adequate assurance that a consent decree will be implemented in a manner consistent with the public interest.[352]

The procedures requisite for the protection of the public interest necessarily de-

347. AT & T Reply Brief at 132, note **

348. Department of Justice Brief at 96–99. But the Department has acknowledged that the Court has a legitimate interest in retaining jurisdiction to assure that the plan of reorganization does not depart from the principles in the judgment. See pp. 165–166 *infra.*

349. Individuals, of course, come and go. What has remained and is likely to remain constant are AT & T's self-interest and its desire to secure from government officials favorable interpretations of laws, rules, regulations, agreements, and understandings; and the possibility that political or other influence may effectively be brought to bear on public officials.

350. Senate Hearings, *supra,* note 72, at 90–91, 103–04 (Assistant Attorney General Thomas Kauper); *Consent Decree Bills: Hearings on*

H.R. 9023, H.R. 9947 and S. 783, *supra,* note 72 at 62, 71–73, 84–85 (Deputy Assistant Attorney General Bruce Wilson).

351. See Part II *supra.*

352. The parties contend that in other cases courts have been content with less than what they have presented here, and that these courts have not required approval of detailed implementation plans. In fact, consent decrees commonly include clauses requiring judicial approval of plans of reorganization. See, *e.g., United States v. American Optical Co.,* 1966 Trade Cas. ¶ 71,781 (E.D.Wis.1966); *United States v. United Fruit Co.,* 1958 Trade Cas. ¶ 68,941 (E.D.La.1958).

pend upon many different circumstances—which is precisely why the Congress left to the courts' discretion the means by which their public interest responsibilities would be effected. There are several reasons why judicial scrutiny and enforcement beyond the entry of judgment stage is especially necessary in these cases.

First. Whether this decree will, in fact, provide the benefits which underlie the Court's public interest determination depends upon (1) the provisions of the plan of reorganization and (2) the extent to which AT & T and the divested Operating Companies comply with the requirements of the decree applicable even after the completion of the divestiture.[353] To preclude Court review of these activities would thus be to do precisely that which Congress sought to prevent.

Second. This particular settlement, and this particular consent decree, are of extraordinary magnitude and complexity. The decree will effectuate the largest, most complicated divestiture since the passage of the Tunney Act, if not in all of American legal history. It will not only provide for the reorganization of the largest corporation in the world, but it will also affect the entire telecommunications industry, the computer industry, the dissemination and publication of information, foreign trade, national defense, and thus the interests of literally millions of individuals—ratepayers, AT & T competitors, creditors, employees, stockholders and bondholders, and ordinary American citizens who are dependent upon the telephone for their private or business interests. It would be wholly inappropriate in that kind of situation for the Court to allow the parties to exercise unreviewable

discretion over future implementation and enforcement.

Third. The Court has recounted how AT & T and various departments of the government, in particular the Department of Justice and the Department of Defense, have cooperated since the 1950s in a manner that does not instill confidence that their sole motivation and purpose was the protection of the public interest. See Part I *supra*. In view of that history, and in view of the mandate of the Tunney Act, the Court would be derelict in its duties if it relied upon Department of Justice enforcement alone for the protection of the public interest following the signing of the judgment itself.

For all these reasons, it is the Court's conclusion that the purpose of the Tunney Act will be fulfilled only if judicial scrutiny and enforcement do not cease with the entry of judgment.

It is unclear whether the decree itself vests in the Court the requisite authority *sua sponte* to enforce the judgment, for the parties to the litigation have taken ambiguous and inconsistent positions on this question. By its terms, the proposed decree grants enforcement power only to the parties to the lawsuit (and after divestiture to the Operating Companies), apparently to the exclusion of the Court acting *sua sponte*.[354] The Department's Competitive Impact Statement likewise strongly suggests[355] that only the parties possess such power, and AT & T's briefs are even more emphatic in asserting that "*sua sponte* action by the Court would be unnecessary and unprecedented," and that various commen-

---

**353.** For example, AT & T and its affiliates are required under Section I(C) of the proposed decree to provide research, development, manufacturing, and other support services to the Operating Companies; and pursuant to Appendix B of the proposed decree, the equal exchange access for all interexchange carriers must be provided by September 1, 1986.

**354.** Section VII of the proposed decree provides that

[j]urisdiction is retained by this Court for the purpose of enabling any of the parties to this

Modification of Final Judgment, or, after the reorganization specified in Section I, a BOC to apply to this Court at any time for such further orders or directions as may be necessary or appropriate for the construction or carrying out of this Modification of Final Judgment, for the modification of any of the provisions hereof, for the enforcement of compliance herewith, and for the punishment of any violation hereof.

**355.** Competitive Impact Statement at 38.

tators are wrong in assuming that *"sua sponte* enforcement action by this Court would be proper." AT & T Brief at 117; AT & T Reply Brief at 133–34.

On the other hand, the Department of Justice has acknowledged elsewhere that, after the judgment has been entered, the "Court will then have the authority to ensure that any actions taken are consistent with the [judgment], and the attendant powers to hold hearings, appoint experts and seek assistance by appropriate means from interested parties." Response to Comments at 15. The Department went on to state that, since the Court would retain jurisdiction pursuant to Section VII of the decree, it would be able on its own motion to initiate proceedings to enforce its provisions,[356] and it further observed that "the Court would retain jurisdiction to assure that the plan of reorganization ultimately approved by the Department of Justice does not in any substantial way depart from the [judgment's] principles—principles that the Court would have approved and hence mandated." [357]

These confusing and somewhat contradictory interpretations do not provide a firm basis for the Court's action *sua sponte* to initiate enforcement proceedings. If such authority is to be found, it will have to be elsewhere than in the present language of the proposed decree.

■ Some such authority already exists through the law of contempt. Although civil contempt proceedings may probably [358] be initiated only by a party or parties with an interest in the decree, a court may enforce its own judgments by means of criminal contempt even if there has been no request from a party. *MacNeil v. United States,* 236 F.2d 149 (1st Cir.1956). See also

United States v. Barnett, 346 F.2d 99 (5th Cir.1965); *United States v. International Union,* 190 F.2d 865 (D.C.Cir.1951); *Fletcher v. United States,* 174 F.2d 373 (4th Cir. 1949); *Palmigiano v. Garrahy,* 448 F.Supp. 659 (D.R.I.1978).

There is, however, a glaring defect to the criminal contempt option as a means of enforcing the decree as it is presently drafted: many of the enforcement problems that are likely to arise may be expected to stem from the broad principles set forth in the decree rather than from narrowly-defined, precise provisions. Yet criminal contempt sanctions as a rule may be imposed only for clear-cut violations of very specific judgments or orders. Thus, unless the proposed decree is modified to allow for the entry of such orders in implementation of the decree's principles, the Court would probably be left without any realistic means of redressing the difficulties that are likely to arise in the implementation phase of the judgment. For the reasons stated, this would not be in the public interest.

The Court will accordingly require as a condition of its approval of the proposed decree that it be modified (1) to require Court approval of the plan of reorganization and (2) to confirm the Court's authority to initiate enforcement proceedings *sua sponte.* These modifications will enable the Court both directly to enforce specific provisions of the decree and to issue orders construing its principles in more specific terms so that, if there is a violation, sufficient grounds will exist for the entry of further enforcement orders or the imposition of appropriate punishment.

## C. *Status of Third Parties*

A number of individuals as well as several governmental and private entities have

---

**356.** Department of Justice Response to Comments at 136–37.

**357.** Competitive Impact Statement at 17. To confuse the parties' positions even further, counsel for the Department suggested during oral argument that under the decree the Court could act on its own motion, but only in the event that the Department had failed in bad faith to undertake its own enforcement efforts. Hearing on June 30, 1982, Tr. 25445–47.

**358.** It may be that, in a case of this kind, where the Court has in effect placed its imprimatur on the decree by virtue of a comprehensive public interest proceeding, it would be a party in interest with sufficient standing for civil contempt purposes. It is not necessary to come to a definite conclusion on this matter at this time.

sought to intervene in these proceedings.[359] Although the Court rejected all these requests at the time they were made, it did, in its order of May 25, 1982, invite interested parties to advise it of the status they sought with respect to further proceedings.[360] In response to that invitation, a number of interested persons and organizations replied that they wished to be granted status as intervenors, and they generally suggested that this should include the right to present evidence, to call and cross-examine witnesses, to file procedural motions and counterclaims, and to take appeals.[361]

■ It is clear from the language of the Tunney Act, its legislative history, and from the cases [362] that there is no right to intervene; to the contrary, Congress intended intervention, and the scope of the intervention if allowed, to be discretionary.

The Tunney Act provides that in making its public interest determination, "the court

may . . . authorize full or limited participation in proceedings before the court by interested persons or agencies, including . . . intervention as a party pursuant to. the Federal Rules of Civil Procedure." 15 U.S.C. § 16(f) (emphasis added). Nothing in the legislative history of the Act or in any decision construing it lends support for the proposition that the Congress intended "may" to mean "shall." In the congressional reports and hearings, it was repeatedly emphasized that the court conducting a Tunney Act proceeding would have the widest possible latitude in choosing the appropriate method for collecting the information necessary to make its decision and that the various means specified in the subsection were to be regarded as permissive.[363]

The applicants for intervention have already been accorded substantial rights in these proceedings—rights which for all intents and purposes have been equal to those

**359.** See notes 60–61 *supra*.

**360.** Specifically, the Court's memorandum stated that

Interested persons shall indicate (1) whether they request participation as intervenors, amicus curiae, or in some other capacity; (2) whether such status would be limited to certain topics or phases of the proceedings; (3) what specific powers they would expect to be able to exercise (*e.g.*, present evidence, file procedural motions or counterclaims, take appeals, acquire the right to veto the settlement); and (4) why such status and such powers are necessary for the safeguarding of their legitimate interests and appropriate in the circumstances of this case [citing a previous Court memorandum].

Order filed May 25, 1982, at 5.

**361.** No one asserted a sufficient reason for receiving a right to veto the settlement. There was little response to the Court's inquiry as to the need for intervention or its appropriateness in the circumstances of these cases.

**362.** There are no court decisions holding that the Tunney Act grants a right to intervene. Decisional law prior to passage of the Act is generally to the same effect. One exception is *Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967), but it involved a unique fact situation. The Supreme Court had ordered divestiture as part of its decision on the merits but no action had been taken to carry out the mandate. Instead, the parties filed a consent decree which did "the opposite of what [the

Court's] prior opinion and mandate commanded." *Id.* at 142, 87 S.Ct. at 940. In that posture, the Court found a right to intervene. The cases are virtually unanimous in limiting the *Cascade* decision to its peculiar facts. For example when a third party sought to intervene in the *Western Electric* case, the court denied the application, finding *Cascade* to be limited to its "extraordinary circumstances," and that decision was affirmed by the Supreme Court. *United States v. Western Electric Co.*, 1968 Trade Cas. ¶ 72,415 (D.N.J.), *aff'd*, 392 U.S. 659, 88 S.Ct. 2286, 20 L.Ed.2d 1348 (1968). See also *United States v. Associated Milk Producers, Inc.*, 534 F.2d 113 (8th Cir.1976); *Smuck v. Hobson*, 408 F.2d 175, 179 n. 16 (D.C.Cir.1969); *United States v. Carrols Development Corp.*, 454 F.Supp. 1215, 1220–21 (N.D.N.Y.1978); *United States v. Paramount Pictures, Inc.*, 333 F.Supp. 1100, 1102 (S.D.N.Y.), *aff'd*, 404 U.S. 802, 92 S.Ct. 79, 30 L.Ed.2d 37 (1971); *United States v. Automobile Manufacturers Ass'n*, 307 F.Supp. 617, 619 (C.D.Cal.1969), *aff'd*, 397 U.S. 248, 90 S.Ct. 1105, 25 L.Ed.2d 280 (1970); *United States v. Blue Chip Stamp Co.*, 272 F.Supp. 432 (C.D.Cal.1967), *aff'd*, 389 U.S. 580, 88 S.Ct. 693, 19 L.Ed.2d 781 (1968).

**363.** See, *e.g.*, S.Rep. No. 93–298, *supra*, at 6 (broad discretion); *Senate Hearings, supra*, note 72 at 453 (procedural devices are discretionary in nature) (Sen. Tunney); *Id.* at 149, 152 (necessary information to be adduced through simplest and least time-consuming means) (Judge J. Skelly Wright).

possessed with respect to the public interest proceeding by the parties to these lawsuits. In addition to their voluminous comments, they have been permitted to file briefs and reply briefs and through lead counsel they have participated in oral argument. The Court has considered their several procedural and substantive arguments, requests, and recommendations, and a fair number of them have resulted in favorable action. The question now is what participation, if any, should be permitted with respect to future proceedings.

As the substantive portions of this opinion show, the Court has concluded that none of the issues before it requires an evidentiary hearing. That being so, there is obviously no need, nor indeed any occasion, for the presentation by a third party of its own witnesses or for the cross-examination of adverse witnesses. As for the filing of motions or counterclaims, the Court has not been advised of the substance of such pleadings or of the claims or issues to which they might be addressed. More importantly, there will be no occasion for the filing of motions and counterclaims prior to the entry of the judgment for, if the government and AT & T agree to the modifications required by the Court, no further proceedings will be held before that time.[364]

The situation is different, however, regarding post-judgment proceedings.[365] The Court intends to conduct proceedings prior to its approval of AT & T's plan of reorganization that will be procedurally similar to the proceedings which the Tunney Act requires in advance of the entry of judgment.[366] The Court expects that interested persons and organizations will be given an opportunity to file comments or briefs; there may be oral argument; and, should it appear that factual development would be helpful, there may be evidentiary hearings at which appropriate third parties will be permitted to participate with full rights. These purposes can best be achieved by granting intervenor status to all those who have filed requests or motions to intervene.

At the time the decree is entered, the Court will issue an order describing the rights of intervenors.[367] These will include: (1) the right to appeal the entry of the decree; (2) full participation in the proceedings which the Court will conduct to determine whether to approve the plan of reorganization; and (3) the right to appeal from the Court's decision concerning the plan of reorganization. Intervenor status will terminate thereafter.

Several third parties have requested the grant of authority, either by way of intervenor status or otherwise, to enforce the judgment after the plan of reorganization has been submitted and approved. These requests pose a difficult problem. On the one hand, it is entirely appropriate, for the reasons discussed above, that the judgment continue to be enforced, if necessary by the Court, past the time when the plan of reorganization is approved. The actual divestiture will not occur for up to eighteen months after formal approval of the plan. Moreover, even after the divestiture significant actions will need to be taken in implementation of the judgment.[368] On the other hand, means must be found for avoiding constant, unnecessary interference by AT & T's competitors and others with implementation of the reorganization and with the normal operations of AT & T and the divested Operating Companies. Furthermore, once the judgment has been entered

---

**364.** Intervenor status would not be appropriate simply in the abstract. As indicted *supra,* the Tunney Act does not require the full formalities extant in normal litigation unless they are needed for the development of information useful to the public interest determination.

**365.** In order to permit interested persons to challenge the Court's public interest determination, they will be allowed to intervene for the purpose of appealing the entry of the decree.

**366.** Substantively, the proceeding will be limited to an examination of plan's consistency with the judgment. See Subpart A *supra.*

**367.** There is no doubt that the Court may authorize intervention on a limited basis. The Tunney Act itself allows the Court to provide for "full or limited participation." 15 U.S.C. § 16(f)(3).

**368.** See note 353 *supra.*

and the plan of reorganization has been approved, this Court should not be burdened with innumerable requests for clarification or modification, and with charges of violation.[369]

To strike an appropriate balance, the Court has decided upon a procedure for the participation of third parties after approval of the reorganization plan which combines the process adopted in *United States v. Associated Milk Producers, Inc.,* 394 F.Supp. 29, 46 (W.D.Mo.1975), aff'd, 534 F.2d 113 (8th Cir.1976) with the government's "bad faith" proposal made in a different context. See note 357 *supra.*

In the *Milk Producers* case, the court after a finding that a proposed decree was in the public interest, issued an order providing that any interested person who believed that "defendant is not complying with the terms of the Final Judgment," would be authorized to serve upon the Department of Justice a request for enforcement. If the Department refused to bring an enforcement action in response to the request, both that request and the Department's response were to be submitted to the court for a determination of "what, if any, further appropriate proceedings should be directed." This procedure appears to have worked well.[370]

In the exercise of its authority under the Tunney Act, its general equitable powers, and pursuant to Rule 24, Fed.R.Civ.P., the Court will, after the decree has been entered, issue an order which will establish a similar complaint and response procedure, with the proviso, however, that application to the Court may be made only after application for enforcement is first made to the Department of Justice. The application to the Court must be accompanied by an affi-

davit alleging facts with particularity [371] which, if true, would demonstrate a bad faith refusal by the Department of Justice to enforce the judgment.[372] As in the *Milk Producers* case, the Court will decide upon receipt of such documents what, if any, further proceedings should be initiated.

D. *Participation of the Bell Operating Companies*

Many persons and organizations have questioned the lack of independent representation for the Operating Companies in this proceeding, both prior to the entry of judgment and in conjunction with the preparation of the plan of reorganization. They contend that AT & T's interests under the proposed settlement are diametrically opposed to those of the Operating Companies, and that AT & T therefore cannot be relied upon to act in the Operating Companies' best interests. They suggest that, for these reasons, the Court should ensure the proper representation of the Operating Companies either by divesting them immediately or by appointing a guardian *ad litem* or similar officer to represent their interests. Such participation will not be ordered at this stage of the proceedings, both because it is not necessary, and, more fundamentally, because there is no practical means for effecting it.

First. It is not at all clear that AT & T will act contrary to the interests of the Operating Companies. Under the proposed decree, AT & T's shareholders will become the shareholders of the Operating Companies and, should AT & T act to undermine the interests of these Companies or fail appropriately to protect them, it and its managers might be liable civilly for breach of their fiduciary duty to these sharehold-

---

**369.** In view of the large number and the variety of interested parties, that contingency is very real.

**370.** See *United States v. Associated Milk Producers, Inc.,* 477 F.Supp. 671 (W.D.Mo.1979).

**371.** Cf. Rule 9(b), Fed.R.Civ.P.

**372.** Some third parties might, of course, have standing to enforce the decree apart from this specific procedure for their participation. See

*Natural Resources Defence Council v. Costle,* 561 F.2d 904 (D.C.Cir.1977); Sullivan, *Enforcement of Government Antitrust Decrees by Private Parties: Third Party Beneficiary Rights and Intervenor Status,* 123 U.Pa.L.Rev. 822 (1975); Berger and Bernstein, *An Analytical Framework for Antitrust Standing,* 86 Yale L.J. 809 (1977).

ers. See Part IX *supra*. Moreover, since the divested Operating Companies will supply AT & T's sole avenue of access to telephone subscribers and will potentially be large purchasers of Western Electric equipment, AT & T has additional incentives to protect their interests.

Second. The views which the Operating Companies might be expected to espouse have substantially been presented in this proceeding. With respect to all of the issues which presumably would concern the Operating Companies—principally the distribution of the assets and the corporate debt, the restrictions on Operating Company operations, the Operating Company access requirements—able parties with able counsel have presented to the Court the factual, legal, and policy arguments bearing upon these questions. In the main, the Operating Companies would have no particular expertise that would give special value to their participation: the Court's decision generally rests upon the rationale of improved competition, and the relevant information on that subject is available to those who are now before the Court. That is not to say, certainly, that the Operating Companies, if they had independent representation, would not make a contribution; obviously they could and would. But in the opinion of the Court that contribution is not so critical as to outweigh the adverse factors recited below.

Third. There is no existing procedural mechanism which would lend itself to the expression of the views of the Operating Companies. Two alternatives have been advanced: an immediate spin-off of the Operating Companies so as to enable them to bargain with AT & T and the Justice Department concerning the terms of the proposed decree, and the appointment of a guardian or trustee to represent their interests in this and future proceedings.

An immediate spin-off of the Operating Companies, while superficially appealing, would be entirely impractical and, notwithstanding the Court's urging, none of those who has advocated such a spin-off has presented a plan that is even remotely feasible. In fact, such an action would leave entirely unresolved all of the problems of administrative coordination, interconnection, and continuity of service that are addressed in the proposed decree.

For example, as a consequence of such a spin-off, the Operating Companies would be wholly independent of AT & T, required to provide to AT & T neither services nor assistance. At a minimum, this would leave AT & T at a serious disadvantage relative to competitors who have constructed their own complete networks among major cities;[373] at worst, this course would disrupt, for months or perhaps years, the nation's telecommunications network, with incalculable consequences to trade and defense, as well as to ordinary communication and interaction among citizens. At the same time, such a spin-off would leave local and interexchange facilities integrated under the common ownership of the Operating Companies, and it would thus be directly contrary to the antitrust objectives of these lawsuits. The Court will not attempt to catalogue all of the other problems and difficulties that would inevitably accompany a separation without advance planning or agreement similar to that embodied in the proposed decree; but there can be no question but that, in a separation of this magnitude, they would be manifold and in all likelihood insurmountable.[374] As indicated, beyond expressing the general expectation that all those matters may somehow be worked out, not one person or organiza-

---

**373.** The Operating Companies own most of the facilities necessary for the provision of interexchange service. See Exhibit D–24B–1011. The functioning of AT & T's Long Lines Department would be substantially impaired if the Operating Companies were divested intact.

**374.** Much of the impetus for an immediate spin-off results from the belief that there

should be arm's length bargaining regarding the valuation of the assets being divided between AT & T and the Operating Companies. That argument in favor of an immediate spin-off is meritless, however, because the Court has concluded that net book value rather than market value is the appropriate standard for this division. See Part IX *supra*.

tion has even attempted to suggest practical solutions. For all these reasons, then, the Court has concluded that it will not require an immediate spin-off.

While the Court's power to appoint a guardian, trustee, or similar officer to represent the interests of the Operating Companies is far from clear, its rejection, again, must be bottomed primarily upon the practical difficulties inherent in this approach. If a guardian were appointed at this time, even before the plan of reorganization has been formulated, he could be expected to face considerable difficulty in obtaining the type of detailed information from the Operating Companies which would be the *raison d'etre* of his participation. The personnel of the Operating Companies and the information they possess would remain under the control of AT & T and it is unlikely that a guardian could secure sufficient assistance from them at this stage to warrant the disruption his appointment would entail. Development of an independent expertise by the guardian would be likely to take years, further delaying resolution of this litigation without the promise of any real benefits to the decision-making process.

Participation by the Operating Companies, through their own chief executive officers, will be appropriate, however, with respect to the process of implementation of the decree. At the time the plan of reorganization is presented, the seven new regional Operating Companies and their chief executives will be a long way on the road toward independence, with a substantial incentive to represent and advocate their own interests. Moreover, their familiarity with the facilities required to provide local and intercity service and exchange access would give them special expertise concerning the adequacy of the reorganization plan in regard to the division of assets.

The Court accordingly intends to require that, at the time the plan of reorganization is submitted to the Court by the Depart-

ment of Justice, the designated chief executive officers of the seven regional Operating Companies file with the Court sworn statements certifying that, to the best of their knowledge, the plan will leave the companies which they head as viable entities with the resources necessary to perform the functions described in the decree. These statements will also be expected to discuss any element of the plan of reorganization that may have been imposed by AT & T over the objections of any chief executive officer.[375] The Court expects, additionally, to call upon the chief executive officers or their staffs to participate in other respects as well in the proceedings held at the time the plan of reorganization is presented for judicial approval.

## XII

### Conclusion

The proposed reorganization of the Bell System raises issues of vast complexity. Because of their importance, not only to the parties but also to the telecommunications industry and to the public, the Court has discussed the various problems in substantial detail. It is appropriate to summarize briefly the major issues and the Court's decisions which are central to the proceeding.

A. The American telecommunications industry is presently dominated by one company—AT & T. It provides local and long-distance telephone service; it manufactures and markets the equipment used by telephone subscribers as well as that used in the telecommunications network; and it controls one of the leading communications research and development facilities in the world. According to credible evidence, this integrated structure has enabled AT & T for many years to undermine the efforts of competitors seeking to enter the telecommunications market.

---

**375.** In order to enable the Court to assess the weight to be accorded to the statements of these individuals, they will also be invited, but not required, to reveal any continuing relation-

ship they may have with AT & T (*i.e.*, reemployment rights, pension plans, informal promises of executive position with AT & T).

The key to the Bell System's power to impede competition has been its control of local telephone service. The local telephone network functions as the gateway to individual telephone subscribers. It must be used by long-distance carriers seeking to connect one caller to another. Customers will only purchase equipment which can readily be connected to the local network through the telephone outlets in their homes and offices. The enormous cost of the wires, cables, switches, and other transmission facilities which comprise that network has completely insulated it from competition. Thus, access to AT & T's local network is crucial if long distance carriers and equipment manufacturers are to be viable competitors.

AT & T has allegedly used its control of this local monopoly to disadvantage these competitors in two principal ways. First, it has attempted to prevent competing long distance carriers and competing equipment manufacturers from gaining access to the local network, or to delay that access, thus placing them in an inferior position vis-a-vis AT & T's own services. Second, it has supposedly used profits earned from the monopoly local telephone operations to subsidize its long distance and equipment businesses in which it was competing with others.

For a great many years, the Federal Communications Commission has struggled, largely without success, to stop practices of this type through the regulatory tools at its command. A lawsuit the Department of Justice brought in 1949 to curb similar practices ended in an ineffectual consent decree. Some other remedy is plainly required; hence the divestiture of the local Operating Companies from the Bell System. This divestiture will sever the relationship between this local monopoly and the other, competitive segments of AT & T, and it will thus ensure—certainly better than could any other type of relief—that the practices which allegedly have lain heavy on the telecommunications industry will not recur.

B. With the loss of control over the local network, AT & T will be unable to disadvantage its competitors, and the restrictions imposed on AT & T after the government's first antitrust suit—which limited AT & T to the provision of telecommunications services—will no longer be necessary. The proposed decree accordingly removes these restrictions.

The decree will thus allow AT & T to become a vigorous competitor in the growing computer, computer-related, and information markets. Other large and experienced firms are presently operating in these markets, and there is therefore no reason to believe that AT & T will be able to achieve monopoly dominance in these industries as it did in telecommunications. At the same time, by use of its formidable scientific, engineering, and management resources, including particularly the capabilities of Bell Laboratories, AT & T should be able to make significant contributions to these fields, which are at the forefront of innovation and technology, to the benefit of American consumers, national defense, and the position of American industry vis-a-vis foreign competition.

All of these developments are plainly in the public interest, and the Court will therefore approve this aspect of the proposed decree, with one exception. Electronic publishing, which is still in its infancy, holds promise to become an important provider of information—such as news, entertainment, and advertising—in competition with the traditional print, television, and radio media; indeed, it has the potential, in time, for actually replacing some of these methods of disseminating information.

Traditionally, the Bell System has simply distributed information provided by others; it has not been involved in the business of generating its own information. The proposed decree would, for the first time, allow AT & T to do both, and it would do so at a time when the electronic publishing industry is still in a fragile state of experimentation and growth and when electronic information can still most efficiently and most economically be distributed over AT & T's long distance network. If, under these circumstances, AT & T were permitted to

engage both in the transmission and the generation of information, there would be a substantial risk not only that it would stifle the efforts of other electronic publishers but that it would acquire a substantial monopoly over the generation of news in the more general sense. Such a development would strike at a principle which lies at the heart of the First Amendment: that the American people are entitled to a diversity of sources of information. In order to prevent this from occurring, the Court will require, as a condition of its approval of the proposed decree, that it be modified to preclude AT & T from entering the field of electronic publishing until the risk of its domination of that field has abated.

C. After the divestiture, the Operating Companies will possess a monopoly over local telephone service. According to the Department of Justice, the Operating Companies must be barred from entering all competitive markets to ensure that they will not misuse their monopoly power. The Court will not impose restrictions simply for the sake of theoretical consistency. Restrictions must be based on an assessment of the realistic circumstances of the relevant markets, including the Operating Companies' ability to engage in anticompetitive behavior, their potential contribution to the market as an added competitor for AT & T, as well as upon the effects of the restrictions on the rates for local telephone service.

This standard requires that the Operating Companies be prohibited from providing long distance services and information services, and from manufacturing equipment used in the telecommunications industry. Participation in these fields carries with it a substantial risk that the Operating Companies will use the same anticompetitive techniques used by AT & T in order to thwart the growth of their own competitors. Moreover, contrary to the assumptions made by some, Operating Company involve-

ment in these areas could not legitimately generate subsidies for local rates. Such involvement could produce substantial profits only if the local companies used their monopoly position to dislodge competitors or to provide subsidy for their competitive services or products—the very behavior the decree seeks to prevent.

Different considerations apply, however, to the marketing of customer premises equipment—the telephone and other devices used in subscribers' homes and offices—and the production of the Yellow Pages advertising directories. For a variety of reasons, there is little likelihood that these companies will be able to use their monopoly position to disadvantage competitors in these areas. In addition, their marketing of equipment will provide needed competition for AT & T, and the elimination of the restriction on their production of the Yellow Pages will generate a substantial subsidy for local telephone rates.[376] The Court will therefore require that the proposed decree be modified to remove the restrictions on these two types of activities.

D. With respect to a number of subjects, the proposed decree establishes merely general principles and objectives, leaving the specific implementing details for subsequent action, principally by the plan of reorganization which AT & T is required to file within six months after entry of the judgment. The parties have also made informal promises, either to each other or to the Court, as to how they intend to interpret or implement various provisions. The Court has decided that its public interest responsibilities require that it establish a process for determining whether the plan of reorganization and other, subsequent actions by AT & T actually implement these principles and promises in keeping with the objectives of the judgment. Absent such a process, AT & T would have the opportunity to interpret and implement the broad

---

**376.** The decree also provides for another method of subsidizing these rates. It permits the Operating Companies, under the supervision of state and federal regulators, to levy access charges upon long distance carriers and those companies that provide information services. These charges may, if the regulators desire, be set at levels which will subsidize for local telephone rates.

principles of the decree in such a manner as to disadvantage its competitors, the Operating Companies, or both, or otherwise to act in a manner contrary to the public interest as interpreted by the Court in this opinion.

For that reason, the Court is requiring that the judgment be modified (1) to vest authority in the Court to enforce the provisions and principles of that judgment on its own rather than only at the request of a party; and (2) to provide for a proceeding, accessible to third party intervenors and to the chief executives of the seven new regional Operating Companies, in which the Court will determine whether the plan of reorganization is consistent with the decree's general principles and promises.

E. For the reasons stated in this opinion, the Court will approve the proposed decree as in the public interest provided that the parties agree to the addition of the following new section:

## VIII

### Modifications

A. Notwithstanding the provisions of section II(D)(2), the separated BOCs shall be permitted to provide, but not manufacture, customer premises equipment.

B. Notwithstanding the provisions of section II(D)(3), the separated BOCs shall be permitted to produce, publish, and distribute printed directories which contain advertisements and which list general product and business categories, the service or product providers under these categories, and their names, telephone numbers, and addresses.

Notwithstanding the provisions of sections I(A)(1), I(A)(2), I(A)(4), all facilities, personnel, systems, and rights to technical information owned by AT & T, its affiliates, or the BOCs which are necessary for the production, publication, and distribution of printed advertising directories shall be transferred to the separated BOCs.

C. The restrictions imposed upon the separated BOCs by virtue of section II(D) shall be removed upon a showing by the petitioning BOC that there is no substantial possibility that it could use its monopoly power to impede competition in the market it seeks to enter.

D. AT & T shall not engage in electronic publishing over its own transmission facilities. "Electronic publishing" means the provision of any information which AT & T or its affiliates has, or has caused to be, originated, authored, compiled, collected, or edited, or in which it has a direct or indirect financial or proprietary interest, and which is disseminated to an unaffiliated person through some electronic means.

Nothing in this provision precludes AT & T from offering electronic directory services that list general product and business categories, the service or product providers under these categories, and their names, telephone numbers, and addresses; or from providing the time, weather, and such other audio services as are being offered as of the date of the entry of the decree to the geographic areas of the country receiving those services as of that date.

Upon application of AT & T, this restriction shall be removed after seven years from the date of entry of the decree, unless the Court finds that competitive conditions clearly require its extension.

E. If a separated BOC provides billing services to AT & T pursuant to Appendix B(C)(2), it shall include upon the portion of the bill devoted to interexchange services the following legend:

This portion of your bill is provided as a service to AT & T. There is no connection between this company and AT & T. You may choose another company for your long distance telephone calls while still receiving your local telephone service from this company.

F. Notwithstanding the provisions of Appendix B(C)(3), whenever, as permitted by the decree, a separated BOC fails to offer exchange access to an interexchange carrier that is equal in type and

quality to that provided for the interexchange traffic of AT & T, the tariffs filed for such less-than-equal access shall reflect the lesser cost, if any, of such access as compared to the exchange access provided AT & T.

G. Facilities and other assets which serve both AT & T and one or more BOCs shall be transferred to the separated BOCs if the use made by such BOC or BOCs predominates over that of AT & T. Upon application by a party or a BOC, the Court may grant an exception to this requirement.

H. At the time of the transfer of ownership provided for in section I(A)(4), the separated BOCs shall have debt ratios of approximately forty-five percent (except for Pacific Telephone and Telegraph Company which shall have a debt ratio of approximately fifty percent), and the quality of the debt shall be representative of the average terms and conditions of the consolidated debt held by AT & T, its affiliates and the BOCs at that time. Upon application by a party or a BOC, the Court may grant an exception to this requirement.

I. The Court may act *sua sponte* to issue orders or directions for the construction or carrying out of this decree, for the enforcement of compliance therewith, and for the punishment of any violation thereof.

J. Notwithstanding the provisions of section I(A), the plan of reorganization shall not be implemented until approved by the Court as being consistent with the provisions and principles of the decree.

F. The United States and AT & T shall within fifteen days hereof submit to the Court their proposed decree, including the modifications listed above, or their statements that they are not prepared to incorporate such modifications. If a modified decree is submitted, the Court will promptly approve it as being in the public interest, and the *AT & T* action will be dismissed. If the parties do not agree to incorporate the modifications, the Court will decline to approve the proposed decree, the 1956 consent decree in the *Western Electric* action will remain in effect, and the *AT & T* trial will resume at a date to be set by the Court.

MODIFICATION OF FINAL JUDGMENT

Plaintiff, United States of America, having filed its complaint herein on January 14, 1949; the defendants having appeared and filed their answer to such complaint denying the substantive allegations thereof; the parties, by their attorneys, having severally consented to a Final Judgment which was entered by the Court on January 24, 1956, and the parties having subsequently agreed that modification of such Final Judgment is required by the technological, economic and regulatory changes which have occurred since the entry of such Final Judgment;

Upon joint motion of the parties and after hearing by the Court, it is hereby

ORDERED, ADJUDGED, AND DECREED that the Final Judgment entered on January 24, 1956, is hereby vacated in its entirety and replaced by the following items and provisions:

I

*AT & T Reorganization*

A. Not later than six months after the effective date of this Modification of Final Judgment, defendant AT & T shall submit to the Department of Justice for its approval, and thereafter implement, a plan of reorganization. Such plan shall provide for the completion, within 18 months after the effective date of this Modification of Final Judgment, of the following steps:

1. The transfer from AT & T and its affiliates to the BOCs, or to a new entity subsequently to be separated from AT & T and to be owned by the BOCs, of sufficient facilities, personnel, systems, and rights to technical information to permit the BOCs to perform, independently of AT & T, exchange telecommunications and exchange access functions, including the procurement for, and engineering, marketing and management of, those functions, and sufficient to enable the BOCs to meet the equal exchange access requirements of Appendix B;

2. The separation within the BOCs of all facilities, personnel and books of account between those relating to the exchange telecommunications or exchange access functions and those relating to other functions (including the provision of interexchange switching and transmission and the provision of customer premises equipment to the public); provided that there shall be no joint ownership of facilities, but appropriate provision may be made for sharing, through leasing or otherwise, of multifunction facilities so long as the separated portion of each BOC is ensured control over the exchange telecommunications and exchange access functions;

3. The termination of the License Contracts between AT & T and the BOCs and other subsidiaries and the Standard Supply Contract between Western Electric and the BOCs and other subsidiaries; and

4. The transfer of ownership of the separated portions of the BOCs providing local exchange and exchange access services from AT & T by means of a spin-off of stock of the separated BOCs to the shareholders of AT & T, or by other disposition; provided that nothing in this Modification of Final Judgment shall require or prohibit the consolidation of the ownership of the BOCs into any particular number of entities.

B. Notwithstanding separation of ownership, the BOCs may support and share the costs of a centralized organization for the provision of engineering, administrative and other services which can most efficiently be provided on a centralized basis. The BOCs shall provide, through a centralized organization, a single point of contact for coordination of BOCs to meet the requirements of national security and emergency preparedness.

C. Until September 1, 1987, AT & T, Western Electric, and the Bell Telephone Laboratories, shall, upon order of any BOC, provide on a priority basis all research, development, manufacturing, and other support services to enable the BOCs to fulfill the requirements of this Modification of Final Judgment. AT & T and its affiliates shall take no action that interferes with the BOCs' requirements of nondiscrimination established by section II.

D. After the reorganization specified in paragraph I(A)(4), AT & T shall not acquire the stock or assets of any BOC.

II

*BOC Requirements*

A. Subject to Appendix B, each BOC shall provide to all interexchange carriers and information service providers exchange access, information access, and exchange services for such access on an unbundled, tariffed basis, that is equal in type, quality, and price to that provided to AT & T and its affiliates.

B. No BOC shall discriminate between AT & T and its affiliates and their products and services and other persons and their products and services in the:

1. procurement of products and services;
2. establishment and dissemination of technical information and procurement and interconnection standards;
3. interconnection and use of the BOC's telecommunications service and facilities or in the charges for each element of service; and
4. provision of new services and the planning for and implementation of the construction or modification of facilities, used to provide exchange access and information access.

C. Within six months after the reorganization specified in paragraph I(A)(4), each BOC shall submit to the Department of Justice procedures for ensuring compliance with the requirements of paragraph B.

D. After completion of the reorganization specified in section I, no BOC shall, directly or through any affiliated enterprise:

1. provide interexchange telecommunications services or information services;
2. manufacture or provide telecommunications products or customer premises equipment (except for provision of customer premises equipment for emergency services); or

3. provide any other product or service, except exchange telecommunications and exchange access service, that is not a natural monopoly service actually regulated by tariff.

## III

### Applicability and Effect

The provisions of this Modification of Final Judgment, applicable to each defendant and each BOC, shall be binding upon said defendants and BOCs, their affiliates, successors and assigns, officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with each defendant and BOC who receive actual notice of this Modification of Final Judgment by personal service or otherwise. Each defendant and each person bound by the prior sentence shall cooperate in ensuring that the provisions of this Modification of Final Judgment are carried out. Neither this Modification of Final Judgment nor any of its terms or provisions shall constitute any evidence against, an admission by, or an estoppel against any party or BOC. The effective date of this Modification of Final Judgment shall be the date upon which it is entered.

## IV

### Definitions

For the purposes of this Modification of Final Judgment:

A. "Affiliate" means any organization or entity, including defendant Western Electric Company, Incorporated, and Bell Telephone Laboratories, Incorporated, that is under direct or indirect common ownership with or control by AT & T or is owned or controlled by another affiliate. For the purposes of this paragraph, the terms "ownership" and "owned" mean a direct or indirect equity interest (or the equivalent thereof) of more than fifty (50) percent of an entity. "Subsidiary" means any organization or entity in which AT & T has stock ownership, whether or not controlled by AT & T.

B. "AT & T" shall mean defendant American Telephone and Telegraph Company and its affiliates.

C. "Bell Operating Companies" and "BOCs" mean the corporations listed in Appendix A attached to this Modification of Final Judgment and any entity directly or indirectly owned or controlled by a BOC or affiliated through substantial common ownership.

D. "Carrier" means any person deemed a carrier under the Communications Act of 1934 or amendments thereto, or, with respect to intrastate telecommunications, under the laws of any State.

E. "Customer premises equipment" means equipment employed on the premises of a person (other than a carrier) to originate, route, or terminate telecommunications, but does not include equipment used to multiplex, maintain, or terminate access lines.

F. "Exchange access" means the provision of exchange services for the purpose of originating or terminating interexchange telecommunications. Exchange access services include any activity or function performed by a BOC in connection with the origination or termination of interexchange telecommunications, including but not limited to, the provision of network control signalling, answer supervision, automatic calling number identification, carrier access codes, directory services, testing and maintenance of facilities and the provision of information necessary to bill customers. Such services shall be provided by facilities in an exchange area for the transmission, switching, or routing, within the exchange area, of interexchange traffic originating or terminating within the exchange area, and shall include switching traffic within the exchange area above the end office and delivery and receipt of such traffic at a point or points within an exchange area designated by an interexchange carrier for the connection of its facilities with those of the BOC. Such connections, at the option of the interexchange carrier, shall deliver traffic with signal quality and characteristics equal to that provided similar traffic of

AT & T, including equal probability of blocking, based on reasonable traffic estimates supplied by each interexchange carrier. Exchange services for exchange access shall not include the performance by any BOC of interexchange traffic routing for any interexchange carrier. In the reorganization specified in section I, trunks used to transmit AT & T's traffic between end offices and class 4 switches shall be exchange access facilities to be owned by the BOCs.

G. "Exchange area," or "exchange" means a geographic area established by a BOC in accordance with the following criteria:

1. any such area shall encompass one or more contiguous local exchange areas serving common social, economic, and other purposes, even where such configuration transcends municipal or other local governmental boundaries;

2. every point served by a BOC within a State shall be included within an exchange area;

3. no such area which includes part or all of one standard metropolitan statistical area (or a consolidated statistical area, in the case of densely populated States) shall include a substantial part of any other standard metropolitan statistical area (or a consolidated statistical area, in the case of densely populated States), unless the Court shall otherwise allow; and

4. *except with approval of the Court, no exchange area located in one State shall include any point located within another State.*

H. "Information" means knowledge or intelligence represented by any form of writing, signs, signals, pictures, sounds, or other symbols.

I. *"Information access"* means the provision of specialized exchange telecommunications services by a BOC in an exchange area in connection with the origination, termination, transmission, switching, forwarding or routing of telecommunications traffic to or from the facilities of a provider of information services. Such specialized exchange telecommunications services include, where necessary, the provision of network control signalling, answer supervision, automatic calling number identification, carrier access codes, testing and maintenance of facilities, and the provision of information necessary to bill customers.

J. "Information service" means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information which may be conveyed via telecommunications, except that such service does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.

K. "Interexchange telecommunications" means telecommunications between a point or points located in one exchange telecommunications area and a point or points located in one or more other exchange areas or a point outside an exchange area.

L. "Technical information" means intellectual property of all types, including, without limitation, patents, copyrights, and trade secrets, relating to planning documents, designs, specifications, standards, and practices and procedures, including employee training.

N. "Telecommunications equipment" means equipment, other than customer premises equipment, used by a carrier to provide telecommunications services.

O. "Telecommunications" means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received, by means of electromagnetic transmission medium, including all instrumentalities, facilities, apparatus, and services (including the collection, storage, forwarding, switching, and delivery of such information) essential to such transmission.

P. "Telecommunications service" means the offering for hire of telecommunications facilities, or of telecommunications by means of such facilities.

Q. "Transmission facilities" means equipment (including without limitation

wire, cable, microwave, satellite, and fibre-optics) that transmit information by electromagnetic means or which directly support such transmission, but does not include customer premises equipment.

## V

### Compliance Provisions

The defendants, each BOC, and affiliated entities are ordered and directed to advise their officers and other management personnel with significant responsibility for matters addressed in this Modification of Final Judgment of their obligations hereunder. Each BOC shall undertake the following with respect to each such officer or management employee:

1. The distribution to them of a written directive setting forth their employer's policy regarding compliance with the Sherman Act and with this Modification of Final Judgment, with such directive to include:

(a) an admonition that non-compliance with such policy and this Modification of Final Judgment will result in appropriate disciplinary action determined by their employer and which may include dismissal; and

(b) advice that the BOCs' legal advisors are available at all reasonable times to confer with such persons regarding any compliance questions or problems;

2. The imposition of a requirement that each of them sign and submit to their employer a certificate in substantially the following form:

The undersigned hereby (1) acknowledges receipt of a copy of the 1982 *United States v. Western Electric* Modification of Final Judgment and a written directive setting forth Company policy regarding compliance with the antitrust laws and with such Modification of Final Judgment, (2) represents that the undersigned has read such Modification of Final Judgment and directive and understands those provisions for which the undersigned has responsibility, (3) acknowledges that the undersigned has been advised and understands that non-compliance with such policy and Modification of Final Judgment will result in appropriate disciplinary measures determined by the Company and which may include dismissal, and (4) acknowledges that the undersigned has been advised and understands that non-compliance with the Modification of Final Judgment may also result in conviction for contempt of court and imprisonment and/or fine.

## VI

### Visitorial Provisions

A. For the purpose of determining or securing compliance with this Modification of Final Judgment, and subject to any legally recognized privilege, from time to time:

1. Upon written request of the Attorney General or of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to a defendant or after the reorganization specified in section I, a BOC, made to its principal office, duly authorized representatives of the Department of Justice shall be permitted access during office hours of such defendants or BOCs to depose or interview officers, employees, or agents, and inspect and copy all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of such defendant, BOC, or subsidiary companies, who may have counsel present, relating to any matters contained in this Modification of Final Judgment; and

2. Upon the written request of the Attorney General or of the Assistant Attorney General in charge of the Antitrust Division made to a defendant's principal office or, after the reorganization specified in section I, a BOC, such defendant, or BOC, shall submit such written reports, under oath if requested, with respect to any of the matters contained in this Modification of Final Judgment as may be requested.

B. No information or documents obtained by the means provided in this section shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Executive Branch of the United States or the Federal Communications Commission, except in the course of legal proceedings to which the United States is a party, or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

C. If at the time information or documents are furnished by a defendant to plaintiff, such defendant or BOC represents and identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and said defendant or BOC marks each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then 10 days' notice shall be given by plaintiff to such defendant or BOC prior to divulging such material in any legal proceeding (other than a grand jury proceeding) to which that defendant or BOC is not a party.

## VII

### *Retention of Jurisdiction*

Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Modification of Final Judgment, or, after the reorganization specified in section I, a BOC to apply to this Court at any time for such further orders or directions as may be necessary or appropriate for the construction or carrying out of this Modification of Final Judgment, for the modification of any of the provisions hereof, for the enforcement of compliance herewith, and for the punishment of any violation hereof.

## VIII

### *Modifications*

A. Notwithstanding the provisions of section II(D)(2), the separated BOCs shall be permitted to provide, but not manufacture, customer premises equipment.

B. Notwithstanding the provisions of section II(D)(3), the separated BOCs shall be permitted to produce, publish, and distribute printed directories which contain advertisements and which list general product and business categories, the service or product providers under these categories, and their names, telephone numbers, and addresses.

Notwithstanding the provisions of sections I(A)(1), I(A)(2), I(A)(4), all facilities, personnel, systems, and rights to technical information owned by AT & T, its affiliates, or the BOCs which are necessary for the production, publication, and distribution of printed advertising directories shall be transferred to the separated BOCs.

C. The restrictions imposed upon the separated BOCs by virtue of section II(D) shall be removed upon a showing by the petitioning BOC that there is no substantial possibility that it could use its monopoly power to impede competition in the market it seeks to enter.

D. AT & T shall not engage in electronic publishing over its own transmission facilities. "Electronic publishing" means the provision of any information which AT & T or its affiliates has, or has caused to be, originated, authored, compiled, collected, or edited, or in which it has a direct or indirect financial or proprietary interest, and which is disseminated to an unaffiliated person through some electronic means.

Nothing in this provision precludes AT & T from offering electronic directory services that list general product and business categories, the service or product providers under these categories, and their names, telephone numbers, and addresses; or from providing the time, weather, and such other audio services as are being offered as of the date of the entry of the decree to the geographic areas of the country receiving those services as of that date.

Upon application of AT & T, this restriction shall be removed after seven years from the date of entry of the decree, unless the Court finds that competitive conditions clearly require its extension.

E. If a separated BOC provides billing services to AT & T pursuant to Appendix B(C)(2), it shall include upon the portion of the bill devoted to interexchange services the following legend:

This portion of your bill is provided as a service to AT & T. There is no connection between this company and AT & T. You may choose another company for your long distance telephone calls while still receiving your local telephone service from this company.

F. Notwithstanding the provisions of Appendix B(C)(3), whenever, as permitted by the decree, a separated BOC fails to offer exchange access to an interexchange carrier that is equal in type and quality to that provided for the interexchange traffic of AT & T, the tariffs filed for such less-than-equal access shall reflect the lesser cost, if any, of such access as compared to the exchange access provided AT & T.

G. Facilities and other assets which serve both AT & T and one or more BOCs shall be transferred to the separated BOCs if the use made by such BOC or BOCs predominates over that of AT & T. Upon application by a party or a BOC, the Court may grant an exception to this requirement.

H. At the time of the transfer of ownership provided for in section I(A)(4), the separated BOCs shall have debt ratios of approximately forty-five percent (except for Pacific Telephone and Telegraph Company which shall have a debt ratio of approximately fifty percent), and the quality of the debt shall be representative of the average terms and conditions of the consolidated debt held by AT & T, its affiliates and the BOCs at that time. Upon application by a party or a BOC, the Court may grant an exception to this requirement.

I. The Court may act *sua sponte* to issue orders or directions for the construction or carrying out of this decree, for the enforcement of compliance therewith, and for the punishment of any violation thereof.

J. Notwithstanding the provisions of section I(A), the plan of reorganization shall not be implemented until approved by the Court as being consistent with the provisions and principles of the decree.

## APPENDIX A

Bell Telephone Company of Nevada

Illinois Bell Telephone Company

Indiana Bell Telephone Company, Incorporated

Michigan Bell Telephone Company

New England Telephone and Telegraph Company

New Jersey Bell Telephone Company

New York Telephone Company

Northwestern Bell Telephone Company

Pacific Northwest Bell Telephone Company

South Central Bell Telephone Company

Southern Bell Telephone and Telegraph Company

Southwestern Bell Telephone Company

The Bell Telephone Company of Pennsylvania

The Chesapeake and Potomac Telephone Company

The Chesapeake and Potomac Telephone Company of Maryland

The Chesapeake and Potomac Telephone Company of Virginia

The Chesapeake and Potomac Telephone Company of West Virginia

The Diamond State Telephone Company

The Mountain States Telephone and Telegraph Company

The Ohio Bell Telephone Company

The Pacific Telephone and Telegraph Company

Wisconsin Telephone Company

## APPENDIX B

### PHASED–IN BOC PROVISION OF EQUAL EXCHANGE ACCESS

A. 1. As part of its obligation to provide non-discriminatory access to interexchange carriers, no later than September 1, 1984, each BOC shall begin to offer to all

interexchange carriers exchange access on an unbundled, tariffed basis, that is equal in type and quality to that provided for the interexchange telecommunications services of AT & T and its affiliates. No later than September 1, 1985, such equal access shall be offered through end offices of each BOC serving at least one-third of that BOC's exchange access lines and, upon bona fide request, every end office shall offer such access by September 1, 1986. Nothing in this Modification of Final Judgment shall be construed to permit a BOC to refuse to provide to any interexchange carrier or information service provider, upon bona fide request, exchange or information access superior or inferior in type or quality to that provided for AT & T's interexchange services or information services at charges reflecting the reduced or increased cost of such access.

2. (i) Notwithstanding paragraph (1), in those instances in which a BOC is providing exchange access for Message Telecommunications Service on the effective date of this Modification of Final Judgment through access codes that do not permit the designation of more than one interexchange carrier, then, in accordance with the schedule set out in paragraph (1), exchange access for additional carriers shall be provided through access codes containing the minimum number of digits necessary at the time access is sought to permit nationwide, multiple carrier designation for the number of interexchange carriers reasonably expected to require such designation in the immediate future.

(ii) Each BOC shall, in accordance with the schedule set out in paragraph (1), offer as a tariffed service exchange access that permits each subscriber automatically to route, without the use of access codes, all the subscriber's interexchange communications to the interexchange carrier of the customer's designation.

(iii) At such time as the national numbering area (area code) plan is revised to require the use of additional digits, each BOC shall provide exchange access to every interexchange carrier, including AT & T, through a uniform number of digits.

3. Notwithstanding paragraphs (1) and (2), with respect to access provided through an end office employing switches technologically antecedent to electronic, stored program control switches or those offices served by switches that characteristically serve fewer than 10,000 access lines, a BOC may not be required to provide equal access through a switch if, upon complaint being made to the Court, the BOC carries the burden of showing that for particular categories of services such access is not physically feasible except at costs that clearly outweigh potential benefits to users of telecommunications services. Any such denial of access under the preceding sentence shall be for the minimum divergence in access necessary, and for the minimum time necessary, to achieve such feasibility.

B. 1. The BOCs are ordered and directed to file, to become effective on the effective date of the reorganization described in paragraph I(A)(4), tariffs for the provision of exchange access including the provision by each BOC of exchange access for AT & T's interexchange telecommunications. Such tariffs shall provide unbundled schedules of charges for exchange access and shall not discriminate against any carrier or other customer. Such tariffs shall replace the division of revenues process used to allocate revenues to a BOC for exchange access provided for the interexchange telecommunications of BOCs or AT & T.

2. Each tariff for exchange access shall be filed on an unbundled basis specifying each type of service, element by element, and no tariff shall require an interexchange carrier to pay for types of exchange access that it does not utilize. The charges for each type of exchange access shall be cost justified and any differences in charges to carriers shall be cost justified on the basis of differences in services provided.

3. Notwithstanding the requirements of paragraph (2), from the date of reorganization specified in section I until September 1, 1991, the charges for delivery or receipt of traffic of the same type between end offices and facilities of interexchange carriers

within an exchange area, or within reasonable subzones of an exchange area, shall be equal, per unit of traffic delivered or received, for all interexchange carriers; provided, that the facilities of any interexchange carrier within five miles of an AT & T class 4 switch shall, with respect to end offices served by such class 4 switch, be considered to be in the same subzone as such class 4 switch.

4. Each BOC offering exchange access as part of a joint or through service shall offer to make exchange access available to all interexchange carriers on the same terms and conditions, and at the same charges, as are provided as part of a joint or through service, and no payment or consideration of any kind shall be retained by the BOC for the provision of exchange access under such joint or through service other than through tariffs filed pursuant to this paragraph.

C. 1. Nothing in this Modification of Final Judgment shall be construed to require a BOC to allow joint ownership or use of its switches, or to require a BOC to allow co-location in its building of the equipment of other carriers. When a BOC uses facilities that (i) are employed to provide exchange telecommunications or exchange access or both, and (ii) are also used for the transmission or switching of interexchange telecommunications, then the costs of such latter use shall be allocated to the interexchange use and shall be excluded from the costs underlying the determination of charges for either of the former uses.

2. Nothing in this Modification of Final Judgment shall either require a BOC to bill customers for the interexchange services of any interexchange carrier or preclude a BOC from billing its customers for the interexchange services of any interexchange carrier it designates, provided that when a BOC does provide billing services to an interexchange carrier, the BOC may not discontinue local exchange service to any customer because of nonpayment of interexchange charges unless it offers to provide billing services to all interexchange carriers, and provided further that the BOC's cost of any

such billing shall be included in its tariffed access charges to that interexchange carrier.

3. Whenever, as permitted by this Modification of Final Judgment, a BOC fails to offer exchange access to an interexchange carrier that is equal in type and quality to that provided for the interexchange traffic of AT & T, nothing in this Modification of Final Judgment shall prohibit the BOC from collecting reduced charges for such less-than-equal exchange access to reflect the lesser value of such exchange access to the interexchange carrier and its customers compared to the exchange access provided AT & T.